## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| FUJIFILM NORTH AMERICA CORPORATION, FUJIFILM CORPORATION, AND FUJIFILM PRINTING PLATE (CHINA) CO. LTD., )<br><br>Plaintiffs, )<br><br>v. )<br><br>UNITED STATES, )<br><br>Defendant, )<br><br>EASTMAN KODAK COMPANY, )<br><br>Defendant-Intervenor. )| Court No. 24-00251 |

## PLAINTIFFS' RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to U.S. Court of International Trade Rule 56.2, Fujifilm North America Corporation, Fujifilm Corporation, and Fujifilm Printing Plate (China) Co. Ltd., ("Fujifilm" or "Plaintiffs") respectfully move for judgment upon the agency record in this court action. Plaintiffs seek judicial review of the U.S. International Trade Commission's ("ITC" or "Commission") affirmative final material injury determination in the antidumping investigation of aluminum lithographic printing plates ("ALPs") from Japan and China. *Aluminum Lithographic Printing Plates from China and Japan*, Inv. Nos.

701-TA-694 and 731-TA-1641-1642, USITC Pub. 5559 (Nov. 2024) ("Final

Determination").

For the reasons set forth in the attached Memorandum in Support of Plaintiff

Fujifilm's Rule 56.2 Motion for Judgment on the Agency Record, which is hereby

incorporated into this motion by reference, the ITC's final determination is unsupported

by substantial evidence on the record and is otherwise not in accordance with law.

WHEREFORE, Plaintiffs respectfully request that this Court enter an Order:

  (1) holding the Final Determination unlawful and

  (2) remanding the Final Determination with instructions for the ITC to render a new

      determination consistent with Fujifilm's Memorandum of Law and the Court's

      decision.

Respectfully submitted,

/s/ Daniel L. Porter

Daniel L. Porter
James P. Durling
Matthew P. McCullough
William Sjoberg
Gina M. Colarusso
William Chandler
John Taishu Pitt

**Pillsbury Winthrop Shaw Pittman LLP**
1200 17th Street, N.W. Washington, D.C. 20036
202-663-8000

*Counsel to Fujifilm*

**Date: July 22, 2025**

## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| **FUJIFILM NORTH AMERICA CORPORATION, FUJIFILM CORPORATION, AND FUJIFILM PRINTING PLATE (CHINA) CO. LTD.,** | ) ) ) ) |
| **Plaintiffs,** | ) ) **Court No. 24-00251** |
| **v.** | ) ) **NON-CONFIDENTIAL** ) **VERSION** |
| **UNITED STATES,** | ) ) *Confidential information* |
| **Defendant,** | ) *removed from pages 6, 27-28,* ) *30, 36, and 39-44.* |
| **EASTMAN KODAK COMPANY,** | ) ) |
| **Defendant-Intervenor.** | ) ) |

## PLAINTIFF FUJIFILM'S RULE 56.2 MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT ON THE AGENCY RECORD

Daniel L. Porter
James P. Durling
Matthew P. McCullough
William Sjoberg
Gina M. Colarusso
William Chandler
John Taishu Pitt

**Pillsbury Winthrop Shaw Pittman LLP**
1200 17th St, N.W.
Washington, D.C. 20036
202-663-8140

*Counsel for Fujifilm*

**July 22, 2025**

# TABLE OF CONTENTS

Page

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................. 1

PLAINTIFFS' STATEMENTS PURSUANT TO RULE 56.2 .......................................... 4

    A.    Administrative Determination Under Appeal ............................................... 4

    B.    Issues of Law Presented ................................................................................. 4

    C.    Statement of Reasons for Remanding the Commission's Determination ..... 5

STATEMENT OF FACTS ........................................................................................... 6

ARGUMENT ............................................................................................................ 10

I.    THE APPLICABLE STANDARD OF REVIEW REQUIRES DIFFERENT
APPROACHES TO STATUTORY INTERPRETATION AND SUBSTANTIAL
EVIDENCE ARGUMENTS ................................................................................ 10

    A.    *Loper Bright* Governs This Court's Review of the ITC's Interpretations of
Statutory Language ..................................................................................... 10

    B.    Substantial Evidence Requires A Probing Review Of The Evidentiary
Record .......................................................................................................... 11

II.    THE MAJORITY'S DECISION ON INJURY FROM SUBJECT IMPORTS IS
NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND IS OTHERWISE
NOT IN ACCORDANCE WITH LAW ............................................................... 13

    A.    The Commission's Decision To Include Fujifilm Greenwood Within The
Domestic Industry Was Not In Accordance With Law And Unsupported By
Substantial Evidence ................................................................................... 13

        1.    The Majority's analytic approach misinterpreted the relevant
statutory provisions and therefore was unlawful ............................. 14

            a.    The related party provision under *Chevron* .......................... 14

            b.    The related party provision in light of *Loper Bright* ............. 15

            c.    The Majority's post-*Loper Bright* determination does not
withstand judicial scrutiny ...................................................... 17

2.    In any event, the Majority's application was unsupported by substantial evidence ........................................................... 20

B.    The Conclusion That The Volume of Subject Imports Was "Significant" Is Not In Accordance With Law Nor Supported by Substantial Evidence ..... 22

1.    The significant volume analysis does not satisfy the statutory requirements ...................................................................... 22

2.    The significant volume conclusion is unsupported by substantial evidence .......................................................................... 25

C.    The Majority's Conclusion of Adverse Price Effects Is Not Supported by Substantial Evidence and Is Otherwise Not In Accordance With Law ...... 29

1.    The Majority ignored the statutory mandate to consider all three pricing factors as a whole, and therefore reached a finding of adverse effect on domestic prices that was not in accordance with law ....... 29

a.    The Commission ignored the statutory mandate to consider and integrate the evidence about price effects ...................... 31

(i)    The statute requires the Commission to consider all three pricing factors to evaluate any possible "effect" on domestic *prices* .................................................... 31

(ii)    The Commission failed to follow the statutory mandate to consider all three pricing factors as a whole .......... 33

2.    The Majority's subsidiary conclusions in its price effects analysis are not supported by substantial evidence ............................................... 36

a.    The record does not support that price is more important than other factors for U.S. ALP purchasers ................................... 36

b.    The record does not support that there is a high degree of substitutability between subject imports and U.S. produced ALPs ...................................................................................... 37

c.    The Record does not support the conclusion that Fujifilm's pricing product data could not be used .................................. 38

d.    The record does not support that a subset of the pricing product data – top 10 customers – was more probative for underselling analysis ........................................................... 39

e.   There is little to no support that certain customers purchased subject imports instead of Kodak's ALPs because of lower prices ................................................................................ 40

3.   The Majority's ultimate conclusion that lower prices caused purchasers to buy subject imports rather than U.S. products is not supported by substantial evidence; indeed, the evidence from the purchasers confirms the opposite ..................................................... 43

D.   The Majority's Conclusion of Adverse Impact from Subject Imports Is Not Supported by Substantial Evidence and Is Otherwise Not In Accordance With Law ............................................................................................... 45

1.   The Majority applied the wrong approach to determine adverse impact, ignoring the need to find declines and negative effects and not just the lack of greater gains ....................................................... 46

2.   The Majority improperly confused the cause and the effect............ 48

3.   The Majority improperly ignored key evidence showing that any adverse trends resulted from other factors, and were not by reason of subject imports ................................................................................ 49

a.   Lack of correlation ................................................................. 49

b.   Declining demand ................................................................. 51

c.   Customer testimony about non-price factors ........................ 53

d.   The factors as a whole........................................................... 54

CONCLUSION AND PRAYER FOR RELIEF ............................................................. 56

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Altx, Inc. v. United States*, 26 CIT 709 (2002) ...................................................... 24, 25, 26

*Lashify, Inc. v. Int'l Trade Comm'n*, 130 F.4th 948 (Fed. Cir. 2025) ............................... 10

*LG Elecs., Inc. v. United States Int'l Trade Comm'n*, 38 CIT 1562 (2014) ....... 14CIT 1415

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) .................................... passim

*Nippon Steel Corp. v. United States*, 25 CIT 1415 (2001) ................................................ 24

*Nippon Steel Corp. v. United States*, 27 CIT 1856 (2003) ................................................ 12

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003) ............................. 36

*NSK Corp. v. United States*, 33 CIT 1185 (2009) ............................................................. 12

*Nucor Corp. v. United States*, 28 CIT 188 (2004) ........................................................... 24

*OCP S.A. v. United States*, 658 F. Supp. 3d 1297 (Ct. Int'l Trade 2023) .................. 24, 25

*OCTAL Inc. v. United States*, 539 F. Supp. 3d 1291 (Ct. Int'l Trade 2021) .................... 32

*Suramerica de Aleaciones Laminadas, C.A. v. United States*,
    44 F.3d 978 (Fed. Cir. 1994) ........................................................................................ 12

*Swiff-Train Co. v. United States*, 793 F.3d 1355 (Fed. Cir. 2015) ................................... 11

*Tenaris Bay City, Inc. v. United States*,
    No. 22-00344, 2025 WL 1720173 (Ct. Int'l Trade June 20, 2025) ............................. 11

*Timken Co. v. United States*, 12 CIT 955 (1988) ............................................................. 12

*Timken Co. v. United States*, 894 F.2d 385 (Fed. Cir. 1990) ........................................... 12

*U.S. Steel Group v. United States,* 25 CIT 1046 (2001) .................................................... 12

*United Steel Workers v. United States*,
    348 F. Supp. 3d 1328 (Ct. Int'l Trade 2018) ............................................................... 33

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) .................................................. 11

*USX Corp. v. United States*, 11 CIT 82 (1987) ...................................................... 23

*Ventura Coastal, LLC v. United States*,
    736 F. Supp. 3d 1342 (Ct. Int'l Trade 2024) ....................................... 11, 15

**Federal Statutes**

19 U.S.C. § 1516a(b). ............................................................................... 10

19 U.S.C. § 1673(2) ................................................................................. 16

19 U.S.C. § 1673b(a)(1)(A) ...................................................................... 16

19 U.S.C. § 1673d(b) ......................................................................... 16, 31, 45

19 U.S.C. § 1677(4)(B) ........................................................................ 14, 17

19 U.S.C. § 1677(7)(H) .................................................................... passim

**Administrative Determinations**

*Aluminum Lithographic Printing Plates From China and Japan: Determinations*,
    89 Fed. Reg. 90,737 (Nov. 18, 2024) ............................................................ 4

*Aluminum Lithographic Printing Plates from China and Japan*, Inv. Nos. 701-TA-694
    and 731-TA-1641-1642, USITC Pub. 5559 (Nov. 2024) ................................. 4

**Other Authorities**

S. Rep. No. 96-249 (1979) ...................................................................... 18, 24

*Significant*, BLACK'S LAW DICTIONARY (11th ed. 2019) ................................. 23

*Significant*, MERRIAM-WEBSTER.COM, https://www.merriam-
    webster.com/dictionary/significant (visited July 15, 2025) ........................... 23

Statement of Administrative Action for the Uruguay Round Agreements Act,
    H.R. Rep. No. 103-316 (1994) .......................................................... 14, 15, 18

**INTRODUCTION AND SUMMARY OF ARGUMENT**

The Majority determination is this case is utterly at odds with the factual reality reflected in the record evidence.  In light of declining global and U.S. demand, Fujifilm decided to close its U.S. production facility to better align supply with demand.  This change led the remaining domestic producer – the Eastman Kodak Company ("Kodak") – to experience increasing prices, improved profitability, and a larger share of the shrinking U.S. market.  The Dissent correctly understood these dynamics.  Yet the Majority found that Fujifilm's substitution of imports for its own U.S. production somehow was the cause of *current* injury to the "domestic industry."  The Majority reached this completely counter-intuitive determination through a combination of erroneous statutory interpretations, and by ignoring substantial record evidence.

