UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES

Court No. 24-00251

**FUJIFILM NORTH AMERICA CORPORATION, FUJIFILM CORPORATION, and FUJIFILM PRINTING PLATE (CHINA) CO. LTD.,**
*Plaintiffs*,

v.

**UNITED STATES,**
*Defendant*,

and

**EASTMAN KODAK COMPANY,**

*Defendant-Intervenor*.

**DEFENDANT UNITED STATES INTERNATIONAL TRADE COMMISSION'S NONCONFIDENTIAL MEMORANDUM IN OPPOSITION TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

CHRISTOPHER W. ROBINSON
Attorney-Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 205-2542
Fax: (202) 205-3111
chris.robinson@usitc.gov

MARGARET D. MACDONALD
General Counsel
Telephone:  (202) 205-25651

KARL VON SCHRILTZ
Assistant General Counsel for Litigation
Telephone: (202) 205-3096
karl.vonschriltz@usitc.gov

DATED:  October 20, 2025

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................ iv

I.　**STATEMENT PURSUANT TO RULE 56.2** ...................................... 1

　　A.　Administrative Determinations Reviewed ................................. 1

　　B.　Questions Presented and Summary of Argument ....................... 2

　　　　1.　Did the Commission Reasonably Exercise Its
　　　　　　Discretion to Not Exclude Fujifilm Manufacturing
　　　　　　USA from the Domestic Industry as a Related Party? .......... 2

　　　　2.　Was the Commission's Volume Finding Supported
　　　　　　by Substantial Evidence and in Accordance with Law? ........ 3

　　　　3.　Was the Commission's Price Effects Finding
　　　　　　Supported by Substantial Evidence and in Accordance
　　　　　　with Law? ................................................................... 4

　　　　4.　Was the Commission's Impact Finding Supported by
　　　　　　Substantial Evidence and in Accordance with Law? ........... 6

II.　**STATEMENT OF FACTS** ............................................................. 7

　　A.　The Subject Product ............................................................. 7

　　B.　The Domestic Industry .......................................................... 8

　　C.　Conditions of Competition ..................................................... 9

　　D.　Volume ............................................................................. 10

　　E.　Price ................................................................................ 11

　　F.　Impact .............................................................................. 12

III.　**STANDARD OF REVIEW** ........................................................... 14

IV.　**ARGUMENT** ............................................................................ 16

　　A.　**The Commission's Determination Not to Exclude
　　　　Fujifilm Manufacturing USA from the Domestic
　　　　Industry Was Reasonable and in Accordance with Law** ........... 16

　　　　1.　The Commission's Analysis was in Accordance
　　　　　　with Law ...................................................................... 16

**TABLE OF CONTENTS (cont'd)**

2.    The Commission Reasonably Found that Appropriate
Circumstances Did Not Exist for Excluding Fujifilm
Manufacturing USA ................................................................22

**B.    The Commission's Volume Finding is Supported by
Substantial Evidence and in Accordance with Law .............................24**

**C.    The Commission's Price Effects Finding Is Supported
by Substantial Evidence and in Accordance with Law ......................28**

1.    The Commission's Price Effects Finding Should Be
Sustained ..................................................................................28

2.    The Commission's Finding that Subject Imports
Had Significant Price Effects Is Supported by
Substantial Evidence ...............................................................30

a.    The Commission Reasonably Found that
Price Was an Important Factor in Purchasing
Decisions ....................................................................30

b.    The Commission Reasonably Found at Least
a Moderate-to-High Degree of Substitutability ................31

c.    The Commission Reasonably Found
Significant Underselling ...........................................32

d.    The Commission Reasonably Found that
Two Major Purchasers Shifted to Subject
Imports Due to Price ................................................37

**D.    The Commission's Price Effects Analysis Is in
Accordance with Law .................................................................39**

**E.    The Commission's Impact Finding Is Supported by
Substantial Evidence and in Accordance with Law .............................42**

1.    The Commission Reasonably Found that Cumulated
Subject Imports Had a Significant Impact on the
Domestic Industry ...................................................................42

2.    The Commission Reasonably Considered Factors
Other than Subject Imports .....................................................47

**V.    CONCLUSION .................................................................................50**

## TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*Adisseo Espana S.A. v. United States,*
   Slip Op. 23-178, 2023 WL 8866562 (Ct. Int'l Trade Dec. 18, 2023).....................3, 26

*Allied Mineral Prods., Inc. v. United States,*
   28 CIT 1861 (2004) .......................................................................................19, 20

*Altx, Inc. v. United States,*
   26 CIT 709 (2002) ......................................................................................27

*Altx, Inc. v. United States,*
   370 F.3d 1106 (Fed. Cir. 2004)...........................................................28, 41, 42

*Batterton v. Francis,*
   432 U.S. 416 (1977).......................................................................................21

*Cleo Inc. v. United States,*
   30 CIT 1380 (2006) ......................................................................................41

*Coal. of Gulf Shrimp Indus. v. United States,*
   71 F. Supp. 3d 1356 (Ct. Int'l Trade 2015) ....................................17, 18, 35

*Companhia Paulista De Ferro-Ligas v. United States,*
   20 CIT 473 (1996) ......................................................................................37

*Consolo v. Fed. Mar. Comm'n,*
   383 U.S. 607 (1966).......................................................................................14, 50

*Grupo Industrial Camesa v. United States,*
   18 CIT 461, 853 F. Supp. 440 (1994) ........................................................41

*Hitachi Metals, Ltd. v. United States,*
   949 F.3d 710 (Fed. Cir. 2020).....................................................................15

*Hynix Semiconductor, Inc. v. United States,*
   30 CIT 1208, 431 F. Supp. 2d 1302 (2006).........................................35, 40

*ITG Voma Corp. v. USITC,*
   253 F. Supp. 3d 1339 (Ct. Int'l Trade 2017), *aff'd,* 753 F. App'x 913
   (Fed. Cir. 2019)......................................................................4, 26, 40, 41

*JMC Steel Grp. v. United States,*
   70 F. Supp. 3d 1309 (Ct. Int'l Trade 2015) .............................................16

*Kenda Rubber Indus. Co. v. United States,*
   10 CIT 120, 630 F.Supp. 354 (1986).......................................................18

## <u>TABLE OF AUTHORITIES (cont'd)</u>

**Cases (cont'd)**                                                                       **Page(s)**

*LG Elecs., Inc. v. U.S. Int'l Trade Comm'n*,
   26 F. Supp. 3d 1338 (Ct. Int'l Trade 2014) .................................................2, 20, 21, 41

*Loper Bright Enter's v. Raimondo*,
   603 U.S. 369 (2024)........................................................................................21

*Metallverken Nederland B.V. v. United States*,
   13 CIT 1013, 728 F. Supp. 730 (1989)......................................................................50

*Michigan v. EPA*,
   576 U.S. 743 (2015)........................................................................................21

*Mittal Steel Point Lisas Ltd. v. United States*,
   542 F.3d 867 (Fed. Cir. 2008)..............................................................................43

*Nippon Steel Corp. v. United States*,
   458 F.3d 1345 (Fed. Cir. 2006)........................................................................14, 16

*Nucor Corp. v. United States*,
   28 CIT 188, 318 F. Supp. 2d 1207 (2004), *aff'd*, 414 F.3d 1331 (Fed.
   Cir. 2005) ...............................................................................................16

*Nucor Corp. v. United States*,
   414 F.3d 1331 (Fed. Cir. 2005)....................................................................16, 41, 42

*OCP S.A. v. United States*,
   658 F. Supp. 3d 1297 (Ct. Int'l Trade 2023) ...............................................................27

*OCTAL Inc. v. United States*,
   539 F. Supp. 3d 1291 (Ct. Int'l Trade 2021) ...................................................... *passim*

*PAO TMK v. United States*,
   No. 21-00532, 2023 WL 6939242 (Ct. Int'l Trade Oct. 12, 2023).............................15

*Saarstahl AG v. United States*,
   18 CIT 595, 858 F. Supp. 196 (1994)......................................................................18

*Siemens Energy, Inc. v. United States*,
   806 F.3d 1367 (Fed. Cir. 2015)..............................................................................50

*Tenaris Bay City, Inc. v. United States*,
   Slip Op. 25-78, 2025 WL 1720173 (Ct. Int'l Trade June 20, 2025).......................3, 26

*Timken U.S. Corp. v. United States*,
   421 F.3d 1350 (Fed. Cir. 2005)..............................................................................16

## <u>TABLE OF AUTHORITIES (cont'd)</u>

**Cases (cont'd)**                                                                                   **Page(s)**

*U.S. Steel Grp. v. United States*,
   18 CIT 1190, 873 F.Supp. 673 (1994), *aff'd*, 96 F.3d 1352 (Fed. Cir.
   1996) ................................................................................................................35, 37

*U.S. Steel Grp. v. United States*,
   96 F.3d 1352 (Fed. Cir. 1996)..............................................................................15, 34

*United Steel, Paper & Forestry, Rubber, Mfr'g, Energy, Allied Indus. &*
   *Serv. Workers Int'l Union, AFL-CIO, CLC v. United States*,
   425 F. Supp. 3d 1374 (Ct. Int'l Trade 2020) ........................................................43, 44

*Universal Camera Corp. v. NLRB*,
   340 U.S. 474 (1951) .....................................................................................................15

*US Magnesium LLC v. United States*,
   36 CIT 690 (2012) .......................................................................................................15

*USEC, Inc. v. United States*,
   25 CIT 49, 132 F. Supp. 2d 1 (2001), *aff'd*, 34 F. App'x 725 (Fed. Cir.
   2002) ...........................................................................................................................19

*Wayman v. Southard*,
   10 Wheat. 1 (1825) .....................................................................................................21

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)...............................................................................................14

19 U.S.C. § 1677(4)(B)...................................................................................................8, 17

19 U.S.C. § 1677(7)(A)(C)(ii) ........................................................................................28, 41

19 U.S.C. § 1677(7)(B)........................................................................................................25

19 U.S.C. § 1677(7)(C)........................................................................................................26

19 U.S.C. § 1677(7)(C)(i) ...............................................................................3, 24, 25, 26

19 U.S.C. § 1677(7)(C)(ii)...................................................................................................25

19 U.S.C. § 1677(7)(C)(iii)................................................................................3, 26, 46

19 U.S.C. § 1677(7)(J)..........................................................................................................43

28 U.S.C. § 2639(a)(1).........................................................................................................14

## TABLE OF AUTHORITIES (cont'd)

**Legislative Material**                                                    **Page(s)**

Statement of Administrative Action for the Uruguay Round Agreements
Act, H.R. Rep. No. 103-316, vol. I (1994) .............................................2, 16, 17, 23, 47

S. Rep. No. 96-249 (1979).................................................................................................17

Defendant U.S. International Trade Commission ("Commission") opposes the motion for judgment upon the agency record filed by plaintiffs Fujifilm North America Corporation, Fujifilm Corporation, and Fujifilm Printing Plate (China) Co. Ltd., ("Fujifilm" or "Plaintiffs").  The Commission respectfully asks the Court to affirm the Commission's final affirmative determinations in the antidumping and countervailing duty investigations regarding imports of aluminum lithographic printing plates ("ALPs" or "plates") from China and Japan because they are supported by substantial evidence and in accordance with law.