Regarding the composition of the domestic industry, the Majority mechanically followed its historical test and ignored the statutory framework, which provides that the International Trade Commission ("Commission" or "ITC") should exclude those related parties that might distort the analysis and mask injury to a domestic industry.  Yet here the Majority inverted its usual paradigm.  Instead of excluding a related party because its positive trends were masking injury, the Majority included a related party only because its negative trends allowed masking the positive trends for the *current* domestic industry.  Essentially, Kodak's 2021-2023 trends were so positive that the Majority defined the domestic industry to mask those trends.  The Majority found injury by reason of imports only by finding that Fujifilm harmed itself.

*NON-CONFIDENTIAL VERSION*

Regarding the volume of imports, the Majority myopically focused on subject import trends in isolation and ignored factual context showing those imports were not "significant."  In doing so, the Commission unlawfully misinterpreted the statutory term "significant."  Critically, the imports here were simply Fujifilm changing the supply source for its existing customers, switching them from U.S. product from Greenwood to imports.  That is why even though imports increased, Kodak gained market share over the 2021-2023 period.  The Majority ignored this context and simply noted the import increase without any explanatory context.

Regarding the price effects of imports, the Majority's errors were even more egregious.  Confronting a record that showed <u>no price depression and no price suppression</u>, the Majority simply ignored those key statutory facts.  There was thus no showing of actual adverse price effects, since domestic prices were increasing and rising faster than costs.  Instead, the Majority asserted adverse price effects because Kodak allegedly lost volume because of alleged underselling.  But this reasoning ignored the statutory framework for assessing price effects and was not grounded in substantial evidence.  In fact, the record showed that overall Fujifilm prices were generally higher than Kodak's, purchasers made their decisions largely for non-price reasons, and key purchasers specifically confirmed they did not buy imports because of lower prices.  In the face of such overwhelming evidence, the Majority ignored the complete record and instead based its conclusions on a subset of the pricing data and a complete misinterpretation of certain purchaser questionnaire responses.

Finally, regarding the impact of subject imports, the Majority ignored the lack of any meaningful correlation and dismissed the important role of factors other than imports. The record here was utterly inconsistent with the alleged causal link to imports: as imports increased over the period, Kodak experienced increasing prices, improved profitability, and a larger share of the shrinking market. The Majority's only answer in the face of such positive trends was to assert that Kodak could have done even better without imports. But the statutory standard does not permit such an expansive view. Under the statute, imports must be the cause of some actual adverse impacts – some declines or negative trends – and not just the missed opportunity of even greater gains without imports. Moreover, the majority ignored the statutory requirement to consider other possible causes. Here, the declining overall demand explained far more of the industry trends than imports. The Majority noted the declining demand, but then essentially ignored that factor when crafting a narrative in service of its desired outcome.

We urge the Court to review the record carefully, and in light of the statutory standards. The Supreme Court in *Loper Bright* recently reminded us that courts play a critical role interpreting statutory standards and holding agencies accountable to the statute. In the past, courts may have been more inclined to defer to the Commission's interpretation of its governing statute. But this case illustrates the mischief an agency can create when its decisions are unmoored from the relevant statutory requirements and the underlying evidentiary record. This case requires a remand so the agency can apply the statute correctly and respect all of the record evidence.

## PLAINTIFFS' STATEMENTS PURSUANT TO RULE 56.2

### A.    Administrative Determination Under Appeal

Fujifilm North America Corp., Fujifilm Corp., and Fujifilm Printing Plate (China)

Co. Ltd. (collectively "Fujifilm" or "Plaintiffs") seek judicial review of the

Commission's affirmative final material injury determination in the antidumping

investigation of aluminum lithographic printing plates ("ALPs") from Japan and China.

This determination was published in the Federal Register on November 18, 2024.

*Aluminum Lithographic Printing Plates From China and Japan: Determinations*, 89 Fed.

Reg. 90,737 (Nov. 18, 2024), P.R. 104; *Aluminum Lithographic Printing Plates from*

*China and Japan*, Inv. Nos. 701-TA-694 and 731-TA-1641-1642, USITC Pub. 5559

(Nov. 2024) ("*ITC Final Determination*"), P.R. 101.[1]

### B.    Issues of Law Presented

This appeal presents the following issues of law:

- Whether the decision to include Fujifilm-Greenwood in the composition of the relevant domestic industry reflects an unlawful interpretation of the statute and is unsupported by substantial evidence;

- Whether the conclusion that the volume of subject imports was "significant" is unsupported by substantial evidence and is otherwise not in accordance with law;

- Whether the conclusion of significant adverse price effects is unsupported by substantial evidence and is not otherwise in accordance with law; and

- Whether the conclusion of adverse impact is unsupported by substantial evidence and is not otherwise in accordance with law.

---

[1] For ease in document reference, hereinafter, Plaintiffs refer to the Commission Majority's final opinion as: Views of the Commission (Nov. 14, 2024) ("*Majority*"), C.R. 170, and the dissenting views as: Dissenting Views of Comm. Johanson (Nov. 14, 2024) ("*Dissent*"), C.R. 171.

*NON-CONFIDENTIAL VERSION*

**C.      Statement of Reasons for Remanding the Commission's Determination**

The Majority injury determination must be remanded because its subsidiary conclusions are not supported by substantial evidence and are otherwise not in accordance with law.  The Majority adopted legal interpretations contrary to applicable statutory provisions and also adopted factual findings that improperly ignored contrary evidence and therefore were not supported by substantial evidence.

## STATEMENT OF FACTS

Plaintiffs challenge the Majority's affirmative injury determination for ALPs. Fujifilm's Complaint sets forth the procedural progression of the underlying injury proceeding. However, there are several key facts from the administrative record about the competitive dynamics of the ALP market – the declining demand, the few suppliers, and Fujifilm's decision making in that light – that are critical to understanding the errors in the Majority's determination on appeal here.

### **ALPs face longer-term decline in demand**

Underlying demand for ALPs is a function of demand for printed materials, such as newspapers, brochures, and school yearbooks (among many others). Commission Staff Report – Final and Preliminary (Oct. 2024) ("Staff Report") at 1.3, C.R. 163. With the growth of electronic media and communications, the overall demand for printed materials has been trending downwards.

The evidentiary record here confirmed this fact. The overall decline – as measured by ALP plate consumption – over the three full years from 2021 to 2023 was [    ] percent. *Id.* at 4.21 and 4.22. For the three year-over-year comparison periods, the decline has averaged [    ] percent each year. *Id.*

This trend was further confirmed by third-party analysts. For example, the evidentiary record contains demand projections based on the *Smithers Report*, which shows historical trends and projections for the installed base of sheetfed offset lithographic presses – the machinery that uses ALPs as the input – that serves as the best available proxy for the underlying demand for ALPs. Fujifilm Pre-Hearing Br. (Sept.

10, 2024) ("Fujifilm Pre-HBR") at Exh. 1, C.R. 129, P.R. 69.  Specifically, the

Commission had *Smithers Report* projections issued in 2016, 2021, and 2023.  The most

recent *Smithers Reports* projections show a decline from 2020 to 2023 of about 15

percent.  *Id*.

### Limited number of global suppliers

Other key conditions of competition are the very small number of suppliers to the

U.S. market.  Globally, there are only three remaining major suppliers accounting for the

vast majority of ALP production: Fujifilm, Kodak, and ECO3 (formerly Agfa).  *Id.* at 42.

And each has had different production operations in different countries from which they

supplied the U.S. market.  *Id.*

There are currently few major global production sites because this industry faces

declining demand, and high capital and operating costs that incentivize larger production

runs at fewer facilities.  Given these fixed costs, manufacturers have an economic

incentive to operate fewer factories at higher rates of utilization to minimize per unit

fixed costs.  That economic reality provides the context for the Fujifilm consolidation that

occurred and is addressed further below.

### Prior to the investigation period, Fujifilm made the decision to close U.S. and European production capacity to better match supply with declining demand.

Fujifilm decided to rationalize its world-wide ALP production operations in the

face of declining demand.  The evidentiary record shows that Fujifilm decided to close its

Greenwood facility <u>before</u> the Commission's period of investigation ("POI"), completed

virtually all remaining production in 2021, and made that decision because of the

imbalance in global demand and global supply, not the existence of subject imports. Staff Report at 3.4, C.R. 163. Indeed, at the time of the decision, subject imports were only a minor part of the U.S. market.

Specifically, prior to the POI, and after careful study, Fujifilm headquarters made a decision to shut down its U.S. ALP production operations in Greenwood, South Carolina ("Fujifilm-Greenwood" or "Greenwood") to consolidate the Greenwood production volumes within Fujifilm production operations in Japan and China. Subsequently, a similar decision was made with respect to Fujifilm's European production operations in Tilburg, The Netherlands. Fujifilm U.S. Producer Questionnaire Response, at II-2a (Additional Explanation), C.R. 72; Fujifilm Pre-HBR at 18, 19, and 44, C.R. 129.

This restructuring was a major decision that Fujifilm did not make lightly, but it reflected key underlying economic realities. Global capacity rationalization was required given the large and growing imbalance between underlying demand for print media (and therefore demand for ALP) and then-existing worldwide ALP production capacity. The underlying data demonstrated that both that the overall size of the market declined, and North America's share of that shrinking demand pie declined, especially relative to Asia. Fujifilm Pre-HBR at 12.

Beyond these demand projections, Fujifilm also faced economic realities on the supply side. Given significant fixed costs, there were strong economic incentives to have fewer factories operating at higher rates of utilization to minimize per unit fixed

costs, it is simply not realistic to produce ALPs in every location in which they are consumed.

Accordingly, by late 2019 the available data and economic realities demonstrated an unsustainable imbalance between demand and supply. This imbalance led Fujifilm corporate management to conclude that global production needed to be rationalized. Fujifilm took that step by closing its U.S. and European ALP manufacturing plants and serving Fujifilm's U.S. ALP customers from Fujifilm's Japan and China ALP production plants**.**

**ARGUMENT**

## I. THE APPLICABLE STANDARD OF REVIEW REQUIRES DIFFERENT APPROACHES TO STATUTORY INTERPRETATION AND SUBSTANTIAL EVIDENCE ARGUMENTS

Pursuant to the statute, the Trade Court shall "hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on the record or otherwise not in accordance with the law." 19 U.S.C. §1516a(b). On appeal, the ITC determination thus must be examined *both* to see whether it is otherwise in accordance with the law and whether it is supported by substantial evidence. This standard of review requires different approaches to statutory interpretation and substantial evidence arguments.