## I.    STATEMENT PURSUANT TO RULE 56.2

### A.    Administrative Determinations Reviewed

Plaintiffs challenge the Commission's final affirmative determinations in the investigations of ALPs from China and Japan.  Notice of the determinations was published in the Federal Register on November 18, 2024.  89 Fed. Reg, 90,737 (Nov. 18, 2024) (PR104).  The Commission's views are contained in *Aluminum Lithographic Printing Plates from China and Japan*, Inv. Nos. 701-TA-694 and 731-TA-1641-1642, USITC Pub. 5559 (Nov. 2024) (Final) (PR103).[1]

---

[1] Citations to the public record are indicated by "PR," referring to list number 1 on the index of the administrative record, and citations to the confidential record are indicated by "CR," referring to list number 2 on the index of the administrative record. Accordingly, citations to the confidential Commission views ("Views") are to CR170 and to the confidential staff report ("CSR") are to CR163 and CR164.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

**B.** **Questions Presented and Summary of Argument**

    **1.** **Did the Commission Reasonably Exercise Its Discretion to Not Exclude Fujifilm Manufacturing USA From the Domestic Industry as a Related Party?**

Yes. The Commission's determination that appropriate circumstances did not exist to exclude Fujifilm Manufacturing USA (also referred to as "Greenwood") from the domestic industry as a related party was a reasonable exercise of its discretion and in accordance with law. First, the Commission's analysis was consistent with its longstanding approach that has been affirmed by this court and comports with Congressional intent. *See, e.g.,* Statement of Administrative Action for the Uruguay Round Agreements Act ("SAA"), H.R. Rep. No. 103-316, vol. I at 858 (1994); *LG Elecs., Inc. v. U.S. Int'l Trade Comm'n*, 26 F. Supp. 3d 1338, 1344 (Ct. Int'l Trade 2014).

Furthermore, substantial evidence supported the Commission's determination. As the Commission explained, the record indicated that Fujifilm Manufacturing USA's operations were not shielded from subject import competition, as Fujifilm's subject imports competed directly with its domestically produced plates. Views at 15. Further, the Commission explained that "where a domestic producer replaces domestic production with imports, excluding that producer from the domestic industry would skew the data in terms of the domestic industry's performance." *Id.* at 16. Accordingly, it found that excluding Fujifilm Manufacturing USA from the domestic industry would have masked declines in the domestic industry's performance, particularly given that it was [ ███ ███████████████████ ]. *Id.* at 15. The Court should reject Plaintiffs' invitation to reweigh evidence reasonably considered by the Commission on this issue.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

### 2.     Was the Commission's Volume Finding Supported by Substantial Evidence and in Accordance with Law?

Yes.  The Commission's finding that the volume and increase in volume of cumulated subject imports were significant in absolute and relative terms is supported by substantial evidence and is in accordance with law.  The Commission based its findings on quantitative data indicating that cumulated subject imports increased irregularly in absolute terms by [ ▮ ] percent and as a share of apparent U.S. consumption by [ ▮ ] percentage points from 2021 to 2023.  Views at 35.  The Commission reasonably found subject import volume and the increase in that volume significant based on these data, which Plaintiffs do not contest.

Contrary to Plaintiffs' argument, the statute requires the Commission to "consider" the significance of subject import volume and does not require it to consider "volume effects" or the "conditions of competition" as part of that analysis.  19 U.S.C. § 1677(7)(C)(i) & (iii); *Octal Inc. v. United States*, 539 F. Supp. 3d 1291, 1300 (Ct. Int'l Trade 2021).  The statute requires the Commission to consider the relevant conditions of competition for purposes of its impact analysis.  19 U.S.C. § 1677(7)(C)(iii); *Tenaris Bay City, Inc. v. United States*, Slip Op. 25-78, at 36-40, 2025 WL 1720173, at *13 (Ct. Int'l Trade June 20, 2025) (appeal pending before the U.S. Court of Appeals for the Federal Circuit, No. 2025-2034); *see also Adisseo Espana S.A. v. United States*, Slip Op. 23-178, at 15-16, 2023 WL 8866562, at *6 (Ct. Int'l Trade Dec. 18, 2023).  Therefore, the Commission appropriately considered the significance of subject import volume using the relevant quantitative data and addressed Plaintiffs' argument that subject import volume was not injurious in its impact analysis.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

**3.    Was the Commission's Price Effects Finding Supported by Substantial Evidence and in Accordance with Law?**

Yes.  The Commission found that cumulated subject imports significantly undersold the domestic like product, enabling cumulated subject imports to gain sales and market share at the expense of the domestic industry from 2022 to 2023 and in January to March 2024 ("interim 2024") compared to January to March 2023 ("interim 2023"), and preventing the industry from gaining additional market share after Greenwood's closure. Views at 47.  Consequently, the Commission reasonably concluded that cumulated subject imports had significant adverse price effects, notwithstanding the absence of significant price depression or suppression.  *ITG Voma Corp. v. USITC*, 253 F. Supp. 3d 1339, 1360-61 (Ct. Int'l Trade 2017), *aff'd without opinion,* 753 F. App'x 913 (Fed. Cir. 2019).

The Commission reasonably found that subject imports significantly undersold the domestic like product by comparing quarterly prices for domestic producer and U.S. importer sales to their ten largest customers, as these data showed that subject imports undersold the domestic like product in [ ███ ] percent of quarterly comparisons corresponding to [ ███ ] percent of subject import sales volume.  Views at 42.  Contrary to Plaintiffs' argument, the Commission considered Fujifilm's overall pricing data, but attached less weight to these data for two reasons.  First, the Commission found that Fujifilm had inflated its reported sales prices by including certain costs that were supposed to have been deducted.  Second, the Commission found that Fujifilm's much larger proportion of smaller customers compared to Kodak, and the prevalence of volume discounts given by both Fujifilm and Kodak to larger customers, had served to inflate subject import sales prices relative to domestic sales prices.  Therefore, the Commission

- 4 -

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

reasonably placed greater weight on the top ten customer pricing data, which mitigated the distortions caused by volume discounts.

The Commission also reasonably based its underselling finding on the moderate-to-high degree of substitutability between subject and domestic ALPs and the importance of price to purchasing decisions. Contrary to Plaintiffs' mistaken contention, the Commission did not find that price was "the most important factor" (PlBr. at 36), but rather that "price is *an* important factor in purchasing decisions, among other important factors." Views at 30 (emphasis added). Moreover, the Commission explicitly considered the evidence highlighted by Plaintiffs – that "quality was the most frequently cited first-most important factor" and most purchasers "reported that they only sometimes or never purchase the lowest-priced product" – but found the evidence outweighed by other evidence indicating that purchasers considered price an important factor. *Id.*

The Commission reasonably found a moderate-to-high degree of substitutability between subject and domestic ALPs based on questionnaire responses indicating that most responding firms considered them [ ▮▮▮▮▮▮▮ ] interchangeable and that a majority of purchasers reported that they were comparable with respect to 16 purchasing factors. *Id.* at 28. Contrary to Plaintiffs' argument, the Commission recognized that the need to recalibrate printing equipment was "{o}ne factor limiting substitutability," but explained, based on a range of evidence, that such recalibration was not particularly uncommon, expensive, or time-consuming. *Id.* at 29.

Finally, substantial evidence supported the Commission's finding that [ ▮▮▮ ] and [ ▮ ], two of the largest purchasers in the market, increased their purchases of subject imports at the domestic industry's expense at least partially due to their lower

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

prices.  While recognizing that neither purchaser reported switching to subject imports

due to price, the Commission explained that price would have been a factor given the

importance both purchasers placed on price and their reporting that subject and domestic

ALPs were comparable in terms of non-price factors.  *Id.* at 43-44 & n.168.  The

Commission also found that [ ███████████ ] could not account for all the

increases because [ ██████ ] increased its purchases of subject imports by more than was

necessary to replace its former volumes from [ ██████ ] and [ █████ ] purchases of

domestic ALPs from Greenwood in 2022 represented only a [ █████ ] of its purchases

of subject imports in 2023.  *Id.* at 44-46.  The Court should reject Plaintiffs' invitation to

reweigh this evidence.

### 4.     Was the Commission's Impact Finding Supported by Substantial Evidence and in Accordance with Law?

Yes.  The Commission found that significant subject import underselling limited

the domestic industry to gaining only a fraction of the market share ceded by Fujifilm

Manufacturing USA upon its closure in 2022 and caused the industry to lose market share

to cumulated subject imports in 2023 and interim 2024.  *Id.* at 57-58.  Consequently, the

domestic industry's production, capacity utilization, shipments, and revenues were lower

than they otherwise would have been.  *Id.*  Contrary to Plaintiffs' argument that the

domestic industry's performance trends were insufficiently adverse, the Commission

recognized that Kodak's financial performance had improved over the period of

investigation ("POI") and explained that the improvement resulted from lower raw

material costs and a "smart revenue" strategy, which ceded sales to low-priced subject

imports at the expense of its production, capacity utilization, U.S. shipments, and market

share.  *Id.* at 60.  Nor did the Commission rely on Greenwood's closure to find material

injury, as Plaintiffs mistakenly argue. PlBr. at 48. Rather, the Commission "set aside the reason" for the closure and found that cumulated subject imports had adversely impacted the domestic industry, consisting of Kodak, after the closure. Views at 57-58.

In its non-attribution analysis, the Commission explained that no other factors accounted for the injury it had attributed to cumulated subject imports. Because the Commission's impact analysis was supported by substantial evidence, the Court should affirm it.

## II.    STATEMENT OF FACTS

In November 2024, the Commission determined that the domestic industry producing ALPs was materially injured by reason of imports of ALPs from China and Japan found by the U.S. Department of Commerce ("Commerce") to be sold in the United States at less than fair value and subsidized by the government of China. In its determinations, the Commission defined a single domestic like product coextensive with Commerce's scope, cumulated imports from China and Japan, and found that critical circumstances did not exist. *Id.* at 5-10, 17-20, 71-75. Plaintiffs do not challenge these aspects of the Commission's determinations.

### A.    The Subject Product

ALPs are image carriers used in the offset printing process, a method used to produce printed materials such as newspapers, magazines, books, and packaging. The plates are made from an aluminum substrate treated to enable a platesetting device to impart an image onto the surface. The plates are then mounted in printing presses in which fountain solutions and inks reproduce the image on printable materials. *Id.* at 8-9.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

### B.     The Domestic Industry

In defining the domestic industry, the Commission had to consider whether appropriate circumstances existed to exclude Fujifilm Manufacturing USA from the domestic industry as a related party under 19 U.S.C. § 1677(4)(B) because of its shared common control with Fujifilm North America Corporation ("FNAC"), a U.S. importer of ALPs from Japan and China, and foreign producers Fujifilm Corporation ("Fujifilm Japan") and Fujifilm Printing Plate (China) Co. ("Fujifilm China").  Views at 11-12.