### A. *Loper Bright* Governs This Court's Review of the ITC's Interpretations of Statutory Language

Following *Loper Bright*, the Commission's interpretations of statutory provisions are no longer entitled to any presumption of deference. *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024). Instead, "{c}ourts must exercise independent judgment in deciding whether an agency has acted within its statutory authority," *id.* at 412, and when reviewing the Commission's statutory construction, must ask whether that interpretation reflects "the best reading of the statute." *Id.* at 400; *see also Lashify, Inc. v. Int'l Trade Comm'n*, 130 F.4th 948, 957 (Fed. Cir. 2025).

This change applies with full force to this Court's review under 28 U.S.C. §2640, which directs the Court to set aside any determination "contrary to law." *See Ventura*

*Coastal, LLC v. United States*, 736 F. Supp. 3d 1342, n.15 (Ct. Int'l Trade 2024). As the

Trade Court has recently explained in another challenge to an injury determination:

> Previously, under *Chevron* deference, "ambiguous" statutes
> were treated as "implicit" delegations of authority to
> agencies, which had authority to "fill any gap{s}" in the
> statute with "reasonable" interpretations. *Chevron*, 467 U.S.
> at 843–44, 104 S.Ct. 2778 (quotation omitted). However,
> *Loper Bright* held that statutory ambiguity "is not a
> delegation to anybody," and courts should not "defer" to an
> agency's interpretation when faced with an unclear statute

*Tenaris Bay City, Inc. v. United States*, No. 22-00344, 2025 WL 1720173, at *6 (Ct. Int'l

Trade June 20, 2025).

Accordingly, this Court should apply all traditional tools of statutory interpretation

to discern the best reading of the statute. "In the business of statutory interpretation, if it

is not the best, it is not permissible." *Loper*, 603 U.S. at 400. The ITC's reading of the

statute must therefore stand upon its own legal footing, not past practice nor mere

assertions of institutional expertise.

### B.    Substantial Evidence Requires A Probing Review Of The Evidentiary Record

We note the following key points about the substantial evidence standard. First,

any conclusion drawn by the Commission must be supported by "evidence that a

'reasonable mind might accept as adequate to support a conclusion.'" *Swiff-Train Co. v.

United States*, 793 F.3d 1355, 1359 (Fed. Cir. 2015) (citations omitted).

Second, the Court must perform its review based on the "record as a whole." *Id*.

at 1351 (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477-78 (1951)). "The

'whole record' means that the Court must consider both sides of the record. It is not

sufficient to merely examine the evidence that supports the agency's conclusion." *Timken Co. v. United States*, 12 CIT 955, 962 (1988), *aff'd*, *Timken Co. v. United States*, 894 F.2d 385 (Fed. Cir. 1990) (citations omitted)).  The reviewing court, in addition to considering the evidence upon which the agency relied, must also "take into account 'whatever in the record fairly detracts from its weight.'"  *Nippon Steel Corp. v. United States*, 27 CIT 1856, 1864 (2003) (citations omitted); *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994)

Third, this review must be probing and requires the court to go beyond the facial aspects of the record and the Commission's proffered analysis.  *See, e.g., NSK Corp. v. United States*, 33 CIT 1185, 1194 (2009) (remanding the Commission's views on injury for a second time due to "cursory treatment of the evidence provided").

Finally, the court must ensure that the Commission has provided a reasoned explanation of its views.  The Commission's decision must include "an examination of the relevant data and a reasoned explanation supported by a stated connection between the facts found and the choice made." *U.S. Steel Group v. United States,* 25 CIT 1046 (2001) (citations omitted).

## II.    THE MAJORITY'S DECISION ON INJURY FROM SUBJECT IMPORTS IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND IS OTHERWISE NOT IN ACCORDANCE WITH LAW

### A.    The Commission's Decision To Include Fujifilm Greenwood Within The Domestic Industry Was Not In Accordance With Law And Unsupported By Substantial Evidence

The Majority declined to exclude Greenwood from its definition of the domestic industry. *Majority* at 13-16, C.R. 170.[2]  This flawed decision contributed significantly to a flawed and counterintuitive overall determination that the current domestic industry – only Kodak – was somehow injured by imports even though Kodak saw improving results at the same time Fujifilm replaced its own domestic shipments with subject imports.  The Majority improperly deemed Greenwood part of the domestic industry, even though doing so distorted the record regarding the only current U.S. producer.

The Majority's analysis was contrary to the statutory requirement to exclude related parties in "appropriate" cases.  The Majority did not carefully consider the statutory text, structure, and purpose, as applied to this set of facts.  The Majority instead applied a one-size-fits-all test that did not make sense for these facts, with a foreign parent deciding to close down its U.S.-based production facility *before* the POI. Although this historical test may have survived judicial scrutiny under the more deferential *Chevron* framework, it cannot survive scrutiny under the more demanding *Loper Bright* framework recently adopted by the Supreme Court as discussed in **Section I.A.** above.  Under an objective analysis of the record, and consistent with the statute, the

---

[2] We recognize that there was no dissent from this part of the Majority's decision.

exclusion of Greenwood was "appropriate" and the Majority's decision to the contrary

was not in accordance with law and unsupported by substantial evidence.

### 1. The Majority's analytic approach misinterpreted the relevant statutory provisions and therefore was unlawful

When analyzing material injury, the statute requires a focus on the current

domestic industry without the distortions associated with affiliated parties or domestic

firms that also import.  Accordingly, the statute provides that:

> If a producer of a domestic like product and an exporter or
> importer of the subject merchandise are related parties, or if a
> producer of the domestic like product is also an importer of
> the subject merchandise, the producer may, in appropriate
> circumstances, be excluded from the industry.

19 U.S.C. §1677(4)(B).  The term "appropriate" here denotes a certain degree of

flexibility.  But a more careful reading of the statute reveals governing principles that the

Majority ignored here.  The provision is predicated on eliminating distortion in the

record, Statement of Administrative Action for the Uruguay Round Agreements Act,

H.R. Rep. No. 103-316 (1994) ("SAA") at 858, consistent with the broader statutory

framework that tasks the Commission with rendering objective and reasonable

determinations of material injury and causation.

### a. The related party provision under *Chevron*

Under the prior *Chevron* standard, this court found the language ambiguous, and

therefore an implicit delegation to the Commission to "establish a reasonable standard for

the exclusion of a domestic producer."  *LG Elecs., Inc. v. United States Int'l Trade

Comm'n*, 38 CIT 1562, 1566-1567 (2014).  Thus, prior to *Loper Bright*, this Court read

"appropriate" from the perspective of deference to the Commission's overall interpretation of the statute and what that discretion implied.  This deference permitted the Commission to adopt and apply its "shielding test," where the Commission only excluded related parties where it found they were shielded from import competition.  The Commission used the related party provision "to reduce any distortion in the data caused by the inclusion in the domestic industry of a related producer who is being shielded from the effects of subject imports."  SAA at 858.

**b.    The related party provision in light of *Loper Bright***

In a post-*Chevron* world, *Loper Bright* instructs courts to interpret statutes carefully and discern statutory meaning by applying the traditional tools of statutory interpretation.  *Loper*, 603 U.S. at 374.  The Commission is no longer accorded *Chevron* deference.  This Court now recognizes that, despite any implied delegation, it is its exclusive role to conclusively interpret the statute, even where the statute implicates technical expertise:

> {F}or a court to conclude that an agency has the power to give meaning to the words of the statute, the source of the agency's authority must be found in the words of the statute; it cannot be presumed by virtue of silence or ambiguity. {*Loper Bright*, 144 S. Ct. at 2263} (overruling *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 647 U.S. 837, . . . ). Even where a statute implicates technical expertise "it does not follow that Congress has taken the power to authoritatively interpret the statute from the courts and given {sic} it to the agency.  Congress expects courts to handle technical statutory questions." *Id.* at 2267.

*Ventura Coastal, LLC*, 736 F. Supp. 3d at 1357.  To that end, "Courts interpret statutes, no matter the context, based on the traditional tools of statutory construction, not

individual policy preferences." *Loper*, 603 U.S. at 374. Properly interpreted, the related party provision imposes limits on the Commission's discretion that were ignored in this case.

At the outset, the phrase "in appropriate circumstances" serves to cabin the Commission's discretion. In isolation, "appropriate" connotes discretion, but in this particular statutory context the phrase "appropriate circumstances" serves to modify and limit what the Commission "may" do. Congress did not grant the Commission broad discretion to do whatever it wished with related parties. This statutory context is not like the use of the term "may" when cumulating for threat of material injury, as opposed to the use of the term "shall" when cumulating for current material injury. *Compare* 19 U.S.C. §1677(7)(H) *with* 19 U.S.C. §1677(7)(G)(i). A proper interpretation of this provision, thus, must respect the addition of "appropriate" as a limiting principle.

Moreover, the statute reveals specific limiting principles. The Commission's focus on "appropriate" in isolation led it to miss these important limiting principles. The statute consistently focuses on the present tense – whether there is a domestic industry that is currently being materially injured by imports. The statute uses the present tense for defining the domestic industry. *See* 19 U.S.C. §§1673b(a)(1)(A) (preliminary determination if an industry "is materially injured"), and 1673d(b)(1)(A) (final determination if an industry "is materially injured"). Moreover, the statutory remedy is purely forward-looking – duties on future imports – not any penalty for past pricing behavior. 19 U.S.C. §1673(2). The term "appropriate," therefore, must be read in light of the statutory limits that focus on the present and the future.

c.    **The Majority's post-*Loper Bright* determination does not withstand judicial scrutiny**

In this investigation, the Majority ignored the statute's focus on present injury and future remedies in its interpretation of the related party test – despite Fujifilm's arguments in support thereof, Fujifilm Pre-HBR at 27 (P.R. 69) – and only addressed the point later when discussing causation. *Majority* at 59, C.R. 170. The Majority never addressed how this statutory focus on the present informs the meaning of "appropriate" for defining the domestic industry.

The statute calls particular attention to the possible distortions from including affiliated parties within the domestic industry. The statute specifically identifies "related parties" as a special situation, separate from the issue of whether the particular domestic producer imports or not. §1677(4)(B)(i). And the statute goes on define "related parties" very broadly to include both direct and indirect control. §1677(4)(B)(ii). The term "appropriate" must be read in light of this statutory concern with how including affiliated parties might distort the analysis.

Yet, in this case, the Majority largely downplayed this concern with affiliated parties. The Majority downplayed that Kodak was also affiliated with foreign producers, noting only that Kodak did not export from Japan. *Majority* at 12 n.29, C.R. 170. With respect to Fujifilm, the Majority explained:

> As {Greenwood} was a U.S. producer and did not itself import subject merchandise during the POI, its primary interest was in domestic production, until it ceased such production in March 2022.