The Commission acknowledged Fujifilm's decision to close Fujifilm Manufacturing USA and replace its production with subject imports, reportedly to "rationalize global capacity," and determined that appropriate circumstances did not exist to exclude Fujifilm Manufacturing USA from the industry.  *Id.* at 12-13, 16.  It found that Fujifilm Manufacturing USA was not shielded from subject import competition but instead that its exclusion would mask the effects of subject imports on the industry.  As Fujifilm Manufacturing USA's production and shipments declined, the volume of cumulated subject imports – [                                    ] – increased substantially, gaining market share as Fujifilm Manufacturing USA's market share declined.  Further, the Commission found that FNAC imported the same products that were domestically produced by Fujifilm Manufacturing USA, indicating that those subject imports competed directly with Fujifilm's domestically produced ALPs.  It concluded that excluding Fujifilm Manufacturing USA from the domestic industry would have masked declines in the domestic industry's market share, output, and financial performance, particularly given that Fujifilm Manufacturing USA was [                  ].  *Id.* at 15-16.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

C.     **Conditions of Competition**

With respect to demand, the Commission found that apparent U.S. consumption of ALPs, driven by demand for printed publications, declined from [         ] square meters in 2021 to [         ] square meters in 2022 and [         ] square meters in 2023, a level [      ] percent lower than in 2021; it was [      ] percent lower in interim 2024, at [         ] square meters, than in interim 2023, at [         ] square meters.  *Id.* at 25-26.

The Commission observed that the domestic industry was the largest source of ALP supply to the U.S. market in 2021 and 2022, but, after Greenwood's closure in March 2022, became the smallest source of supply in 2023 and interim 2024.  *Id.* at 26.  As such, Kodak was the sole remaining domestic producer in 2023 and interim 2024.  *Id.* at 26-27.  The Commission found that the industry maintained excess capacity throughout the POI, with capacity utilization below 50 percent in 2023 and interim 2024.  *Id.* at 27.

Turning to imported supply, the Commission observed that FNAC accounted for the large majority ([      ] percent in 2023) of subject imports, followed by ECO3, another large global supplier.  It also found that nonsubject imports were the second-largest source of supply throughout the POI, sourced primarily from Germany, where ECO3 and Kodak produced ALPs, and the Netherlands, where Fujifilm produced ALPs until closing its facility in [      ] 2023.  *Id.* at 27-28.

The Commission found that there was at least a moderate-to-high degree of substitutability between the domestic like product and cumulated subject imports and that price was an important factor in purchasing decisions, among other important factors.  The Commission observed that responding market participants considered subject

imports and domestic ALPs generally interchangeable and comparable in terms of non-price factors. *Id.* at 28-30. While recognizing that the need to recalibrate printing equipment when switching plate suppliers was a factor that limited substitutability, it found that switching suppliers remained possible and that many purchasers sourced from multiple suppliers. *Id.* at 29.

The Commission found that domestic and subject ALPs were primarily sold from inventory. It also observed that most sales were pursuant to long-term contracts, although spot sales accounted for [ ███████ ] of subject import sales. Nevertheless, it found that long-term contracts did not preclude purchasers from switching suppliers or from seeking more advantageous pricing, but only moderated their ability to rapidly switch suppliers. *Id.* at 30-31.

The Commission also observed that ALPs were typically sold in connection with other products and services, such as equipment, chemicals, and technical support, which added to the prices at which ALPs were sold. In addition, the prices of equipment and services from a particular ALP supplier were commonly linked to the purchases of ALPs, and volume discounts were common. *Id.* at 32.

**D. Volume**

Between 2021 and 2023, cumulated subject imports increased irregularly by [ ███ ] percent, increasing from [ ██████ ] square meters in 2021 to [ ███████ ] square meters in 2023. During that time, subject imports gained [ ████ ] percentage points of market share and their ratio to domestic production increased from [ ███ ] percent in 2021 to [ ████ ] percent in 2023. Based on these and interim period data, the Commission concluded that the volume of cumulated subject imports, and the increase in

that volume, were significant in absolute terms and relative to consumption and

production in the United States. *Id.* at 35-36.

      **E.**    **Price**

      The Commission analyzed price effects in the context of its findings of at least a

moderate-to-high degree of substitutability and that price was an important factor in

purchasing decisions. *Id.* at 36. Examining several sources of information, the

Commission considered the overall pricing data but attached little weight to it. As it

explained, FNAC's sales prices, unlike Kodak's, were inflated by costs that should have

been deducted. It also found that Kodak's greater share of sales to large customers with

volume discounts and Fujifilm's greater share of sales to smaller customers without

volume discounts tended to inflate subject import prices relative to domestic prices,

making price comparisons based on overall pricing data not apples-to-apples. To

mitigate this distortion, the Commission placed greater weight on data reflecting sales to

the ten largest customers of both Kodak and Fujifilm. *Id.* at 40-41. These data showed

that subject imports pervasively undersold domestic ALPs, and that the frequency and

volume of underselling increased over the POI. *Id.* at 42-43.

      The Commission also considered evidence of lost sales. It found that two of the

largest purchasers significantly increased their purchases of subject imports between

2021 and 2023 at the expense of the domestic industry. *Id.* at 43. Although these

purchasers did not attribute their shift solely to price, their responses emphasized the

importance of price and comparability of subject imports to domestic products on non-

price factors, leading the Commission to conclude that price contributed to their decision

to purchase subject imports instead of domestic product. *Id.* at 43-44.

Based on the foregoing evidence, the Commission found that cumulated subject imports significantly undersold domestic ALPs during the POI. The Commission also found that underselling enabled subject imports to gain sales and market share, causing a shift from the domestic industry to subject imports from 2022 to 2023 and between interim periods, and preventing the domestic industry from gaining additional market share over the POI after Greenwood closed. *Id.* at 47.

Finally, the Commission considered whether subject imports had depressed or suppressed domestic prices. It found that domestic prices had increased over the POI and that the industry's unit costs had not increased faster than its unit prices during the period. *Id.* at 47-49.

### F.    Impact

The Commission found that cumulated subject imports had a significant impact on the domestic industry. While recognizing that subject imports' gain in market share over the POI reflected, in part, Fujifilm's decision to replace domestic production with subject imports, the Commission rejected Fujifilm's premise that it was entitled to the entire market share ceded by Fujifilm Manufacturing USA when it closed Greenwood in 2022. Views at 56. The Commission found that Fujifilm's ability to gain nearly all the sales relinquished by Fujifilm Manufacturing USA was facilitated by the availability of lower-priced subject imports. *Id.* at 57. The Commission also found that subject import underselling limited Kodak's ability to gain those sales and caused Kodak to lose sales and market share to subject imports in 2023 and interim 2024, despite its low and declining capacity utilization rate. *Id.* at 57-58. Consequently, the Commission found that Kodak's gross income, operating income, and net income, as well as its production and shipment quantities, would have been higher but for subject imports. *Id.* at 58.

The Commission rejected Fujifilm's argument that subject imports could have caused no injury because Kodak's financial performance improved. As the Commission explained, in response to significant underselling by subject imports, Kodak adopted a "smart revenue" strategy focusing on sales "where it could earn a reasonable return." *Id.* at 60. This strategy, along with declining raw material costs from 2022 to 2023, improved Kodak's financial performance but at the expense of its production, capacity utilization, U.S. shipments, and market share. *Id.*

The Commission also rejected Fujifilm's argument that purchasers could not easily change suppliers due to high costs involved with switching and long-term contracts. It found that these factors did not pose a significant impediment to purchasers changing suppliers on the basis of price, noting that eight of 24 purchasers reported changing suppliers since January 1, 2021, including four that dropped or reduced purchases from Kodak and began purchasing from Fujifilm. *Id.* at 60-61.

Nor was the Commission persuaded by Fujifilm's argument that non-price factors explained any purchases lost by Kodak to Fujifilm, given that domestic ALPs had at least a moderate-to-high degree of substitutability with subject imports. *Id.* at 62. It also rejected Fujifilm's argument that Kodak's loss of market share to subject imports from 2022 to 2023 and in interim 2024 compared to interim 2023 was not injurious. *Id.* at 63-69.

Finally, the Commission considered other factors that may have had an impact on the domestic industry. The Commission found that nonsubject imports did not explain the injury to the domestic industry because their market share was unchanged from 2022 to 2023 and decreased between interim periods. *Id.* at 69-70.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

The Commission also found that the decline in apparent U.S. consumption did not explain the larger declines in the domestic industry's production, nor the industry's loss of market share and inability to gain additional sales and market share in 2023 and interim 2024 due to significant subject import underselling.  Although Kodak's production and U.S. shipments declined by less than apparent U.S. consumption from 2021 to 2023, Kodak's production, capacity utilization, and U.S. shipments declined by more than apparent U.S. consumption from 2022 to 2023, as it lost [ ▮ ] percentage points of market share to subject imports.  *Id.* at 70.

## III.  STANDARD OF REVIEW

Under the Tariff Act of 1930, this Court reviews the Commissions' final antidumping and countervailing duty determinations to assess whether they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  The Commission's determinations are presumed to be correct, and the burden is on the party challenging the determinations to demonstrate otherwise.  *See* 28 U.S.C. § 2639(a)(1).

Under the substantial evidence standard, the reviewing courts defer to the Commission's reasoned fact-finding and analysis in injury investigations.  *See, e.g.*, *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1354-55 (Fed. Cir. 2006).  Substantial evidence is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).  Nor does the fact that Plaintiffs can point to an alternative view of the same factual record by a dissenting

Commissioner establish that the Commission's views on remand were not supported by substantial evidence. *See U.S. Steel Grp. v. United States,* 96 F.3d 1352, 1362 (Fed. Cir. 1996). (it is an "indisputable proposition that each commissioner is free to attach different weight to factual information bearing on, and determinate of, the many statutory tests" and "commissioners may ultimately reach different factual conclusions on the same record"). Thus, under the substantial evidence standard, a court may not, "even as to matters not requiring expertise . . . displace the {agency's} choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). "{T}he question is not whether the court would have reached the same conclusion on the same record –rather, it is whether the administrative record as a whole permits the Commission's conclusion." *PAO TMK v. United States*, No. 21-00532, 2023 WL 6939242, at *2 (Ct. Int'l Trade Oct. 12, 2023). A court "must affirm a Commission determination if it is reasonable and supported by the record as a whole, even if some evidence detracts from the Commission's conclusion." *Hitachi Metals, Ltd. v. United States*, 949 F.3d 710, 716 (Fed. Cir. 2020) (citation omitted).

In injury investigations, the Commission is the trier of fact. As such, "{i}t is the Commission's task to evaluate the evidence it collects during its investigation" and "{c}ertain decisions, such as the weight to be assigned a particular piece of evidence, lie at the core of that evaluative process." *U.S. Steel Grp.*, 96 F.3d at 1357. Accordingly, the Commission has "discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor in its analysis." *US Magnesium LLC v. United States*, 36 CIT 690, 692 (2012) (citation omitted). As the Federal Circuit

has stated, if "the totality of the evidence does not illuminate a black-and-white answer to

a disputed issue, it is the role of the expert fact-finder—here the majority of the

Presidentially-appointed, Senate-approved Commissioners—to decide which side's

evidence to believe." *Nippon Steel*, 458 F.3d at 1359.