- 17 -

*Id.* at 14.  Again, the focus is on the fact of importation.  This assertion that Greenwood did not import and was focused on domestic production completely ignores the fact that Greenwood and Fujifilm North America ("FNAC") were owned by the same ultimate corporate parent and, therefore, belies the statutory concern with related parties more generally.  The Majority never addressed how the relationship between the parties – regardless of whether they import or not – informs the meaning of "appropriate" for defining the domestic industry.

Notably, the statute is fundamentally concerned with the possible distortions of including related parties.  Importantly, the legislative history to this provision confirms the Commission's discretion is not open-ended, and there are situations where there is little or no room for the Commission to exercise discretion, offering an "example" of such situations:

> Thus, *for example*, where a U.S. producer is related to a foreign exporter and the foreign exporter directs his exports to the United States so as not to compete with his related U.S. producer, this *should* be a case where the ITC would not consider the related U.S. producer to be part of the domestic industry.

S. Rep. No. 96-249 (1979) at 83 (emphasis added).  The legislative history's example confirms there are other circumstances where the Commission's discretion is limited or curtailed altogether.  The SAA explains this statutory purpose to "reduce any distortion in the data caused by the inclusion in the domestic industry of a related party producer . . . ."  SAA at 858.  This understanding is consistent with the broader statutory scheme, which tasks the Commission with objectively and reasonably analyzing the record in terms of

- 18 -

volume, price, and impact so as to ultimately render accurate material injury and causation findings.

The Majority here ignored this explicit guidance. The underlying facts presented a case of a foreign producer that "directs his exports to the United States so as not to compete with his related U.S. producer," as foreshadowed by the legislative history as the quintessential case where the related domestic producer should be excluded. Fujifilm did not export from Japan and China to compete with its U.S. producer and instead coordinated an orderly withdrawal of U.S. production to be replaced by subject imports. The Majority noted these key facts, *Majority* at 13 (C.R. 170), but then largely ignored them. Instead, the Majority mechanically applied its historical test, ignoring the clear statutory principles that pointed to this being an "appropriate" case where the related party should be excluded.

Serious distortions in the record associated with related party fact patterns can unreasonably impair the Commission's analysis, leading to an erroneous determination. In light of the paradigm shift required by *Loper Bright*, we urge this Court to give no weight to prior decisions affirming the traditional ITC test under the deferential *Chevron* standard. Instead, this Court must independently evaluate whether the ITC test comports with the statutory requirements. As detailed above, the test applied by the Majority was not otherwise in accordance with law.

- 19 -

2.    **In any event, the Majority's application was unsupported by substantial evidence**

Even if the Majority's determination was not contrary to law, that determination was unsupported by substantial evidence.  The Majority acknowledged the key facts that showed including Greenwood would distort the analysis, yet the Majority included Greenwood in the domestic industry anyway for reasons that do not withstand serious scrutiny.

Fujifilm explained and the Majority acknowledged that Fujifilm decided to shutdown Greenwood to reposition its global production assets in light of declining global demand.  Fujifilm Pre-HBR at 14-22, P.R. 69; *Majority* at 13, C.R. 170.  Even though this decision meant a massive switch from domestic production to imports by Fujifilm, the Majority largely ignored the distortion associated with this shift.  Instead, the Majority asserted that Greenwood was not "shielded" so as to fit this case into its one-size-fits-all historical test for excluding related parties.  This conclusion, however, makes no sense and is not supported by substantial evidence.

The Majority's analysis implicitly assumes the Fujifilm parties are unrelated and that Greenwood had its own perspective and thus misses the basic point of the related party provision.  The Majority asserts that Greenwood's focus was on domestic production, *Majority* at 14, even though Greenwood did not have its own interest as the wholly-owned subsidiary of its foreign parent.  Fujifilm at the parent company level was deciding corporate direction going forward.  The foreign parent company had decided to

switch domestic production to a focus on foreign production, and it thus makes no sense to say Greenwood had an independent interest in domestic production.

The Majority then recites a series of trends, *id.* at 15, but in doing so conflated Fujifilm's orderly wind-down and sourcing switch with import competition, citing trends that were the result of the planned wind down of U.S. production. It simply makes no sense to assert that Fujifilm imports from Japan and China somehow "captured" domestic sales from Greenwood when the foreign parent company was determining all of these sourcing decisions.

Moreover, the Majority's failure to recognize Fujifilm's decision making at a corporate level, not at the Greenwood level, resulted in the Majority inverting the effect of the distortions. The Majority found that excluding Greenwood would distort the data. *Id.* at 15-16. But this finding has it backwards. Including Greenwood distorted the data by masking the trends for Kodak, the only remaining U.S. producer and the only member of the current domestic industry.

The Majority's problem was that it was trying to squeeze the square peg of these facts into the round hole of its traditional related party test. In doing so, the Majority forced the distinct wind-down fact pattern into its "shielding" paradigm to affect a specific outcome when the traditional question of "shielding" was not really relevant to the record facts. Indeed, that is probably why the Majority did not even bother with any serious discussion of its other traditional exclusion factors, *compare id.* at 11 n.27, *with id.* at 13-16, which were irrelevant in any case given the implications of its dispositive shielding test.

In sum, the Majority determination as written cannot reasonably justify including Greenwood in the domestic industry. The Majority reasoning used the orderly winddown of Greenwood's operations to create the illusion of adverse industry trends that mask the extent to which Kodak was doing better and better over the period. The statute properly applied to the facts of this case would have excluded Greenwood and focused the analysis on Kodak, the only member of the current domestic industry and the only company for which the prospective remedy of duties would apply.

**B.     The Conclusion That The Volume of Subject Imports Was "Significant" Is Not In Accordance With Law Nor Supported by Substantial Evidence**

The conclusion that the subject import volume was "significant" simply because it increased over the period does not satisfy the statutory requirement to demonstrate significance. Nor did the Majority assess the volume and market share data in the context of the conditions of competition and thus its conclusion is unlawful. Moreover, the conclusion is not supported by substantial evidence, which demonstrates that subject imports increased as Fujifilm shifted supply sources and had to rely on imports to satisfy U.S. demand.

**1.     The significant volume analysis does not satisfy the statutory requirements**

The relevant statutory provisions are 19 U.S.C. §1677(7)(C)(i) and 19 U.S.C. §1677(7)(C)(iii). These two statutory provisions are to be read together, but we address each in turn below. We urge the Court to review the statue in light of the more demanding standard of *Loper Bright* as discussed in **Section I.A.**

19 U.S.C. §1677(7)(C)(i) requires the Commission to assess whether the volume of subject imports, or any increase in that volume, is "significant."  "Congress, this court, and ITC itself have repeatedly recognized that it is the *significance* of a quantity of imports, and not absolute volume alone, that must guide ITC's analysis under section 1677(7)." *USX Corp. v. United States*, 11 CIT 82, 85 (1987).  The statute requires the Commission to do more than recount the quantity of subject imports at the beginning and end of the period and calculate whether imports increased or decreased.  The term "significant" has meaning.  Black's Law Dictionary defines significant as "{e}mbodying or bearing some meaning; having or expressing a sense." *Significant*, Black's Law Dictionary (11th ed. 2019).  The plain meaning according to Merriam-Webster Dictionary is "having meaning" or "having or likely to have influence or effect: Important". *Significant*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/significant (visited July 15, 2025).  Here, the Determination provided no assessment of whether the absolute volume, change in volume, and market share of subject imports had any meaning, influence, or effect on the domestic industry; it briefly stated the absolute volume of subject imports in each year of the POI, calculated the rate of increase, expressed the volume as a share of apparent U.S. consumption, and concluded that the volume was "significant." *Majority* at 35-36, C.R. 170.  Such analysis is not sufficient to comply with the statute.

Pursuant to the text of 19 U.S.C. §1677(7)(C)(iii), for the Commission's finding under 1677(7)(C)(i) to be lawful, the Commission must analyze the volume and market share data "within the context of the business cycle and conditions of competition that are

distinctive to the affected industry." *See OCP S.A. v. United States*, 658 F. Supp. 3d

1297, 1319 (Ct. Int'l Trade 2023) (citing *Nippon Steel Corp. v. United States*, 25 CIT

1415, 1420 (2001)). Whether a particular volume of imports is "significant" varies

across industries and circumstances, thus the context is key to the Commission's analysis.

S. Rep. No. 96-249 (1979) at 88, reprinted *in* 1979 U.S.C.C.A.N. 381, 474 ("The statute

does not define what is considered 'significant' {in a volume determination} because,

'{f}or one industry, an apparently small volume of imports may have a significant impact

on the market; for another, the same volume might not be significant.'").

Plaintiffs recognize that the Determination addressed conditions of competition in

one part of its decision. But the Commission "does not comply with its statutory mandate

by simply describing various conditions of competition in isolation," but rather the

Commission must apply its findings regarding the conditions of competition to its

analysis of the three statutory factors: subject import volume, price effects, and impact on

the domestic industry. *OCP*, 658 F. Supp. 3d at 1312-13; *Altx, Inc. v. United States*, 26

CIT 709, 717-19 (2002); *see also Nucor Corp. v. United States*, 28 CIT 188, 207 (2004),

*aff'd*, 414 F.3d 1331 (Fed. Cir. 2005). The Majority failed to do so when it concluded

that the volume of subject ALP imports was significant. *Majority* at 35-36, C.R. 170. As

stated, the Majority provided only a very brief numerical assessment of subject imports.

*Id.* at 35. There is no indication that the Majority considered any of the conditions of

competition at all when it concluded that the volume of subject imports was significant.

In the underlying investigation Plaintiffs recognized that there was an absolute increase in

subject imports during the POI but stressed the importance of the Commission assessing

this increase in the context of Fujifilm's decision to shift supply sources for its U.S. customers. *See* Fujifilm Pre-HBR at 58-63, C.R. 129. Indeed, by the plain terms of the statute (and this court's precedent), such assessment was required by law.

In short, the Determination's volume analysis failed to comply with the requirements of the statute because it did not demonstrate how or why the quantity and increase in imports was meaningful or had any influence or effect on the domestic industry. Nor did it consider the volume of imports within the context of the conditions of competition. The Court should therefore find the Determination that subject import volume was "significant" to be unlawful.

### 2.    The significant volume conclusion is unsupported by substantial evidence

The Commission's conclusion regarding significant import volumes also was unsupported by substantial evidence. This court has repeatedly found that the Commission's volume analysis must not be at odds with findings on the conditions of competition in the domestic industry and its determination of significant import volumes itself (not just the Commission's findings with respect to the conditions of competition) must be supported by substantial evidence. *See OCP*, 658 F. Supp. 3d at 1320; *Altx*, 26 CIT at 717-19. For instance, in *Altx, Inc. v. United States*, the Commission concluded that the volume of subject imports was significant without discussing subject import volume relative to the conditions of competition and without indicating any evidence from which the court could discern whether the increase in imports could be attributed to product types or sizes not produced by the domestic industry or to products that directly

competed with the domestic industry. *Altx*, 26 CIT at 718. In that case, the record

demonstrated a substantial and increasing portion of the market for which there was no

viable domestic source of supply. *Id.* at 717-18. Despite this fact, the Commission did

not determine or provide evidence regarding whether "the increase in subject imports

{was} primarily or entirely in the range of product types not produced by the domestic

industry." *Id.* at 718. The court therefore remanded the Commission's finding of

significant volume, requiring it to analyze and provide evidence regarding the

significance of subject import volumes in terms of product types available and practically

unavailable from U.S. sources during the POI. *Id.* at 719.