 Since the Commission "is presumed to have considered all of the evidence

on the record," it is "not required to explicitly address every piece of evidence presented

by the parties" during an investigation. *Nucor Corp. v. United States*, 28 CIT 188, 234,

318 F. Supp. 2d 1207, 1247 (2004), *aff'd*, 414 F.3d 1331 (Fed. Cir. 2005). Instead, the

Commission need only address the "issues material to {its} determination" so that the

"path of the agency may reasonably be discerned." SAA at 892; *see also Timken U.S.*

*Corp. v. United States*, 421 F.3d 1350, 1354–57 (Fed. Cir. 2005). "When evaluating

challenges to the ITC's choice of methodology," this Court "will affirm the chosen

methodology as long as it is reasonable." *JMC Steel Grp. v. United States*, 70 F. Supp. 3d

1309, 1316 n.4 (Ct. Int'l Trade 2015).

## IV. ARGUMENT

### A. The Commission's Determination Not to Exclude Fujifilm Manufacturing USA from the Domestic Industry Was Reasonable and in Accordance with Law

#### 1. The Commission's Analysis Was in Accordance with Law

 Plaintiffs argue that the Commission violated the statute when it exercised its

discretion not to exclude Fujifilm Manufacturing USA from the domestic industry as a

related party by somehow ignoring the statute's focus on present injury and future

remedies. PlBr. at 13-14, 17. Specifically, they contend that the Commission ignored

that this case presented "the quintessential case" of a domestic producer that should be

excluded, allegedly because it did not compete with subject imports from the related

- 16 -

foreign producer.  *Id.* at 19.  However, the Commission's analysis of this issue was consistent with the statute, Congressional intent, and its longstanding approach to analyzing such issues, which has been affirmed by this court.

Contrary to Plaintiffs' argument, there is no requirement under the statute that the Commission focus its analysis of whether "appropriate circumstances" exist on the present and future.  Under the statute, when a producer is related to an exporter of the subject merchandise, the Commission may, in "appropriate circumstances," exclude that producer from the domestic industry.  19 U.S.C. § 1677(4)(B).  Although the statute defines "related parties," it does not describe "appropriate circumstances."  In the SAA, however, Congress explained that the purpose of the related parties provision is for "the Commission to reduce any distortion in industry data caused by the inclusion in the domestic industry of a related producer who is being shielded from the effects of the subject imports."  SAA at 858.  This is consistent with the legislative history indicating that the Commission should exclude a related party from the domestic industry where "the foreign producer directs his exports to the United States so as not to compete with his related U.S. producer."  S. Rep. No. 96-249, at 83 (1979), *as reprinted in* 1979 U.S.C.C.A.N. 381, 469.

To assess whether a domestic producer was shielded from subject import competition, the Commission necessarily must consider whether subject imports competed with the domestic producer's U.S. shipments *during the period of investigation.*  This court has long recognized that the Commission normally examines historical data covering a three-year period, plus any interim data, to determine present material injury in original investigations.  *Coal. of Gulf Shrimp Indus. v. United States,*

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

71 F. Supp. 3d 1356, 1371 (Ct. Int'l Trade 2015)**;** *Saarstahl AG v. United States*, 18 CIT 595, 600, 858 F. Supp. 196, 200 (1994) (*citing, inter alia, Kenda Rubber Indus. Co. v. United States,* 10 CIT 120, 126–27, 630 F. Supp. 354, 359 (1986)).  Limiting the Commission's analysis to data concerning the present and future, as Plaintiffs argue, would shed little light on the question of whether a related party was shielded from subject import competition during the POI.  It would also perversely require the Commission to exclude from the industry domestic producers forced by subject import competition to replace their domestic production with subject imports earlier in the POI, though such a firm's performance would clearly be relevant to the Commission's impact analysis.

Here, in accordance with the statute, the Commission considered whether Fujifilm Manufacturing USA was shielded from subject import competition during POI such that its inclusion in the industry would mask injury and reasonably concluded it was not. First, the Commission found that Fujifilm Manufacturing USA had accounted for [ ██ ] percent of domestic production in 2021 and that its primary interest had been in domestic production until it ceased production.  Views at 13-14.  The Commission then explained that as cumulated subject imports increased, [ ████████████████████████ ██████ ], Fujifilm Manufacturing USA's production, market share, U.S. shipments, and financial performance declined.  *Id.* at 15.  These declines were not consistent with the performance of a domestic producer shielded from subject import competition, as such producers normally outperform others.

Considering whether Fujifilm Manufacturing USA's shipments might nevertheless have been shielded from subject imports, the Commission found that FNAC

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

imported the same products domestically produced by Fujifilm Manufacturing USA. *Id.* The record showed overlap between sales of Fujifilm Manufacturing USA's sales and FNAC's sales of subject imports for [ ███████████████████████████ ██ ], and Fujifilm acknowledged that subject imports "replace{d} Greenwood's shipments during the period." *Id.* at 15 n.46. This was not a case where "the foreign producer directs his exports to the United States so as not to compete with his related U.S. producer." To the contrary, the Commission found that Fujifilm China and Fujifilm Japan exported ALPs to the United States identical to those produced by Fujifilm Manufacturing USA. Given this, and the decline in Fujifilm Manufacturing USA's performance as subject imports increased, the Commission reasonably concluded that Fujifilm Manufacturing USA's domestic production was not shielded from subject import competition during the POI. For this reason, the Commission explained, its exclusion would skew the domestic industry data by masking declines in the domestic industry's performance due to subject imports, particularly given that [ ████████████████ ████████████████████ ]. *Id.* at 14-15.

Consistent with the Commission's analysis, this court has recognized that the rationale for the related parties provision was Congress's concern that domestic producers may benefit from their affiliation with U.S. importers and foreign producers of subject merchandise. *USEC, Inc. v. United States*, 25 CIT 49, 61, 132 F. Supp. 2d 1, 12 (2001) ("{T}he provision's purpose is to exclude from the industry headcount domestic producers substantially benefitting from their relationships with foreign exporters."), *aff'd without opinion*, 34 F. App'x 725 (Fed. Cir. 2002); *Allied Mineral Prods., Inc. v. United States,* 28 CIT 1861, 1864 (2004) ("The most significant factor considered by the

Commission in making the 'appropriate circumstances' determination is whether the domestic producer accrued a substantial benefit from its importation of the subject merchandise."). Here, the Commission found that Fujifilm Manufacturing USA had derived no such benefit from its affiliations; to the contrary, its performance declined as subject imports identical to its domestically produced ALPs increased.

This court has also affirmed the very factors the Commission considered here as consistent with the statute in *LG Electronics*, under strikingly similar facts. *See* 26 F. Supp. 3d at 1345-46. In that case, the Commission found that Electrolux, the largest domestic producer of large residential washers in the first year of the POI, decided to shift production to Mexico and increased its ratio of subject imports to domestic production each year until ceasing domestic production. *Id.* at 1346. Notwithstanding that Electrolux's then-current interest was not aligned with the domestic industry, the Commission found there was "'no evidence that Electrolux's domestic production activities benefitted from its subject imports or were otherwise shielded from subject import competition . . . .'" *Id.* In particular, the Commission found that Electrolux's financial losses increased as its subject imports increased and that the record showed a significant volume of subject imports similar to those produced domestically by Electrolux. *Id.* The Commission concluded that excluding Electrolux would distort the data by masking declines in domestic industry performance. *Id.* In affirming, the court held that "the test employed by the Commission is a reasonable one that looked not only at the benefits received by the domestic producer, but also at its share of the market and whether excluding the producer would distort the data." *Id.* at 1345-46. The Court should likewise affirm the Commission's application of the same test here.

Plaintiffs cite *Loper Bright* in urging the Court to give no weight to the CIT's affirmance of the Commission's approach to related parties in *LG Electronics* because that decision relied in part on *Chevron*. *See* PlBr. at 19 (*citing Loper Bright Enter's v. Raimondo*, 603 U.S. 369 (2024)). But *Loper Bright* recognized that the best interpretation of a statute can be that the statute "delegates discretionary authority to an agency." *Id*. at 394-95. The Court cited several examples of Congressional delegation of authority: "some statutes 'expressly delegate{}' to an agency the authority to give meaning to a particular statutory term," *id*. (quoting *Batterton v. Francis*, 432 U.S. 416, 425 (1977)), and other statutes "empower an agency to prescribe rules to 'fill up the details' of a statutory scheme," *id*. at 395 (quoting *Wayman v. Southard,* 10 Wheat. 1, 43 (1825)), or use "a term or phrase that 'leaves agencies with flexibility,' such as 'appropriate' or 'reasonable.'" *Id.* (quoting *Michigan v. EPA*, 576 U.S. 743, 752 (2015)). Here, both the statute's use of the word "appropriate" and the absence of any prescribed criteria serve to delegate to the Commission the authority to determine when "appropriate circumstances" exist for the exclusion of a related party from the domestic industry.

Additionally, the Supreme Court emphasized that its decision in *Loper Bright* does not call into question prior cases that relied on the *Chevron* framework. Instead, it found that "{t}he holdings of those cases that specific agency actions are lawful . . . are still subject to statutory *stare decisis* despite our change in interpretive methodology." *Id*. at 412 (citation omitted). Thus, the Court's analysis in *LG Electronics* sustaining the Commission's approach to related parties remains highly persuasive.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

For all these reasons, the Commission's determination that appropriate circumstances did not exist to exclude Fujifilm Manufacturing USA from the domestic industry was in accordance with law, and the Court should therefore affirm it.

> **2.    The Commission Reasonably Found that Appropriate Circumstances Did Not Exist for Excluding Fujifilm Manufacturing USA**

Plaintiffs alternatively argue that the Commission's determination not to exclude Fujifilm Manufacturing USA from the domestic industry is unsupported by substantial evidence.  In their view, the Commission's inclusion of Fujifilm Manufacturing USA in the domestic industry somehow masked the trends for Kodak, the last remaining domestic producer at the end of the POI.  PlBr. at 21.  The Court should reject Plaintiffs' invitation to reweigh evidence reasonably considered by the Commission.

The Commission acknowledged Fujifilm's explanation that it had decided to close Fujifilm Manufacturing USA's facility prior to the POI as part of a global reallocation strategy but found that even if true, this did not support Plaintiffs' position that Fujifilm Manufacturing USA should be excluded.  Views at 13, 16.  As the Commission explained, where a domestic producer replaces domestic production with subject imports, excluding that producer from the domestic industry would skew the data on domestic industry performance.  *Id.* at 16.  Indeed, the Commission found that Fujifilm Manufacturing USA was not shielded from subject import competition because its performance declined as subject imports increased and its domestically produced ALPs were identical to, and competed directly with, the subject imports.  *Id.* at 15.  The Commission also found that Fujifilm Manufacturing USA had been the [ ███████████ ███████████ ], making exclusion of its data especially distortive.  *Id.*  While

acknowledging Fujifilm's stated reasons for replacing domestic production with subject imports, the Commission reasonably found that appropriate circumstances did not exist to exclude Fujifilm Manufacturing USA from the domestic industry.