Here, the Majority's determination of significant subject import volume is not

supported by substantial evidence. As addressed above in **Section II.A** and in Plaintiffs'

briefs during the underlying investigation, the record demonstrates that the increase in

subject imports was the result of Fujifilm's pre-POI decision to rationalize its world-wide

ALP production operations in the face of persistent declining demand, which meant

closing its U.S. production facility in Greenwood, S.C., and servicing U.S. customers

from Fujifilm's other production facilities. Fujifilm Pre-HBR at 13-22, 39-41 and Exh. 1,

C.R. 129; Staff Report at 3.4 and 3.13, C.R. 163; *see also Majority* at 25-27, C.R. 170.

Virtually the entire gain in subject import volume and market share came from the

cessation of production at the Fujifilm Greenwood facility and the replacement of that

existing Fujifilm volume with other Fujifilm sources. This had nothing to do with subject

import competition. Moreover, as Fujifilm shifted supply sources for its U.S. customers,

it lost market share to the sole U.S. producer (Kodak) and to non-subject imports, as

Fujifilm's increase in subject imports from 2021 to 2023 of about **[        ]** square meters ("SQM") did not even come close to replacing the pre-existing volume sold from Greenwood in 2021 of about **[        ]** SQM.  Fujifilm Pre-HBR at 66 and Exh. 13, C.R. 129.  The Majority's volume analysis makes no mention of these crucial facts, nor does it contemplate the impact of this important change in the market.

The Majority's volume analysis also did not consider the fact that the sole U.S. producer (Kodak) *gained* market share during the POI despite declining overall demand and an increase in subject imports.  Fujifilm Pre-HBR at 59-60, C.R. 129; Staff Report at 4.22, C.R. 163 *see also Majority* at 25, C.R. 170 (describing consistently declining demand during the POI); *supra* at 6-7.  Kodak's overall market share based on volume "increased from **[        ]** percent in 2021 to **[        ]** percent in 2023, a gain of **[        ]** percentage points over the full period based on volume, and a gain of **[        ]** percentage points based on value."  Fujifilm Pre-HBR at 59, C.R. 129; Staff Report at 4.22 and 4.24, C.R. 163.  Had the Majority considered the various market segments, which each have their own demand trends, it would have seen that Kodak's market share gain was even greater (nearly **[    ]** percentage points) in the growing process-free segment of the market. Fujifilm Pre-HBR at 63-65 and Exh. 12, C.R. 129.

In its impact analysis the Majority does address market share considerations but, as discussed below in **Section II.D**, its theory that Kodak should have gained even more market share upon the closure of Fujifilm Greenwood ignores one of the key conditions of competition – declining demand – and is belied by substantial record evidence demonstrating that the contractual relationships in place and product types supplied by

Fujifilm meant that this volume was not "up for grabs" as the Majority seems to believe.

Relatedly, the Majority also failed to weigh the evidence regarding the significant share

of subject import volume consisting of products that are not manufactured in the United

States. *See* Fujifilm Pre-HBR at 68-71, C.R. 129 (recounting record evidence of the

approximately **[    ]** percent of Fujifilm's subject import shipments in 2023 that consist

of products not produced within the United States).

By ignoring these facts, the Majority failed to engage with the substantial record

evidence that detracts from its conclusion that the volume and increase in subject imports

was "significant."  Even if the Court (erroneously) decides that the Majority's decision to

include Fujifilm Greenwood as part of the domestic industry was lawful and supported by

substantial evidence, the Majority must explain how Fujifilm's pre-POI decision to close

the Greenwood facility and supply its pre-existing U.S. customers from its other

production sites renders its own imports, which were not able to fully replace its

Greenwood supply, "significant" in the U.S. market.  The Majority cannot hide behind its

usual parlance and ignore the true dynamics in this market – Kodak, the only current U.S.

producer of ALP, is trying to take advantage of its main competitor's decision to shift

supply from the U.S. to foreign sources, despite the fact that this shift was *good* for the

current U.S. domestic industry which solely consists of Kodak, who gained market share

through this process.  Irrespective of how the Majority characterizes Greenwood, the

Majority is required to consider (and explain) the volume of subject imports in the

context of the conditions of competition and its conclusion regarding whether such

volume is "significant" must be supported by substantial evidence.  It is not.

**C.      The Majority's Conclusion of Adverse Price Effects Is Not Supported by Substantial Evidence and Is Otherwise Not In Accordance With Law**

The Majority's conclusion of adverse prices effects is *both* premised upon an unlawful statutory interpretation and unsupported by substantial evidence.  The Majority did not actually find adverse effects on domestic prices – it noted but ignored the analytic relevance of the key statutory factors that prices were not depressed (they were increasing) and were not suppressed (they were increasing faster than costs).  Instead, the Majority ignored the positive price trends and asserted that Kodak lost volume because of alleged lower prices, without finding any adverse effect on domestic prices.  Beyond ignoring the statute, this assertion also is not supported by substantial evidence.  Each of the subsidiary conclusions the Majority offered collapse under more careful scrutiny of the record evidence as a whole.

**1.      The Majority ignored the statutory mandate to consider all three pricing factors as a whole, and therefore reached a finding of adverse effect on domestic prices that was not in accordance with law**

The Majority concluded that subject imports had "significant price effects," but this overall conclusion rests on a flawed reading of the statute.  *Majority* at 49, C.R. 170.  The Majority failed to appreciate or discuss the significance of its implicit conclusions that subject imports (a) did not lead to lower domestic prices (price depression) and (b) did not prevent prices increases which otherwise have occurred (price suppression).  The Majority based its overall conclusion about adverse price effects entirely on its finding that the "significant underselling by cumulated subject imports caused subject imports to

- 29 -

gain sales and market share from the domestic industry." *Id*. This reasoning, however, disregarded the explicit statutory framework for finding adverse price effects. The Majority apparently believes that checking any one of the statutory boxes is enough. That approach does not reflect the statutory framework, which this Court should review carefully in light of the more demanding standard of *Loper Bright*, as discussed in **Section I.A.** above.

The statute mandates that the Commission examine whether subject imports otherwise depress prices to a significant degree or suppress price increases, which otherwise would have occurred, to a significant degree. 19 U.S.C. §1677(7)(C)(ii). Vis-à-vis *price depression*, the Staff Report noted: "domestic price increases ranged from [    ] to [    ] percent during January 2021 to March 2024." Staff Report at 5.12, C.R. 163. And the back-up data (as presented by the Staff Report) showed consistently increasing prices for all three pricing products over the entire period. *Id*. This data led the Dissent to conclude explicitly: "these price data do not indicate price depression by reason of subject imports." *Dissent* at 5, C.R. 171.

And vis-à-vis *price suppression*, the evidentiary record demonstrated the absence of any price suppression, given that domestic prices rose faster than costs, the key ratio of COGS to net sales improved throughout the period, and domestic industry profitability improved. Staff Report at 6.12-14, C.R. 163. Accordingly, the Dissent concluded explicitly: "the domestic industry was able to increase its pricing, even in the face of raw material volatility, restoring its COGS-to-net-sales ratio to the level at which it began the POI." *Dissent* at 5, C.R. 171.

And, pointedly, the Majority never disputed the Dissent's conclusion that evidentiary record demonstrated no price depression and no price suppression. Instead, the Majority did not make any explicit affirmative findings of price depression or price suppression, and did not follow the statutory framework for an integrated analysis of any actual adverse effects on prices.

**a.    The Commission ignored the statutory mandate to consider and integrate the evidence about price effects**

**(i)    The statute requires the Commission to consider all three pricing factors to evaluate any possible "effect" on domestic *prices***

The Commission must make an overall finding about the "effect" of imports on domestic *prices*. The statute sets forth a comprehensive framework for how to analyze these effects on price. The overarching requirement regarding prices is that the Commission consider the "effect of {subject imports} on prices in the United States." 19 U.S.C. §1677(7)(B)(i)(II). *See also* 19 U.S.C. §1677(7)(C)(ii). This "effect" on domestic prices then becomes part of the overall injury findings, including the final views on injury in antidumping cases under 19 U.S.C. §1673d(b).

The statute, at §1677(7)(C)(ii), clarifies how the Commission should proceed when "evaluating the effect of imports" on domestic prices. The statute puts underselling in one provision and price depression/suppression in another provision. The statutory term "and" means that all of these factors must be considered.

More importantly, the statute also provides the Commission is "evaluating the effect" of imports based on all of these factors. The existence of underselling by imports

- 31 -

*itself* does not represent some "effect" that is adverse to the domestic prices. Under the statute, underselling is not an adverse effect on domestic prices. Any such adverse effect must be shown and not assumed. And when the three elements — underselling, price depression, and price suppression — point to different conclusions (as explicitly noted by the Dissent), the statute requires the Commission to evaluate and reconcile that conflicting evidence.

The statutory structure reveals the underlying congressional logic about the interrelationship of the three distinct factors to be considered. The statute begins with underselling and then turns to price depression and price suppression with the introductory phrase that "the effect of imports of such merchandise otherwise" depresses or suppresses domestic prices. 19 U.S.C. §1677(7)(C)(ii)(II). The phrase "such merchandise" refers to imports and the initial analysis of any underselling. The term "otherwise" indicates that even imports that are overselling might lead to price depression or price suppression. But the converse is also true — imports that are underselling might <u>not</u> lead to price depression or price suppression. The point is that the statute does not prejudge what particular facts might show. The Commission "shall consider" all three of these elements and evaluate what each one shows with regard to a possible adverse "effect" on domestic prices.[3]

---

[3] We acknowledge that the court has once rejected a statutory argument being made here -- that the statute requires the Commission to consider and explain price depression and price suppression data and conclusions. *OCTAL Inc. v. United States*, 539 F. Supp. 3d 1291 (Ct. Int'l Trade 2021). That decision, however, was arguably premised upon a *Chevron* deferential approach to statutory interpretation. We respectfully submit that this court should apply a different approach under *Loper Bright, supra*. In addition, we believe that *United Steel Workers*

This part of the analysis focuses on the effect of imports on domestic <u>prices</u>.  Any possible volume effects (*e.g.*, market share loss) or overall adverse impact are covered in other statutory provisions.  This part of the analysis — one of the key building blocks — is about the effect on domestic <u>prices</u> alone. 19 U.S.C. §1677(7)(B)(i)(II) ("the effect of imports … on prices"); 19 U.S.C. §1677(7)(C)(ii) ("the effect of imports on prices"). Yet, the Majority simply side-stepped this mandated focus on domestic prices.