Plaintiffs' argument that the Commission should have excluded Fujifilm Manufacturing USA even though its production was replaced by subject imports confuses the Commission's analysis of causation with its analysis of related parties. Their contention that Fujifilm Manufacturing USA's decline stemmed from its "orderly wind-down" rather than competition from subject imports is a causation argument. PlBr. at 20-21. But the statute does not require the Commission to find that a related party was materially injured by subject imports before including that producer. Rather, the statute provides that the Commission may exclude related parties under "appropriate circumstances," and the SAA and legislative history indicate that such circumstances would exist where a domestic producer is shielded from subject import competition. Here, Plaintiffs acknowledge that Fujifilm Manufacturing USA was not shielded from subject import competition but rather had its domestic production systematically replaced by dumped and subsidized imports. The Commission appropriately considered Plaintiffs' arguments concerning the impact of subject imports on the domestic industry, including Fujifilm Manufacturing USA, in its impact analysis, discussed below. *See* Views at 56-58 & n.236.

For these reasons, the Commission reasonably determined that appropriate circumstances did not exist to exclude Fujifilm Manufacturing USA from the domestic industry. The Court should therefore affirm this aspect of the Commission's determinations.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

**B.      The Commission's Volume Finding Is Supported by Substantial Evidence and in Accordance with Law**

The statute instructs the Commission to "consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant."  19 U.S.C. § 1677(7)(C)(i).  In accordance with the statute, the Commission found, and the evidence shows, that the volume of subject imports and the increase in that volume was significant in absolute terms and relative to consumption and production in the United States.  Views at 36.  Although Plaintiffs argue that the Commission was required to reach additional findings in the context of its volume analysis, these claims are without basis in the statute and disregard the Commission's consideration of these issues elsewhere in the Commission's opinion.  Thus, the Commission's volume analysis was reasonable and in accordance with law.

The Commission reasonably found that the volume of subject imports and the increase in that volume was significant in absolute terms and relative to consumption and production in the United States.  Specifically, the Commission found that the absolute volume of subject imports irregularly increased, more than tripling over the POI, increasing from [          ] square meters in 2021 to [          ] square meters in 2022 before declining to [          ] square meters in 2023, while subject import market share also increased from [     ] percent in 2021 to [     ] percent in 2022 and [     ] percent in 2023.  Views at 35.  The ratio of cumulated subject imports to domestic production also increased from [     ] percent in 2021 to [     ] percent in 2022 and [     ] percent in 2023.  *Id*.  The Commission also found that while subject import volume declined relative to U.S. production over the interim periods, they

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

increased by [ █ ] percentage points in market share.  *Id.*  Based on these data, the

Commission reasonably found that the volume of subject imports and the increase in that

volume were "significant in absolute terms and relative to consumption and production in

the United States."  *Id.* at 36.

Plaintiffs do not challenge the data on which the Commission based its analysis of

subject import volume and acknowledge that "there was an absolute increase in subject

imports during the POI."  PlBr. at 24.  Instead, Plaintiffs' raise several statutory

arguments, which do not withstand scrutiny.[2]

Plaintiffs' argument that the Commission was required to consider factors other

than the significance of subject import volume, such as conditions of competition and

"volume effects," has no basis in the statute.  *Id.* at 23-25.  The plain language of the

statutory volume provision contains no mention of effects, unlike the price and impact

provisions.  *Compare* 19 U.S.C. § 1677(7)(C)(i) *with id.* at § 1677(7)(C)(ii) ("In

evaluating the effect of imports of such merchandise on prices . . . ."); *see also id.* at

§ 1677(7)(B) (bifurcating the Commission's injury assessment between analysis of

subject import "volume," and its "consequent impact" (*i.e.*, its effects)).  Moreover, the

Commission is not required to consider the reasons for increased subject import volumes

in assessing whether the volume or increase in volume is significant.  The statute

explicitly permits a finding that subject import volumes are "significant" in "absolute

---

[2] Plaintiffs' arguments regarding "Fujifilm's decision to shift supply sources for its U.S. customers" and the alleged "effect" of subject import volume on the domestic industry do not undermine the Commission's statutory finding that subject import volume was significant.  Those contentions concern causation, as addressed in the Commission's impact analysis.  We therefore address them in section IV.D, below.

terms," based upon volume alone. *See OCTAL*, 539 F. Supp. 3d at 1299-1300 (citing 19 U.S.C. § 1677(7)(C)(i)).

Nor do Plaintiffs cite any legal authority for their assertion that the Commission was legally required to consider the reasons for and effects of increased subject imports as part of its volume analysis. Indeed, this court has previously rejected similar arguments. *See Adisseo*, Slip Op. 23-178 at 15-16, 2023 WL8866562, at *6 (holding that the statute does not require the Commission to consider "volume effects" in considering the significance of subject import volume); *OCTAL*, 539 F. Supp. 3d at 1299–1300 (citing 19 U.S.C. § 1677(7)(C)(i) and *ITG Voma*, 253 F. Supp. 3d at 1357) (upholding the Commission's volume finding and rejecting arguments that the statute requires the Commission to consider the effects of subjects imports in its volume analysis or why subject import market share increased).

Furthermore, the statute only requires that the Commission take conditions of competition into account when analyzing the impact of subject imports. *Compare* 19 U.S.C. § 1677(7)(C) *with* 19 U.S.C. § 1677(7)(C)(iii). Section 1677(7)(C)(iii) lists the economic factors for the Commission's assessment of the affected domestic industry and mandates consideration of "conditions of competition" within "this clause," meaning section 1677(7)(C)(iii). Indeed, this court has recognized that the Commission need not consider the conditions of competition in its volume analysis, as that requirement only applies to *impact*. *Tenaris*, Slip Op. 25-78 at 39, 2025 WL 1720173, at *14 "The Court agrees that the last section of 19 U.S.C. § 1677(7)(C)(iii) regarding 'conditions of competition' should be read to apply only to the 'impact on affected domestic industry' section of the statute.").

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

Nevertheless, the Commission addressed the relevant conditions of competition in the section immediately preceding its volume analysis and therefore took them into account.  Views at 25.  As this Court has recognized, the Commission is not required "to explicitly cite the Commission's findings on the conditions of competition" in its volume analysis.  *OCP S.A. v. United States*, 658 F. Supp. 3d 1297, 1319-20 (Ct. Int'l Trade 2023).

Plaintiffs' reliance on *OCP* and *Altx* is misplaced because, as discussed above, the statute only requires that the Commission take conditions of competition into account when analyzing impact.  Moreover, the cases are factually distinguishable, as they "'stand{} for the principle that imported volumes may not be significant if the imported quantities fill demand that the domestic industry is unable to meet 'either because of incapability or lack of viability.'"  *OCP*, 658 F. Supp. 3d at 1320 (quoting *Altx*, *Inc. v. United States*, 26 CIT 709, 717 (2002)).  Here, the record showed that the domestic industry was fully capable of meeting nearly all of the demand satisfied by increased volumes of cumulated subject imports, except for two small-volume niche products.  *See* Views at 67-69.  In its analysis of conditions of competition, the Commission found that the domestic industry maintained substantial excess capacity throughout the POI, and that the increase in cumulated subject import volume from 2021 to 2023 was [ ▮ ] less than the excess capacity of the domestic industry in 2023.  *Id.* at 27, 35.  Accordingly, there was no need for the Commission to consider "demand that the domestic industry is unable to meet" in its consideration of the significance of subject import volume, and Plaintiffs' reliance on *OCP* and *Altx* is therefore misplaced.

Consistent with the statute, the Commission considered whether the volume and increase in volume of subject imports was significant and reasonably concluded they were. The Court should decline to "ask more of the Commission than required by the statute." *Altx, Inc. v. United States*, 370 F.3d 1106, 1123 (Fed. Cir. 2004).

### C.   The Commission's Price Effects Finding Is Supported by Substantial Evidence and in Accordance with Law

#### 1.   The Commission's Price Effects Finding Should Be Sustained

Consistent with the statute, the Commission "consider{ed} whether . . . there ha{d} been significant price underselling by the imported merchandise . . . and the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree." 19 U.S.C. § 1677(7)(A)(C)(ii).

With respect to underselling, the Commission considered the overall pricing data but found that the greater proportion of sales to smaller customers in FNAC's reported sales of subject imports than in Kodak's reported sales of the domestic like product, and the prevalence of volume discounts to larger customers, served to inflate subject import sales price relative to Kodak's sales prices and prevent apples-to-apples price comparisons using overall pricing data. The Commission also found that Fujifilm's pricing data inflated subject import prices by including certain costs that should have been netted out. Accordingly, the Commission attached little weight to the overall pricing data. Views at 37-41.

The Commission also considered pricing data reported by Kodak and FNAC for sales to their ten largest customers, which were comparable in purchase volumes in 2023 and thus controlled for FNAC's larger proportion of smaller customers. Based on these

- 28 -

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

data, the Commission found that subject imports undersold the domestic like product in

[ ▮ ] percent of quarterly comparisons corresponding to [ ▮ ] percent of reported

subject import volume, even though these data would have been similarly inflated as

FNAC's overall pricing data by the inclusion of certain costs that should have been netted

out.  The Commission also found that the frequency of underselling and the volume of

subject imports in quarters of underselling increased over the POI.  *Id.* at 41-43.

The Commission considered lost sales information, including that five of 25

purchasers had reported that subject imports were priced lower than the domestic like

product and that two purchasers reported purchasing subject imports instead of the

domestic like product due to their lower price.  The Commission also found that two of

the largest purchasers, [ ▮ ] and [ ▮ ], substantially increased their purchases of

subject imports at the domestic industry's expense during the 2021-2023 period and that

the importance both placed on price, as well as other evidence, indicated that price would

have contributed to the shift.  *Id.* at 43-46.

Based on the moderate-to-high degree of substitutability, the importance of price

in purchasing decisions, and evidence that subject imports were lower priced than the

domestic like product, including the predominant underselling by subject imports in the

top ten customer pricing data, the Commission found that subject imports significantly

undersold the like product.  The Commission further found that this underselling caused a

shift in market share from the domestic industry to subject imports from 2022 to 2023

and between interim periods and prevented the industry from gaining additional market

share as Fujifilm Manufacturing USA exited the industry.  *Id.* at 46-47.

The Commission next considered whether subject imports depressed or suppressed domestic prices to a significant degree.  In considering price depression, it found that domestic prices consistently increased for all three pricing products.  In considering price suppression, it found that the domestic industry's cost of goods sold ("COGS") to net sales ratio was the same in 2023 as in 2021 and lower in interim 2024 than in interim 2023, indicating that the industry's unit costs had not increased faster than its unit prices.  As the Commission noted, the industry's unit net sales value increased by more than its unit COGS from 2021 to 2023 and its unit net sales value was higher in interim 2024 than in interim 2023 while its unit COGS was lower.  *Id.* at 47-49.

The Commission concluded that subject imports had significant price effects because their significant underselling caused subject imports to gain sales and market share from the domestic industry.  *Id.* at 49.  Having considered underselling, price depression, and price suppression, consistent with the statute, the Commission reasonably found that subject imports had adverse price effects.  The Court should therefore sustain the Commission's price analysis.