**(ii)**     **The Commission failed to follow the statutory mandate to consider all three pricing factors as a whole**

The Majority ignored this carefully structured statutory framework.  Instead, the Commission focused on underselling alone without establishing any adverse <u>price</u> effects from that underselling.  Contrary to the statutory framework, the Commission essentially made underselling actionable, without any demonstrated adverse price effects from the underselling.

This case is somewhat unusual in that the Commission did not affirmatively find either price depression or price suppression.  In most cases, underselling leads to either price depression or price suppression, or both.  In most cases the Commission thus finds that import prices had an adverse effect on domestic prices — the underselling led to either price depression (lower domestic prices) or price suppression (domestic prices that did not keep up with increasing costs).

---

*v. United States*, 348 F. Supp. 3d 1328, 1335-1336 (Ct. Int'l Trade 2018) supports our price effects statutory argument.

In this case, however, the Commission found only price underselling.  But price underselling in this case had no effect on domestic prices.  As the Dissent noted, and as confirmed by the record evidence, domestic prices were not falling and were increasing faster than costs.  *Dissent* at 5, C.R. 171; *see* Staff Report at 5.20 and 6.13, C.R. 163. Indeed, here, the Commission also considered an overall domestic industry earning solid operating profits.  Staff Report at 6.7-8 and C.4 (Table C-1), C.R. 163.  So, there were no adverse price effects — neither directly (through lower prices) or indirectly (through lower profits).  The traditional paradigm that explains most of the Commission's final affirmative views on injury simply did not apply in this case.

In place of this traditional paradigm for price effects, the Commission's novel approach disregarded the statutory framework.  Instead of identifying any adverse price effects, the Commission turned to various measures of volume.  The Commission pointed to individual lost sales and an overall market share shift.  *Majority* at 43-47, C.R. 170. This lost market share is the only true basis for the Commission's finding of adverse price effects.  Indeed, the Commission made this point explicitly when it ended its price effects section:

> In sum, we find that the significant underselling by cumulated subject imports caused subject imports to gain sales and market share from the domestic industry. We therefore find that cumulated subject imports had significant price effects.

*Id.* at 49.  This legal conclusion, however, is deeply flawed as the basis to find adverse price effects for several reasons.

First, this finding has nothing to do with adverse effects on domestic <u>prices</u> as required by the statute.  The express statutory requirement for this element of the analysis is to find an "effect" on <u>prices</u>. 19 U.S.C. §1677(7)(B)(i)(II) ("the effect of imports … on prices"); 19 U.S.C. §1677(7)(C)(ii) ("the effect of imports on prices").  Effects on volume — including market share shifts — are addressed separately in the statute.  Essentially, the Commission's approach here relies twice on adverse volume effects (as reflected in lost market share) and skips over the need to find adverse effects <u>on domestic prices</u>.

Second, as again explicitly noted by the Dissent, this finding is logically inconsistent.  *Dissent* at 4-5, C.R. 171.  Assuming price was important as the Majority did, *Majority* at 30 (C.R. 170), then one would expect lower import prices to have some effect on the comparable domestic prices, pulling down the domestic prices.  But that did not happen here.  The Majority found no such price depression or price suppression.  The Majority's reliance on underselling alone just underscores the logical inconsistency.  Why was such underselling not having any discernable effect on domestic prices?  Indeed, as we argue below, there are compelling reasons to doubt the Commission's findings that price was important to purchasing decision in this case.  But if price were actually that important, then why did domestic prices not fall or fail to keep up with costs?  If price is not important, then the lack of any price depression from the underselling actually makes sense.  The Commission never addresses this logical inconsistency.

2. **The Majority's subsidiary conclusions in its price effects analysis are not supported by substantial evidence**

The Majority could only find the alleged adverse price effects from subject imports by first making several subsidiary factual conclusions. None of these subsidiary factual conclusions are supported by substantial evidence. The Commission must consider all of the evidence, including the evidence that might undermine the conclusion the Commission is contemplating. *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003). The Commission did not do so here.

a. **The record does not support that price is more important than other factors for U.S. ALP purchasers**

The majority found "that price is an important factor in purchasing decisions, among other important factors." *Majority* at 30, C.R. 170. This conclusion about the importance of price for customers and, therefore, U.S. domestic ALP producers lost sales to lower priced subject imports is arguably the main pillar for the Majority's entire decision. Given the absence of price depression and price suppression from subject imports, *see* **Section II.C.1.a.**, without this conclusion that lower subject import prices caused U.S. customers switch volume from Kodak to Fujifilm, the Commission would not have identified any injury from subject import pricing.

However, the underlying factual predicate for this conclusion about the importance of price and why the volume shifted is just not correct. The evidentiary record <u>as a whole</u> demonstrates the contrary – that price was not the most important factor for the U.S. customers purchasing ALPs. *See e.g., Dissent* at 2, C.R.171 ("{O}nly **[  ]** of **[   ]** purchasers stated that they considered price to be the top factor in purchasing decisions.")

The Majority never grappled with key pieces of evidence that other factors mattered more. Specifically, as the Staff Report noted, there are two key points taken directly from the purchasers' questionnaire responses when asked to rank those factors considered most important to ALP purchasing decision. First, "{q}uality was the most frequently cited first-most important factor . . . price was the third-most frequently reported important factor." Staff Report at 2.12, P.R. 89. Second, "{t}he majority of purchasers . . . reported that they {only} sometimes or never purchase the lowest-priced product." *Id.* The Majority never grappled with this evidence that was directly contrary to the conclusion that price was of primary importance to purchasers.

> **b.    The record does not support that there is a high degree of substitutability between subject imports and U.S. produced ALPs**

Another key pillar of the Majority's conclusion of adverse price effects was that "we find that there is at least a moderate-to-high degree of substitutability between cumulated subject imports and the domestic like product." *Majority* at 36, C.R. 170. However, this conclusion is also not supported by substantial evidence.

Specifically, while the Majority references one part of the Staff Report that lends support to their conclusion, the Majority does not explain why it discounts other parts of the Staff Report that address evidence that does not support a high degree of substitutability. In particular, the Staff Report noted that all suppliers and all customers agreed that it was <u>not</u> possible to substitute one supplier's ALP for another supplier's ALP without some modification of equipment and machinery. *See* Staff Report at 2.20-21, C.R. 163. The Majority notes this dynamic, but neglects to explain why such equipment

modification requirement did not limit substitutability. Such an explanation is required under the substantial evidence standard, particularly when the Dissent specifically identified customer operating systems as limiting price effects from subject imports. *Dissent* at 2, C.R. 171.

> **c.    The Record does not support the conclusion that Fujifilm's pricing product data could not be used**

The Majority's factual conclusion of "significant underselling" was the only basis to find adverse price effects. The Majority reached its conclusion of significant underselling, however, by ignoring Fujifilm's submitted pricing product data. *Majority* at 38-43, C.R. 170. The Majority claims that it did so because, supposedly, Fujifilm had not properly compiled its pricing product data, whereas Kodak had. *Id.* at 38-40. But this claim is just wrong as the very documents that the Majority references demonstrate the opposite.

Specifically, the Majority first claims that "there were errors in the pricing data reported by FNAC" because FNAC did not properly net out linked goods (e.g., chemicals) and services costs for associated products (e.g., CTPs and processors); whereas Kodak did. *Id.* at 38-39. However, this claim that Kodak adopted a different approach is just wrong. In discussing adjustments to Kodak's shipment data (a subset of which were included in Kodak's pricing data), the Commission's Verification Report – cited by the Majority – actually found only that the value of shipments was adjusted to remove freight costs. Verification Report of Kodak (Sept. 26, 2024) at 2 and 6, C.R. 150. There is absolutely no mention of any adjustments for linked goods or services. This is

not surprising given that the questionnaires instructed that reported prices be net of transportation costs, the reporting basis that everyone followed, as evidenced by their certified questionnaire responses. Kodak Producer QR at IV-2c, C.R. 70; FNAC Importer QR at III-2c, C.R. 74; *see also Dissent* at 3, C.R. 171.

And so, there is no evidence that Fujifilm and Kodak adopted different approaches in compiling reported pricing product data, which is why the Dissent had no issue analyzing underselling by using all pricing product data submitted by all parties. *Dissent* at 3, C.R. 171.

> **d.    The record does not support that a subset of the pricing product data – top 10 customers – was more probative for underselling analysis**

The Majority's separate underselling analysis discarded more comprehensive pricing product data submitted by both sides and instead relied solely on pricing data for a subset – the top 10 customers. The Majority claimed that doing so was more probative. *Majority* at 38 and 41-43, C.R. 170.

But this Majority claim is just wrong. The Majority focused myopically on alleged flaws in the Fujifilm overall pricing data but never addressed the advantages of such data over the narrower Top 10 data. The quarterly pricing data are more comprehensive than the narrower Top 10 dataset which accounted for only [    ] percent of subject import volume. *See* Fujifilm Final Comments at 9, C.R. 168. Critically, in contrast to the claim by the Majority, the Top 10 dataset does not offer a more apples-to-apples comparison of head-to-head competition between domestic and subject ALPs, given that there is [

**]**.  *See* Fujifilm Post-Hearing Br. (Sept. 27, 2024) ("Fujifilm Post-HBR"), Attachment A (Answers to Commissioners' Questions) at 13-14, C.R. 152.

In fact, the Top 10 dataset supports Fujifilm's argument that there is no causal link between under/overselling and the condition of the domestic industry.  The subsets of the pricing data show that subject imports may have undersold for the limited volume sold to the largest customers but oversold with respect to the much larger import volume sold to other smaller customers.  Moreover, Kodak was able to raise prices to both its large and small customers and it actually maintained relatively higher volume for the large customers (for which they were undersold) than for its smaller customers.  These facts demonstrate the lack of correlation between underselling and any effect on domestic volume, prices, or profitability.  *See* Fujifilm Final Comments (Oct. 17, 2024) at 9-10, C.R. 168.

> **e.    There is little to no support that certain customers purchased subject imports instead of Kodak's ALPs because of lower prices**

The Majority's primary basis for its factual conclusion that customers purchased imports instead of Kodak's U.S. ALPs were the questionnaire responses and purchasing data from just **[                                    ]**.  *See Majority* at 43-46, C.R. 170.  But, once again, the Majority's factual conclusion has little to no support.  We respectfully ask this Court to read the entire questionnaire responses submitted by these customers.

**[                            ]** Purchaser Questionnaire Response ("**[        ]** Purchaser QR"), C.R. 103; **[                ]** Purchaser Questionnaire Response ("**[        ]** Purchaser QR"),

C.R. 82; **[                    ]** Revised Purchaser Questionnaire Response ("**[        ]** Revised

QR"), C.R. 144.  These questionnaire responses *themselves* disprove the Majority's

factual conclusion.