2.  <strong>The Commission's Finding that Subject Imports Had Significant Price Effects Is Supported by Substantial Evidence</strong>

a.  <strong>The Commission Reasonably Found that Price Was an Important Factor in Purchasing Decisions</strong>

The Commission reasonably found that price was an important factor, among other important factors, contrary to Plaintiffs' claim that the Commission somehow "never grappled with key pieces of evidence."  PlBr. at 37.  As an initial matter, the Commission did not find that price was "the most important factor," as Plaintiffs mistakenly contend, *id.* at 36, but rather that "price is *an* important factor in purchasing decisions, among other important factors."  Views at 30 (emphasis added).  Furthermore,

- 30 -

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

the Commission considered the very evidence highlighted by Plaintiffs, PlBr. at 37,

recognizing that "quality was the most frequently cited first-most important factor,"

followed by availability and price, and that "{a} majority of responding purchasers . . .

reported that they only sometimes or never purchase the lowest-priced product."  Views

at 30.  The Commission also acknowledged that more purchasers cited other purchasing

factors as very important other than price.  *Id*.  Nevertheless, the Commission explained

that "purchasers most frequently ranked price (20 firms) as among their top three

purchasing factors," and that "{t}he majority of responding purchasers (18 of 23)

reported that price was a very important purchasing factor, and no purchasers reported

that price was not an important purchasing factor."  *Id.*  Having considered all the

evidence, the Commission reasonably concluded that price was an important purchasing

factor, among other important purchasing factors.  The Court should reject Plaintiffs'

invitation to reweigh the evidence.

### b.    The Commission Reasonably Found at Least a Moderate-to-High Degree of Substitutability

The Commission reasonably found at least a moderate-to-high degree of

substitutability between subject imports and the domestic like product.  As the

Commission explained, "[ ███████████████████ ], all responding U.S.

importers, and a majority of responding purchasers reported that subject imports were

[ ██████████ ] interchangeable with domestically produced ALPs," and that

when comparing domestic ALPs with subject imports "with respect to 16 purchasing

factors, a majority of responding purchasers reported that U.S.-produced ALPs were

comparable to subject imports for all 16 factors."  Views at 28.  The Commission also

found that [ ██████████ ] and a majority of importers reported that differences

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

other than price between subject imports and the like product were sometimes or never important, while recognizing that a majority of purchasers reported that such differences were always or frequently significant. Plaintiffs contest none of this substitutability evidence.

Plaintiffs only argue that the Commission somehow failed to explain why the need for end users to recalibrate printing equipment when switching plate suppliers did not limit substitutability. PlBr. at 37-38. To the contrary, the Commission expressly recognized that this was "{o}ne factor limiting substitutability" and factored recalibration into its substitutability finding. Views at 29. Although purchasers reported that operational downtime adds to the cost of switching suppliers, the Commission explained, a Kodak official testified that printing equipment is easily recalibrated to plates produced by other suppliers and each supplier certifies its plates will run on the machines of others. *Id.* The Commission also found that customers could more easily switch suppliers once their equipment had been calibrated for a particular supplier, that Kodak charges $[ ███ ] to $10,000 and takes four hours to recalibrate its equipment to use ALPs from other suppliers, and that many purchasers sourced from multiple suppliers during the POI. *Id.* at 29-30. The U.S. producer, a majority of importers, and 8 of 23 purchasers reported that ALPs from different suppliers are compatible with all types of machinery with some modifications. *Id.* at 30. Because the Commission reasonably found at least a moderate-to-high degree of substitutability, the Court should reject Plaintiffs' invitation to reweigh the relevant evidence.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

### c.    The Commission Reasonably Found Significant Underselling

The Commission reasonably found that cumulated subject imports significantly undersold the domestic like product, based on the analysis discussed in section IV.C.1 above.  Contrary to Plaintiffs' argument, the Commission did not "ignore{e} Fujifilm's submitted pricing data."  PlBr. at 38.  Rather, the Commission considered price comparisons based on the overall pricing data reported by Fujifilm but attached little weight to these comparisons, opting instead to place greater weight on pricing data reported by Kodak and FNAC on sales to their top ten customers.  Views at 37-38.

The Commission attached little weight to the overall pricing data for two reasons.  First, the Commission found that Fujifilm's pricing data inflated subject import prices by including certain costs that should have been netted out.  *Id.* at 38-40.  Second, the Commission found that FNAC's greater proportion of sales to smaller customers, compared to Kodak's, and the prevalence of volume discounts to larger customers inflated subject import prices relative to Kodak's and prevented apples-to-apples comparisons using overall pricing data.  *Id.* at 40-41.  As the Commission explained, all parties agreed that differences in customer size could distort the pricing data and top ten customers accounted for [ ▮ ] percent of Kodak's pricing data but only [ ▮ ] percent of FNAC's pricing data.  *Id.* at 40.  Although Plaintiffs contest the Commission's finding that there were errors in FNAC's pricing data, they do not contest its finding that FNAC's greater proportion of small customers made its data an unreliable basis for comparisons with Kodak's pricing data.  *See* PlBr. at 38-39.  Accordingly, even if Plaintiffs' arguments had merit, which they do not, the determination to attach little weight to the price comparisons based on overall pricing data would remain supported by substantial

evidence.  *U.S. Steel Grp.*, 96 F.3d at 1367 (holding that even if the court were to agree

that a subsidiary finding was unsupported by substantial evidence, the Commission's

determination may remain supported by substantial evidence based on the record as a

whole).

Furthermore, the Commission reasonably found that FNAC's pricing data

contained errors that served to inflate subject import prices.  Contrary to Plaintiffs'

argument, the Commission not only verified that Kodak adjusted its pricing data to

remove freight costs, as Plaintiffs acknowledge, but also "deemed reasonable" Kodak's

methodology for reporting pricing data based on staff's review of a "select number of

randomly chosen transactions."  Verification Report at 11-12 (CR150), cited in Views at

39 n.152.  Nor is it correct that the questionnaires only instructed parties to report pricing

data net of transportation costs, as Plaintiffs mistakenly claim.  The questionnaires also

instructed parties to report pricing data net of discounts and rebates and the Commission

further clarified at the hearing that pricing data should exclude "indirect services" and

requested documentation to verify compliance.  Views at 38-39; U.S. Importer

Questionnaire at III-2 (PR9).  Fujifilm's submissions indicated that such services were

netted out when separately charged but not when they were embedded in the transaction

("baked in").  Views at 39-40.  In contrast, Kodak's pricing data were verified not only

for the proper deduction of freight costs but also for compliance with the broader net

pricing requirements.  *Id.* at 39 n.152.

Having attached little weight to overall pricing data, the Commission reasonably

considered the pricing data reported by Kodak and FNAC on sales to their top-ten

customers, whose purchase volumes were comparable and therefore controlled for

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

purchaser size.  Notwithstanding Plaintiffs' argument that the Commission never addressed the alleged shortcomings of the top ten pricing data, the Commission considered Plaintiffs' points and explained why the top ten pricing data were more probative.  PlBr. at 39-40.  While recognizing that the overall pricing data accounted for "virtually all" sales of subject imports and the domestic like product, the Commission found that the top ten pricing data accounted for a substantial portion of ALP sales in the U.S. market, including [ ■ ] percent of Kodak's total pricing data and [ ■ ] percent of total subject import pricing data, and mitigated the distortions caused by the differing sizes of each supplier's customer base.  Views at 37, 41, 42 n.161.  In addition, in response to Fujifilm's argument that there was minimal overlap between the top ten customers of the two firms, the Commission found that the presence of [ ■ ] purchasers on both Kodak's and Fujifilm's lists of top ten largest customers, in a market containing thousands of purchasers, indicated that there was direct competition between the companies even within this subset.  *Id.* at 42 n.160.

The Commission is accorded great discretion in selecting a methodology to assess the evidence of underselling, as long as the choice is supported by substantial evidence.  *U.S. Steel Grp. v. United States*, 18 CIT 1190, 1218, 873 F. Supp. 673, 698-99 (1994), *aff'd*, 96 F.3d 1352 (Fed. Cir. 1996); *see also Hynix Semiconductor, Inc. v. United States*, 30 CIT 1208, 1215, 431 F. Supp. 2d 1302, 1311 (2006).  The Court should affirm the Commission's chosen methodology as long as it is reasonable.  *Coal. of Gulf Shrimp Indus.*, 71 F. Supp. 3d at 1365.  Here, it was reasonable for the Commission to attach little weight to the overall pricing data, based on the distortions in those data, and

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

more weight to the top ten customer pricing data, which provided a more probative basis for price comparisons.

Finally, the Commission reasonably found that significant subject import underselling caused subject imports to gain sales and market share from the domestic industry, based on the moderate-to-high degree of substitutability and the importance of price to purchasers. Plaintiffs' alternative interpretation of the same evidence not only asks the Court to reweigh the evidence but also is unpersuasive. That subject imports pervasively undersold the domestic like product on sales to top ten customers does not mean that they oversold the domestic like product on sales to smaller customers, as Plaintiffs claim. PlBr. at 40. The record contains no reliable pricing data on Kodak's and FNAC's sales to smaller customers of comparable size and Plaintiffs cite none.

Equally unavailing is Plaintiffs' argument that subject imports could have had no adverse price effects because Kodak raised its prices during the POI and made a greater proportion of its sales to large customers, despite underselling. *Id.* The Commission recognized that domestic prices increased and that large customers accounted for a majority of Kodak's pricing data, but explained that significant subject import underselling, which intensified during the POI, caused the domestic industry to lose sales and market share to subject imports after 2022 and prevented the domestic industry, consisting of Kodak, from gaining more of the sales ceded by Fujifilm Manufacturing USA when it closed in 2022. Views at 47. The record showed that Kodak lost [ ▉ ] percentage points of market share to subject imports from 2022 to 2023 and another [ ▉ ] in interim 2024 compared to interim 2023. *Id.* at 70.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

Finally, the Commission recognized that two of 25 responding purchasers reported purchasing [ ▮ ] square meters of subject imports instead of domestic ALPs due to price, *id.* at 43, but this did not require the Commission to find that subject imports had no adverse price effects, as Plaintiffs argue.  PlBr. at 44-45.  Evidence of lost sales is not required to support an affirmative injury determination.  *Companhia Paulista De Ferro-Ligas v. United States*, 20 CIT 473, 479-80 (1996) (citation omitted).  "As a trier of fact," this court has held, "the Commission is allowed to weigh the evidence of lost sales and revenue against other evidence relating to volume and price effects in making its impact determination."  *U.S. Steel Grp.*, 18 CIT at 1209, 873 F. Supp. at 692. As discussed above, the Commission found that significant underselling by cumulated subject imports, in the context of the at least moderate-to-high degree of substitutability and the importance of price to purchasing decisions, caused the domestic industry to lose sales and market share to cumulated subject imports toward the end of the POI.  The Court should reject Plaintiffs' invitation to reweigh the evidence.

> **d.    The Commission Reasonably Found that Two Major Purchasers Shifted to Subject Imports Due to Price**

The Commission reasonably found that [ ▮ ] and [ ▮ ], the [ ▮ ] and [ ▮ ] largest responding purchasers of ALPs, respectively, increased their purchases of subject imports at the expense of the domestic industry at least partially due to the lower price of subject imports, notwithstanding Plaintiffs' arguments to the contrary.  Views at 43-46; CSR at Table 5.13.  In making this finding, the Commission expressly considered the evidence highlighted by Plaintiffs but found it outweighed by other evidence.