We first address **[            ]**.  **[            ]** was the largest purchaser of **[**

**]** but only the **[            ]** largest purchaser of subject

imports.  Staff Report at 5.16 (Table 5.13), C.R. 163.  As recognized by the Staff Report

itself, **[            ]** questionnaire response explicitly reported that it did **not** purchase

subject imports instead of domestic ALPs and that this domestic producer did not lower

their prices to compete with subject imports.  *Id.* at 5.17 (Table 5.14) and 5.20 (Table

5.16).

Notwithstanding this evidence, the Majority instead focused on the absolute

increase in **[            ]** purchases of subject imports over the POI and the absolute

increase in **[            ]** subject import purchases as a share of its total purchases relative

to the absolute decline of domestically produced ALPs share of its total purchases.

*Majority* at 45-46, C.R. 170.

There are key facts, however, that fundamentally undermine the Majority's

analysis.  First, the Majority ignores evidence that the increase in **[            ]** subject

import quantities and share of **[            ]** total purchases are explained by shifts

involving non-subject sources.  The increase in subject imports from 2021 to 2022

occurred because Fujifilm shifted sales from Greenwood to both subject countries *and* its

facility in the Netherlands (a non-subject country).  It did not come at the expense of

Kodak. *See* Fujifilm Post-HBR at 9, C.R. 152 (citing **[            ]** Purchaser QR at II-1, II-3(a), and III-20).

Thus, with all of these shifts among supply sources over a three-year period, the Majority has no reasonable basis for concluding that the changes in quantities and shares observed in **[          ]** purchases during 2021 to 2023 reflect that **[          ]** purchased subject imports from Fujifilm (and **[            ]**) instead of Kodak.

We next address **[      ]**. Like it did vis-à-vis **[          ]**, the Majority completely ignored **[      ]**'s *own* explanations for its increases in subject imports, as explained in **[      ]** certified questionnaire responses submitted to the Commission. *See* **[     ]** Revised QR at II-2 (Attachment) and II-3 (Attachment).

First, **[      ]** clearly states that its purchases from Fujifilm occurred because it **[                    ]** that were *already* purchasing subject imports from Fujifilm. Thus, the pricing of these subject imports had nothing to do with the increases in **[     ]**'s subject imports from Fujifilm, and the purchases of these ALPS could not have come at the expense of Kodak.

Second, **[      ]** also states that its increase in purchases of subject imports from **[      ]** was primarily due to a shift in existing business from **[       ]** (a non-subject country). Thus, the increase in **[     ]**'s subject imports purchased from **[      ]** came at the expense of non-subject imports, not Kodak's domestic production.

Despite these clear, certified statements by **[     ]** that pricing had nothing to do with any share lost by Kodak, the Majority insisted on attributing Kodak's lower share to

competition from subject producers.  However, the share of subject imports accounted for by [      ]'s purchases from Fujifilm – which arose due to [                    ], not priced based competition -- increased by [      ] percentage points.  This implies that the maximum net gain in subject share with [       ] that could possibly be attributed to price competition was only [     ] percent (i.e., [     ] percent minus [     ] percent).  This difference is so small that it could easily be due to annual variations in consumption among [       ]'s [     ] facilities.  [       ] Purchasers QR at 1.2a, C.R. 82.

The Majority also chose to ignore overwhelming evidence that [       ]'s falling purchases from Kodak reflected reduced demand for ALPs.  As noted above, such reduced demand was amply noted by the Staff Report.  Staff Report at C.3 (Table C.1), C.R. 163.

### 3. The Majority's ultimate conclusion that lower prices caused purchasers to buy subject imports rather than U.S. products is not supported by substantial evidence; indeed, the evidence from the purchasers confirms the opposite

As noted above, the Majority's ultimate conclusion that "subject imports had significant price effects," was premised on the Majority's subsidiary finding that "significant underselling by cumulated subject imports caused subject imports to gain sales and market share from the domestic industry."  *Majority* at 49, C.R. 170.  There is no substantial evidence for this finding; indeed, the statements by the purchasers themselves disprove this claim.

The ITC's Purchaser Questionnaire has a specific multistep question devoted to obtaining critical information about whether price was the true reason a purchaser

decided to buy from subject imports rather than the domestic like product.  In this case,

each responding ALP customer answered the following:

### II.3 Purchasing subject imports rather than domestic products

(a) Since 2021 did your firm import and/or purchase ALPs from China and/or Japan instead of purchasing US produced ALPs {Y/N}

(b) If responded "Yes" to part (a), was the imported product priced lower than the domestic product {Y/N?}

(c) If responded "Yes" to part (a), was price the primary reason for importing and/or purchasing subject imports rather than domestic product.

The ITC received "25 usable" responses from purchasers.  The Staff Report

summarizes the responses as follows:

> **Of the 25 responding purchasers**, 19 reported that, since 2021, they had purchased imported ALPs from China or Japan instead of U.S.-produced product.  Five of these purchasers reported that subject import prices were lower than U.S.-produced product, and **two of these purchasers reported that price was a primary reason** for the decision to purchase imported product rather than U.S.-produced product . . .  Purchasers identified quality, production facility closings, and service and support as non-price reasons for purchasing imported rather than U.S.-produced product.

Staff Report at 5.15-16 (emphasis added), P.R. 89.

Thus, *only two* purchasers confirmed that they purchased subject imports

instead of U.S. produced because of lower prices.  Moreover, these two customers

were [          ] purchasers, accounting for [                    ] of total ALP

purchases by customers submitting responses to the ITC's Purchaser Questionnaire.

*Compare* Staff Report at Table 5.14 *with id.* at Table 5.13.  Thus, at most, lower

prices of subject imports only caused [              ] of ALP customers to purchase

subject imports rather than the domestic like product.

The Majority's decision does not adequately address this evidence contrary to its conclusion. The Majority notes the existence of this evidence, *Majority* at 43 (C.R. 170) but does not explain why this contrary evidence should be ignored, as it is required to do under the substantial evidence standard. *See supra*.

> **D.    The Majority's Conclusion of Adverse Impact from Subject Imports Is Not Supported by Substantial Evidence and Is Otherwise Not In Accordance With Law**

Under the statute, the Commission must focus on "the impact of imports of such merchandise on domestic producers of domestic like products." 19 U.S.C. §1677(7)(B)(i)(III). This assessment is part of the overall determination about whether any adverse impact is "by reason of" subject imports. 19 U.S.C. §1673d(b). It is not enough that the domestic industry has been suffering some negative trends. The Commission must find that any such adverse impact is "by reason of" subject imports. The Majority asserted that imports of ALPs "had a significant adverse impact on the domestic industry," *Majority* at 56 (C.R. 170), but the record as a whole does not support that conclusion. Rather, the record shows improving performance by Kodak for many key metrics, confirms that any negative trends resulted from other factors, and reveals a Majority determination that does not reasonably address this contrary evidence. As we discuss below, the Majority determination:

- applies the wrong statutory standard, ignoring Kodak's improvements and focusing on the assertation that Kodak could have done better even though the statutory standard focuses on declines and negative effects, not the missed opportunity to do better;

- fundamentally confuses cause and effect, pointing to declining overall industry trends that largely reflect the shutdown of Fujifilm's

Greenwood facility even though the increase in subject imports by
Fujifilm was the result of the Greenwood shutdown, not the cause of
that shutdown; and

- does not seriously grapple with the substantial evidence disproving a
  causal link, including the lack of correlation, the greater explanatory
  power of declining demand, and the specific purchaser testimony that
  they did not buy imports based on price.

In sum, the Majority's conclusion about causation applied both flawed analytic

frameworks and largely ignored the most relevant of the record evidence. That

determination should not be sustained, and certainly not as currently written.

> **1.    The Majority applied the wrong approach to determine adverse
> impact, ignoring the need to find declines and negative effects
> and not just the lack of greater gains**

At the outset, the Majority asserts a "significant adverse impact," but then largely

focuses on the facts that Kodak was doing well but could have done better. In the key

paragraphs summarizing its conclusion, the Majority conceded that Kodak gained market

share and had improved financial performance over the full 2021 to 2023 period, but then

repeatedly stressed that Kodak could have done better. *See Majority* at 38, C.R. 170 ("its

performance would have been stronger"), *id.* at 43 ("would have been higher"); *id.* at 44

("would have performed better"); and *id.* at 45 ("would have been higher"). This "could

have done better" approach, however, ignores the statutory requirements to find actual

negative effects, and not just the failure to improve by more. The statutory enumeration

of impact factors focuses on the "actual and potential <u>decline</u>" in various factors and the

"actual and potential <u>negative</u> effects" in other factors. 19 U.S.C. §1677(7)(C)(iii)

(emphasis added). The statute does not set forth a "could have done better" standard, and

this flawed reading of the statute deserves no deference under the more demanding standard of *Loper Bright* as discussed in **Section I.A.**

The Majority's approach underscores the logical disconnect in its reasoning. Needing to find negative trends, the Majority first masks Kodak's performance by addressing the industry as a whole, including the severe distortions associated with Fujifilm closing Greenwood and exiting domestic production, even though Greenwood did not shut down "by reason of" of subject imports. The Majority then considers Kodak alone. But instead of finding consistent and severe negative trends, the Majority finds some negative volume trends -- explained by declining demand, as discussed in section (3)(b) below -- and many positive trends, particularly improved market share and financial performance. The place where normally one would expect the adverse impact of subject imports to be the most severe, financial performance, showed improvement. The Majority dismissed the logical inference that imports were not a problem and instead argued that without imports Kodak could have done better.

This approach makes a mockery of the statutory standard to find injury "by reason of" imports. The Majority's logic – the domestic industry could have done better – is always true regardless of any other facts. In any industry, most firms could do better if one excludes their competition. But Congress did not create a strict liability scheme always blaming imports. The statutory standard "by reason of" requires more than arguing the domestic industry could have done better.

### 2.     The Majority improperly confused the cause and the effect

The Majority discusses both the domestic industry as a whole and Kodak alone, but then largely ignores the key analytic insights from the contrasting trends.  When Kodak's performance is isolated from the effects of Fujifilm shutting down Greenwood, that diverging trend strongly suggests that subject imports cannot be the cause of any declining trends experienced by the domestic industry.

Regarding the domestic industry as a whole, the Majority's analysis confuses the cause and the effect.  Fujifilm made the decision to close its Greenwood facility before the POI and, therefore, before the increase in subject imports.  Staff Report at 6.2 n.6, P.R. 89.  Accordingly, subject imports did not force Fujifilm to close Greenwood; rather the increase in subject imports resulted from the closure of Greenwood.  Moreover, regardless of the reasons Fujifilm closed Greenwood, the timing point remains.  Negative trends in the domestic industry as a whole are not "by reason of" subject imports when those imports occurred almost entirely because of the corporate decision to shut down the Greenwood facility.  Indeed, as the Dissent correctly noted, the Fujifilm "switch from domestic production to servicing its U.S. purchasers with subject imports resulted in an increased volume of subject imports and incontrovertible declines in the domestic industry." *Dissent* at 9 (emphasis added), C.R. 171.