With respect to [ ▮ ], the Commission considered [ ▮ ]'s stated reasons for its increased purchases of subject imports, including that it [ ▮

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

██████████████████████████████████████████ ].”  Views at 45-46.

Contrary to Plaintiffs' argument that this shift could not have come at the expense of

Kodak, however, the Commission found that the [ ███ ] percentage point increase in the

subject import share of [ ██████ ] purchases from 2021 to 2023 outstripped the [ ███ ]

percentage point decline in the share of its purchases consisting of domestically produced

ALPs.  *Id.* at 46.  In other words, [ ██████ ] increased its purchases of subject imports by

more than was necessary to replace its former purchases from Greenwood, effectively

shifting [ ██ ] percentage points of its purchases that it was making from domestic

producers to subject imports.  Views at 46; [ ██████ ] Purchaser Questionnaire at II-1

(CR103).  Furthermore, as noted, the Commission found that subject import pricing

prevented Kodak from gaining additional sales and market share as the only other

domestic producer exited the market.  As the Commission explained, [ ██████ ] was the

only responding purchaser [ ████████████████████

████████ ], and [ ██████ ] other explanation for the increase, [ ██████████

███████████████████ ], could not explain the shift because [ █████████

███████████████████████████████████

███████████████████████████████ ].  *Id.* at 45-46

& n.175.  The Commission also explained that price would have been a factor in the shift

because [ █████ ] reported that domestic ALPs were [ ████████████████

███████████████████████████████████

█████████████████████████████

█████████████████████ ].  *Id.* at 44 & n.168.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

With respect to [ ██ ], the Commission considered [ ██ ] stated reasons for its increased purchases of subject imports, contrary to Plaintiffs' mistaken assertion that they were "completely ignored," and explained why other evidence indicated that the shift was due to price. PlBr. at 42. As the Commission explained, [ ██ ] purchases from Fujifilm Manufacturing USA in 2022 were equivalent to only [ ██ ] percent of its purchases of Fujifilm subject imports in 2023, meaning that [ ██ ] percent of its Fujifilm subject import purchases that year could not be explained by Greenwood's closure. *See* Views at 45. The Commission also explained that [ ██ ] reported shift from nonsubject imports to subject imports could not account for the [ ██ ] percentage point decline in the share of its total purchases consisting of domestic ALPs, as the share of subject imports in its purchases increased by [ ██ ] percentage points. *Id.* at 45 & n.172. The Commission also explained that price would have been a factor in this shift given that [ ██ ] reported purchasing subject imports instead of domestic ALPs, that subject imports were lower-priced than domestic ALPs, and that differences other than price are never significant to its purchasing decisions. *Id.* at 44 & n.168.

Thus, substantial evidence supported the Commission's finding that [ ██ ] and [ ██ ] increased their purchases of subject imports in part at the domestic industry's expense due to price. The Court should therefore affirm this aspect of the Commission's analysis.

## D.     The Commission's Price Effects Analysis Is in Accordance with Law

There is no basis for Plaintiff's argument that the statute somehow precludes the Commission from finding adverse price effects other than price depression and price suppression. PlBr. at 31-33. The statute provides three factors the Commission is

required to consider in evaluating the impact of subject imports on domestic prices –

underselling, price depression, and price suppression – but does not indicate that these

factors are exclusive or that the Commission is precluded from considering other adverse

price effects.  Indeed, the CIT has held that the Commission need not find significant

price depression or suppression to find that significant subject import underselling caused

adverse price effects.  *OCTAL*, 539 F. Supp. 3d at 1308 (noting that the court had "upheld

cases in which the Commission found significant underselling, but no significant price

depression or suppression"); *ITG Voma*, 253 F. Supp. 3d at 1361 ("The Commission was

not required to find price depression or suppression in order to find that subject imports

adversely affected domestic prices.").  Nor does anything in the statute require the

Commission to consider a shift in market share from the domestic industry to subject

imports caused by significant underselling in the section of its views concerning impact,

as Plaintiffs mistakenly suggest.  PlBr. at 33.  This court has recognized that "the ITC

need not lay out its analysis in some prescribed way, as there is no 'magic word

analysis.'"  *Hynix*, 30 CIT at 1219, 431 F. Supp. 2d at 1314.

     Far from a "novel approach," as Plaintiffs mistakenly argue, the Commission has

long recognized that domestic producers may react to significant underselling by subject

imports by either meeting low-priced subject import competition, resulting in the

depression or suppression of domestic prices, or maintaining higher prices, resulting in

lost sales and market share.  Consistent with this recognition, the Commission collects

information from purchasers concerning lost revenues, when domestic producers reduce

their prices to secure a sale against low-priced subject import competition, and lost sales,

when domestic producers lose sales to subject imports due to price.  CSR at 5.15-20.

Although lost sales are nowhere mentioned under 19 U.S.C. § 1677(7)(A)(C)(ii), this court has affirmed the Commission's consideration of confirmed lost sales as evidence that subject imports had significant adverse price effects. *LG Electronics,* 26 F. Supp. 3d at 1357; *Grupo Indus. Camesa v. United States*, 18 CIT 461, 466-67, 853 F. Supp. 440, 445 (1994). Similarly, the Court of International Trade has affirmed the Commission's findings that significant underselling by subject imports caused the domestic industry to lose sales and market share to subject imports, as support for its finding that subject imports had significant adverse price effects. *OCTAL*, 539 F. Supp. 3d at 1309 (sustaining the Commission's finding "that the underselling by the cumulated subject imports caused adverse price effects — lost sales and lost market share — to the U.S. domestic industry"); *ITG Voma*, 253 F. Supp. 3d at 1360-61 (sustaining the Commission's finding that "{a}lthough there was insufficient evidence . . . to make a finding regarding price depression or suppression . . . low-priced subject imports significantly undersold the domestic like product . . . result{ing} in loss of shipments and market share for domestic producers"); *Cleo Inc. v. United States*, 30 CIT 1380, 1396, 1398 (2006) (sustaining the Commission's adverse price effects finding "that significant underselling by subject imports led to substantial declines in the domestic industry's market share"). The Court should do so here as well.

Similarly unavailing is Plaintiffs' argument that the Commission erred by neglecting to make express findings concerning price depression and suppression. PlBr. at 31. As the Federal Circuit explained in *Altx*, the Commission's "consideration" of a statutory factor does not encompass an obligation to reach any conclusion regarding that factor. *Altx*, 370 F.3d at 1123 (discussing "consideration" of the magnitude of the margin

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

of dumping); *see also Nucor Corp. v. United States*, 414 F.3d 1331, 1339 (Fed. Cir. 2005) (even without "a concrete conclusion regarding the significance of underselling," the court held that "{t}he Commission complied with the statutory requirement that it *consider* whether there had been underselling") (emphasis added).

### E. The Commission's Impact Finding Is Supported by Substantial Evidence and in Accordance with Law

#### 1. The Commission Reasonably Found that Cumulated Subject Imports Had a Significant Impact on the Domestic Industry

In analyzing impact, the Commission recognized that subject import market share increased partly as a result of Greenwood's closure, but found that Fujifilm's ability to gain nearly all the sales ceded by Fujifilm Manufacturing USA was facilitated by significant underselling, which limited the domestic industry, consisting of Kodak, to gaining only a fraction of these sales. Views at 56-57. As the Commission explained, Kodak gained only [ ■ ] percentage points of market share in 2022, the year Greenwood closed, before losing market share to cumulated subject imports from 2022 to 2023 and in interim 2024 compared to interim 2023 for a net gain of only [ ■ ] percentage points. *Id* at 57. Based on the at least moderate-to-high degree of substitutability, the importance of price to purchasing decisions, and the significant subject import underselling on sales to top ten customers, the Commission found that low-priced subject imports caused Kodak to lose sales and market share in 2023 and interim 2024 and prevented Kodak from gaining additional sales and market share after Greenwood's closure. *Id.* at 57-58. Consequently, the Commission explained, Kodak's production, capacity utilization, shipments, and revenues were lower than they otherwise would have been, even as the decline in Kodak's capacity utilization rate from [ ■ ] percent in 2022 to [ ■ ]

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

percent in 2023 and [ ███ ] percent in interim 2024 reflected ample excess capacity with which Kodak could have increased its production and shipments. *Id.* at 58. While recognizing that Kodak's financial performance improved over the POI, the Commission found that it would have been stronger but for the sales and market share lost to cumulated subject imports. *Id.* Because the Commission reasonably found that cumulated subject imports had a significant impact on the domestic industry, the Court should affirm this aspect of the Commission's analysis.

Contrary to Plaintiffs' argument that the domestic industry's performance trends were insufficiently adverse (PlBr. at 46-47), the Commission recognized that the domestic industry's financial performance improved but reasonably explained that cumulated subject imports had more than a tangential, trivial or incidental effect on the industry, consistent with the statute. *Mittal Steel Point Lisas Ltd. v. United States*, 542 F.3d 867, 879 (Fed. Cir. 2008) (citation omitted). Under 19 U.S.C. § 1677(7)(J), the "Commission may not determine that there is no material injury or threat of material injury to an industry in the United States merely because that industry is profitable or because the performance of that industry has recently improved." The Commission may therefore determine that subject imports injured a domestic industry by making it less profitable than it would have been but for the imports. *See, e.g., Octal*, 539 F. Supp. 3d at 1310-11 (affirming the Commission's affirmative impact determination and conclusion that domestic industry would have performed materially better in the absence of subject imports because, although the industry showed improving gross profits, other indicia, such as shipments, capacity utilization and market share, declined). Indeed, in *United Steel, Paper & Forestry, Rubber, Manufacturing, Energy, Allied Industrial & Service*

*Workers International Union, AFL-CIO, CLC v. United States*, the court affirmed the Commission's finding that subject imports had an adverse impact notwithstanding the domestic industry's "positive performance indicators," including increased profitability, on grounds that "many of the performance indicators lagged behind the strong growth in apparent U.S. consumption." 425 F. Supp. 3d 1374, 1380 (Ct. Int'l Trade 2020). Here, in rejecting Plaintiffs' argument that Kodak's improved financial performance warranted negative determinations, the Commission explained that Kodak's adoption of a "smart revenue" strategy in 2022, shifting from "chasing low-price sales" to pursuing profitable sales, and declining raw material costs caused Kodak's financial performance to improve in 2023, but at the expense of its production, capacity utilization, U.S. shipments, and market share. Views at 60. Rather than reducing its prices to meet low-priced subject import competition, Kodak had prioritized sales at higher prices and consequently lost sales and market share to cumulated subject imports. Thus, as the Commission reasonably concluded, Kodak's capacity utilization, shipments, and revenues would have been higher and its financial performance stronger but for low-priced cumulated subject imports, which prevented Kodak from gaining additional sales and market share after Greenwood's closure and captured sales and market share from the domestic industry in 2023 and interim 2024. *Id.*

Nor did the Commission "confuse the cause and the effect," as Plaintiffs argue unpersuasively, by allegedly treating Greenwood's closure as injury by reason of subject imports when, in their view, subject imports did not force Fujifilm to close Greenwood. PlBr. at 48. The Commission considered the performance of the domestic industry as a whole, including Fujifilm Manufacturing USA, *see* Views at 50-53, and recognized that

subject imports' gain in market share reflected, in part, Fujifilm's decision to replace its domestic production with subject imports.[3]  *Id.* at 56.  At the same time, the Commission did not find that the closure was caused by subject imports.  Rather, it "set aside the reason for the Greenwood facility's closure" and found that Fujifilm's ability to gain nearly all the sales ceded by Fujifilm Manufacturing USA's closure in 2022 was facilitated by significant underselling, causing the last remaining domestic producer, Kodak, to lose sales and market share to subject imports in 2023 and interim 2024 and preventing it from gaining additional sales and market share over the POI.  *Id.* at 57. Thus, regardless of the cause of the closure, the Commission found that, but for subject imports, the remaining domestic producer would have had significantly more sales and market share than it did.