Regarding the current domestic industry consisting of only Kodak, these trends actually highlight the fact that any adverse effects cannot be "by reason of" subject imports.  For several key metrics, Kodak showed improvements and not declines.  As we discuss in more detail below in section (D)(3)(a), if the adverse trends were actually

caused by imports, one would expect to see Kodak suffering declines, not improvement. That Kodak saw improving market share and financial performance confirms that subject imports were not the cause of industry trends.

> **3.    The Majority improperly ignored key evidence showing that any adverse trends resulted from other factors, and were not by reason of subject imports**

The Majority's determination blaming the adverse trends on subject imports suffered analytic flaws, but this assertion also largely ignores several key points and improperly mischaracterizes other key points about the underlying facts.

> **a.    Lack of correlation**

At the outset, we note the lack of the usual correlation the Commission finds and relies upon. In most affirmative determinations, the Commission points to the increase in subject imports and the associated declines in domestic trends over the same period. Yet that typical correlation did not exist here. Fujifilm pointed to three different categories of evidence to show the lack of correlation. The Majority ignored the first and second points and mischaracterized the third.

First, relying on Kodak public disclosures in its SEC filing, Fujifilm showed that the financial results that Kodak reported to the ITC in the U.S. market were stronger than its results outside the U.S. market. Fujifilm Pre-HBR at 107, 112-13, P.R. 69; Fujifilm Post-HBR at 6-7, P.R. 85. The Majority ignored this specific comparison of Kodak's ALP business inside and outside the U.S. market. This comparison provides strong evidence that whatever was affecting Kodak was unrelated to the alleged unfair pricing in the U.S. market, where Kodak did better than elsewhere. The Majority addressed lack of

correlation generally, but did not address this specific point at all.  *Majority* at 60, C.R. 170.

Second, Fujifilm noted the absence of price depression (prices were increasing, not falling) and price suppression (the margin of price over cost was improving), both of which are logically inconsistent with the purported causal link.  Fujifilm Pre-HBR at 107, 116, P.R. 107; Fujifilm Post-HBR at 9-10, P.R. 85.  The Majority acknowledged the lack of any price depression or suppression in its discussion of pricing, *Majority* at 47-48 (C.R. 170), but never addressed the implications of this contrary evidence in its discussion of pricing or causation.

Fujifilm also showed the comparison of year-by-year trends entirely within the U.S. market, highlighting the lack of correlation year-by-year and for the period as a whole.  Fujifilm Pre-HBR at 107, 119-20, C.R. 129; Fujifilm Post-HBR at 13, P.R. 85.  Kodak did better – improving prices and improving profitability as subject imports increased their share of the market.

The Majority acknowledged this argument but did not really address this lack of correlation.  The Majority pointed to other reasons for the improved financial performance, *Majority* at 60 (C.R. 170), but there are always other factors and they do not change the fact that Kodak had improving finances even in the face of the allegedly injurious imports.  The Majority then switched topics, returning to its Kodak "could have done better" mantra.  *Id.*  But in doing so, the Majority made a rather telling admission that "Kodak's trade-related indicators <u>declined by less than</u> apparent U.S. consumption from 2021 to 2023."  *Id* (emphasis added).  In other words, the Majority acknowledged

that declining demand explained all of the decline in the trade indicators such as production and shipments.

The lack of correlation, thus, shows a fundamental disconnect in the Majority's theory of causation. Rather than establishing the typical link between increasing imports and decreasing financial performance and domestic shipments, the record here showed Kodak's improving finances and stronger than expected shipments in a declining market – both fundamentally at odds with any effort to find injury "by reason of" subject imports.

### b.     Declining demand

This lack of correlation with subject imports is reinforced by the strong evidence here showing that any negative industry trends largely reflect the decline in demand over the period. Declining demand – not subject imports – explains the key trend here. Fujifilm stressed that declining demand largely explained the decline in Kodak's production and shipment volumes. Total consumption fell significantly, Kodak's volumes fell by less, and Kodak gained market share relative to imports. Fujifilm Pre-HBR at 107, 121-23, C.R. 129; Fujifilm Post-HBR at 12-13, C.R. 152; *see also supra* at 6-7.

Again, the Majority acknowledged but did not really address this argument about the substantial evidence – summarized above at pages 6-7 – showing declining demand as an alternative cause. Indeed, the Majority repeatedly admitted the central point: that over the full 2021 to 2023 period, Kodak's production and shipments declined by less than the fall in demand. *Majority* at 60, 70, C.R. 170. Accordingly, the Dissent correctly

concluded, it "was primarily declining demand" that explained the trends. *Dissent* at 62,

C.R. 171. Given these facts, one might expect a robust explanation for why the Majority

disregarded this rather compelling piece of evidence, but the Majority's explanation is

woefully inadequate.

The main response suffers largely from the same analytic flaws as masking of

Kodak's situation behind the industry as a whole and repeating the mantra that Kodak

"could have done better." *Majority* at 50, 60, C.R. 170. The Majority points to declines

for the domestic industry overall, making the rather obvious point that when Greenwood

closed, the domestic share of the market fell. Nonetheless, Fujifilm closed Greenwood

because of the declining global demand. Fujifilm Pre-HBR at 13-17, P.R. 107. As set

forth above, the Majority acknowledged Kodak doing better than the overall decline in

demand, which supports, and does not refute, that declining demand is main explanatory

factor.

The Majority points to trends within the overall period. *Majority* at 70.

Nonetheless, the decline from 2022 to 2023 does not change the fact that from 2021 to

2023 Kodak did better than the overall market. To stress 2022 to 2023 ignores 2021 to

2022 – that is the significance of the entire period that considered both. The different

trend in 2022 to 2023 reflects other factors the Majority did not bother to address, in

particular the specific reasons for the increase in Kodak volume in 2022 even as overall

demand was falling. Fujifilm Pre-HBR at 122-23, C.R. 129; Fujifilm Post-HBR at 9,

C.R. 152. The Majority also notes interim 2024 but does not mention that it is only a

single quarter of data.

The Majority simplifies this important task of non-attribution into the simplistic statement: "{t}hus, the decline in demand cannot account for the injury that we have attributed to cumulated subject imports." *Majority* at 71, C.R. 170. This overbroad conclusion implies some non-attribution analysis when there was none. The Majority attributed all of the injury to imports. Having acknowledged that over the first 12 of the 13 quarters considered, Kodak did better than the market, the Majority asserts, without explanation, that the trend over a single final quarter nullifies the factual significance of the prior 12 quarters. *Id.* at 70-71. The statutory standard "by reason of" requires more than a simplistic binary conclusion. At a minimum, there must be some explanation grounded in substantial evidence explaining the conclusion. The perfunctory and conclusory analysis in the Majority determination as written is not enough to be considered supported by substantial evidence.

### c.    Customer testimony about non-price factors

Further reinforcing this evidence showing no correlation and confirming the importance of declining demand, there was also significant purchaser testimony about their specific decisions to source from different suppliers. As discussed in more detail in **Section II.B.2** and **3** above and discussed by Fujifilm as part of its causation argument, Fujifilm Pre-HBR at 125-27 (P.R. 107), Fujifilm Post-HBR at 12-13 (C.R. 152), that evidence showed that purchasers generally made their decisions for non-price reasons, a key point that further undermines the Majority determination that low-priced imports caused the injury.

The Majority dismissed this argument, but did not really engage with the most relevant evidence.  In its discussion of causation, the Majority addressed only product comparability in general, not the more specific evidence of why particular purchasers made their purchasing decisions.  *Majority* at 62-63, C.R. 170.  Products can be generally comparable, but purchasers can still make their decisions for non-price reasons.  And that is precisely what the vast majority of purchasers here indicated.  In its discussion of price effects, the Majority implicitly acknowledged that of the 19 purchasers who reported they had purchased subject imports, 14 responded that subject imports were higher priced, and 17 confirmed that they did not purchase imports because of the lower price.  *Majority* at 43, C.R. 170.  The majority tried to shift the focus to a few larger customers, but as explained in **Section II.C.2** this effort does not address the complete record.  Thus, the vast majority of purchasers, representing the vast majority of volume, disagreed with the central premise to the Majority's reasoning that Kodak lost sales to lower priced subject imports.  The Dissent noted this key point stressing both the number of responding purchasers and their relative volumes, *Dissent* at 8 (C.R. 171), but the Majority simply ignored this more specific evidence in favor of more general comments about comparability.  Such conclusory discussion is not enough and does not reflect substantial evidence.

### d.     The factors as a whole

Finally, we note that, although the Commission purported to address these factors one-by-one, it made no effort to consider how they interacted with each other.  The conclusion that subject imports were not to blame is a logically consistent explanation

- 54 -

well-supported by substantial evidence. The lack of correlation with subject imports makes sense, in light of the importance of declining demand and specific evidence that most purchasers did not purchase imports based on a lower price. Declining demand explains why Kodak lost volume, and, thus, reinforces the lack of correlation between those volumes and subject imports, especially since Kodak lost less volume than would have been expected given the declining demand. Moreover, the purchaser focus on non-price factors is fully consistent with the lack of correlation and the importance of declining demand.

The Majority determination to the contrary is internally inconsistent and not supported by substantial evidence. The Majority blames imports even though the lack of correlation and declining demand better explains the trends. Moreover, the Majority blames lower-priced imports even though 17 of 19 purchasers confirmed they did not buy imports because of a lower price. Whatever the Majority may have said about each of these three points, the Majority's explanation fails as internally inconsistent and unsupported by the record as a whole.

## CONCLUSION AND PRAYER FOR RELIEF

For the foregoing reasons, Fujifilm respectfully requests that this Court find that the Majority's final affirmative injury determination was unlawful and not supported by substantial evidence. Accordingly, Fujifilm asks that this Court remand the Majority's final injury determination for further proceedings consistent with the law.

/s/ Daniel L. Porter

Daniel L. Porter
James P. Durling
Matthew P. McCullough
William Sjoberg
Gina M. Colarusso
William Chandler
John Taishu Pitt

**Pillsbury Winthrop Shaw Pittman LLP**
1200 17th St, N.W.
Washington, D.C. 20036
202-663-8140

*Counsel for Fujifilm*

**CERTIFICATION OF COMPLIANCE WITH CHAMBERS PROCEDURE 2(B)(1)**

This brief has been prepared utilizing Microsoft 365 Word using a proportionally spaced typeface 13-point Times New Roman font.

In accordance with the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that this brief complies with the word limitations set forth in the Chambers Procedures. Specifically, excluding those exempted portions of the brief as set forth in 2(B)(1) of the Chambers Procedures (*i.e.*, the table of contents, table of authorities, and counsel's signature block), I hereby certify that this brief contains 13,900 words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Daniel L. Porter

Daniel L. Porter
James P. Durling
Matthew P. McCullough
William Sjoberg
Gina M. Colarusso
William Chandler
John Taishu Pitt

**Pillsbury Winthrop Shaw Pittman LLP**
1200 17th St, N.W.
Washington, D.C. 20036
202-663-8140

*Counsel for Fujifilm*