Finally, there is no merit to Plaintiffs' claim that the Commission somehow overlooked its various other arguments concerning the alleged lack of correlation between cumulated subject imports and material injury.  PlBr. at 49-51.  Contrary to Plaintiffs' mistaken claim concerning "the lack of the usual correlation," the Commission found that increases in the market share of low-priced cumulated subject imports from 2022 to 2023 and in interim 2024 compared to interim 2023 were associated with declines in domestic industry market share and lower industry production, capacity utilization, shipments, and revenues than would otherwise have been the case.  Views at 57-58.  As discussed in section IV.C.3, above, the absence of significant price depression

---

[3] Commissioner Kearns found in his own footnote that Fujifilm's replacement of domestic ALPs with subject imports was injury by reason of subject imports, however, in part because one of Fujifilm's stated reasons was the lower cost of producing subject merchandise, and Plaintiffs have not persuasively argued otherwise (*i.e.*, that the decision to serve the U.S. market with subject imports instead of domestic production was unrelated to subject imports).  *Id.* at 58 n.236.

or suppression in no way precluded the Commission from finding that significant underselling by cumulated subject imports caused the market share shift, notwithstanding Plaintiffs' erroneous argument that there can be no causation without price depression or suppression.

The Commission also considered the domestic industry's performance "year-by-year and for the period as a whole," PlBr. at 50, and recognized that the industry's financial performance improved. Views at 50, 52-53, 55-56. As the Commission explained, however, the industry's improved financial performance resulted from reduced raw material costs and Kodak's "smart revenue" strategy, whereby Kodak prioritized profitable sales at the expense of production, capacity utilization, U.S. shipments, and market share. *Id.* at 60. The Commission also explained that declining demand could not account for the injury attributed to cumulated subject imports, as further discussed below. Once again, Plaintiffs invite the Court to reweigh evidence reasonably considered by the Commission.

Similarly unavailing is Plaintiffs' argument that the Commission overlooked their argument concerning Kodak's financial results outside the U.S. market. PlBr. at 49-50. Kodak's financial results outside of the United States are irrelevant to the Commission's impact analysis, which focuses on "all relevant economic factors which have a bearing on the state of the industry in the United States." 19 U.S.C. § 1677 (7)(C)(iii) (emphasis added). Furthermore, Kodak's allegedly lower profitability outside the United States in no way conflicts with the Commission's finding that cumulated subject imports used underselling to take sales and market share from the domestic industry, causing the industry's performance to be worse than it would have been otherwise. Having made the

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

path of its reasoning clear, the Commission had no need to make an explicit response to

Plaintiffs' specific argument.  *See* SAA at 892 ( "{The statute} does not require that an

agency make an explicit response to every argument made by a party, but instead requires

that issues material to the agency's determination be discussed so that the path of the

agency may reasonably be discerned by a reviewing court.") (quotation omitted).

## 2. The Commission Reasonably Considered Factors Other than Subject Imports

In its non-attribution analysis, the Commission fully explained that factors other

than cumulated subject imports, including the factors argued by Plaintiffs, did not

account for the injury it had attributed to cumulated subject imports.  As discussed below,

Plaintiffs' arguments are yet another invitation for the Court to reweigh evidence

reasonably considered by the Commission.

The Commission reasonably explained that declining demand could not explain

the injury it had attributed to cumulated subject imports, contrary to Plaintiffs' mistaken

argument that declining demand was the sole explanation.  PlBr. at 51-53.  The

Commission acknowledged that apparent U.S. consumption decreased [ ███ ] percent

from 2021 to 2023 and was [ ███ ] percent lower in interim 2024 than in interim 2023, but

explained that declines in apparent U.S. consumption could not account for the larger

declines in the domestic industry's production, market share, or inability to gain

additional sales and market share between 2021 and 2023 as cumulated subject imports

increasingly undersold the domestic like product.  Views at 70.  The Commission

explained that although Kodak's production and U.S. shipments declined by less than

apparent U.S. consumption from 2021 to 2023, Kodak's production, capacity utilization,

and U.S. shipments declined by more than the decline in apparent U.S. consumption from

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

2022 to 2023, as it lost [ █ ] percentage points of market share to cumulated subject imports.  The Commission concluded that the injury from this market share shift, as well as the additional [ █ ] percentage points of market share the industry lost to subject imports in interim 2024 compared to interim 2023, was attributable to subject imports rather than declining demand.  *Id.* at 70-71.  Because the Commission's analysis of declining demand was reasonable, the Court should affirm it.

None of Plaintiffs' claims concerning the Commission's analysis of declining demand withstand scrutiny.  The Commission's analysis did not hinge on the cause of Greenwood's closure, as Plaintiffs mistakenly suggest.  *See* PlBr. at 52.  While the Commission noted that the domestic industry's production declined by more than apparent U.S. consumption from 2021 to 2023, partly reflecting Greenwood's closure, it recognized that Kodak's production and U.S. shipments declined by less.  Views at 70. As the Commission explained, however, Kodak's production, capacity utilization, and U.S. shipments declined by more than apparent U.S. consumption from 2022 to 2023, as it lost market share to subject imports, and it lost additional market share in interim 2024 compared to interim 2023.  *Id.*  The Commission reasonably attached weight to the impact of cumulated subject imports on the domestic industry after 2022 given that industry trends from 2021 to 2022 would have been driven primarily by Greenwood's closure in early 2022, as stressed by Plaintiffs themselves.  Nor did the Commission attach undue significance to "the trend over a single final quarter," as Plaintiffs' assert. PlBr. at 53.  While noting the domestic industry's market share loss in interim 2024, the Commission emphasized that Kodak's performance declined by more than apparent U.S.

consumption from 2022 to 2023 as it lost market share to low-priced subject imports. Views at 70. The Court should reject Plaintiffs' invitation to reweigh the same evidence.

The Commission also reasonably rejected Plaintiffs' argument that non-price factors explained the purchasers Kodak lost to Fujifilm, notwithstanding Plaintiffs' invitation for the Court to reweigh the evidence concerning this issue. PlBr. at 53-54. Based on the at least moderate-to-high degree of substitutability between domestic and subject ALPs, the vast majority of responding purchasers reporting that domestic and subject ALPs were comparable with respect to all non-price factors, and the importance of price to purchasing decisions, the Commission reasonably concluded that the significant subject import underselling would have caused the domestic industry to lose sales and market share to cumulated subject imports. Views at 62-63.

Moreover, the Commission considered the evidence Plaintiffs claim the Commission "did not really engage with" (PlBr. at 54) and found it outweighed by other evidence. Specifically, in rejecting Plaintiffs' argument concerning non-price factors, the Commission referenced the very pages of Fujifilm's prehearing brief highlighted by Plaintiffs, as well as other relevant pages and hearing testimony. Views at 62 n.254. In finding that price was an important purchasing factor, the Commission considered all the evidence concerning why purchasers made their purchasing decisions, including that purchasers ranked price among their top three factors more than any other factor and that a majority of purchasers deemed price a very important purchasing factor. *Id.* at 30. The Commission also found that a majority of purchasers rated domestic ALPs as comparable to subject imports with respect to all 16 purchasing factors, including 15 non-price factors, which would have elevated the importance of price. *Id.* at 28. As discussed in

section IV.C.1 above, the Commission also considered the lost sales information

highlighted by Plaintiffs and reasonably found significant underselling based on other

evidence.  *Id.* at 43, 46-47.  Plaintiffs' argument that the dissenting commissioner drew a

different conclusion from the same lost sales information, as well as its assertion that a

negative determination is "well-supported by substantial evidence," PlBr. at 54-55, only

underscore that Plaintiffs are asking the Court to reweigh the evidence.  *See Metallverken*

*Nederland B.V. v. United States,* 13 CIT 1013, 1017, 728 F. Supp. 730, 734 (1989) ("In

asking the Court to negate a commissioner's determination based upon the findings of the

dissenting commissioners, plaintiffs are, in essence, asking the Court to reweigh the

evidence."); *see also Siemens Energy, Inc. v. United States*, 806 F.3d 1367, 1372 (Fed.

Cir. 2015) (quoting *Consolo*, 383 U.S. at 620) ("'The possibility of drawing two

inconsistent conclusions from the evidence does not prevent an administrative agency's

finding from being supported by substantial evidence.'").  Because the Commission's

impact analysis was supported by substantial evidence, the Court should affirm it.

## V.     CONCLUSION

For all the foregoing reasons, the Court should affirm the Commission's

affirmative determinations for ALPs from China and Japan.  Because the Commission

reasonably considered all the evidence and thoroughly explained its findings, the

Commission's determinations are supported by substantial evidence and in accordance

with law.

Respectfully submitted,


Margaret D. Macdonald
General Counsel

Karl von Schriltz
Assistant General Counsel

*/s/ Christopher W. Robinson*
Christopher W. Robinson
Attorney-Advisor
Office of the General Counsel
U.S. International Trade
Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 205-2542
Fax: (202) 205-3111
chris.robinson@usitc.gov


*Attorneys for U.S. International*
*Trade Commission*


Dated: October 20, 2025

**CERTIFICATE OF COMPLIANCE**

Pursuant to Chambers Procedures 2(B)(1) and (2), I hereby certify that the attached **DEFENDANT UNITED STATES INTERNATIONAL TRADE COMMISSION'S NONCONFIDENTIAL MEMORANDUM IN OPPOSITION TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD** contains 13,840 words, according to the word-count function of the word processing system used to prepare this brief (Microsoft Word 2010).

*/s/ Christopher W. Robinson*
Christopher W. Robinson
Attorney-Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 205-2542
Fax: (202) 205-3111
chris.robinson@usitc.gov

Dated: October 20, 2025

## CERTIFICATE OF SERVICE

I hereby certify that, on this 20th day of October 2025, I provided true and correct

electronic copies of the foregoing **DEFENDANT UNITED STATES**

**INTERNATIONAL TRADE COMMISSION'S NONCONFIDENTIAL**

**MEMORANDUM IN OPPOSITION TO PLAINTIFF'S RULE 56.2 MOTION FOR**

**JUDGMENT ON THE AGENCY RECORD** to all counsel of record via the

Commission's secure file transfer system, according to counsels' written consent.

/s/ *Christopher W. Robinson*
Christopher W. Robinson
Attorney-Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Tel:  (202) 205-2542
Fax: (202) 205-3111
chris.robinson@usitc.gov