**NONCONFIDENTIAL**

## UNITED STATES COURT OF INTERNATIONAL TRADE

### BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| FUJIFILM NORTH AMERICA CORPORATION, FUJIFILM CORPORATION, AND FUJIFILM PRINTING PLATE (CHINA) CO. LTD., ) ) ) ) ) | |
| **Plaintiffs,** ) | **Court No. 24-00251** |
| v. ) | |
| UNITED STATES, ) | |
| **Defendant,** ) | |
| and ) | |
| EASTMAN KODAK COMPANY, ) | |
| **Defendant-Intervenor.** ) | |

---

### DEFENDANT-INTERVENOR'S RESPONSE BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD

JOHN M. HERRMANN
PAUL C. ROSENTHAL
JOSHUA R. MOREY
ELIZABETH C. JOHNSON
JULIA A. FOX
MATTHEW T. MARTIN
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, DC 20007
(202) 342-8400

**Counsel to Defendant-Intervenor**

**October 20, 2025**

NONCONFIDENTIAL

# TABLE OF CONTENTS

Page

ADMINISTRATIVE DETERMINATION UNDER REVIEW ................................................... 1

ISSUES PRESENTED AND SUMMARY OF ARGUMENT ................................................ 1

STANDARD OF REVIEW ............................................................................................... 5

STATEMENT OF FACTS ................................................................................................ 6

ARGUMENT .................................................................................................................. 11

I.     FUJFILM IS WRONG THAT ASPECTS OF THE COMMISSION'S
       FINAL DETERMINATION CANNOT SURVIVE SCRUTINY UNDER
       *LOPER BRIGHT* ............................................................................................... 11

II.    THE COMMISSION LAWFULLY INCLUDED ALL U.S.
       PRODUCERS OF ALUMINUM LITHOGRAPHIC PRINTING PLATES
       IN THE DOMESTIC INDUSTRY ....................................................................... 13

       A.    The Statute's Plain Language Permits, But Does Not Require, the
             Commission to Exclude a Domestic Producer from the Domestic
             Industry ................................................................................................... 14

       B.    The Commission Lawfully Determined that Appropriate
             Circumstances Did Not Exist to Exclude Fujifilm's Greenwood
             Facility from the Domestic Industry ........................................................ 15

III.   THE COMMISSION LAWFULLY FOUND THE VOLUME OF
       SUBJECT IMPORTS TO BE SIGNIFICANT ...................................................... 18

IV.    THE COMMISSION'S ANALYSIS OF ADVERSE PRICE EFFECTS IS
       LAWFUL ............................................................................................................ 21

       A.    Fujifilm's Arguments Contending the Commission's Analysis of
             Price Effects Is Not in Accordance With Law Are Wrong ...................... 21

       B.    Fujifilm's Arguments Contending the Commission's Analysis of
             Price Effects Is Not Supported by Substantial Evidence Are Wrong ...... 25

             1.    Substantial Evidence Demonstrates That Price Is An
                   Important Factor for U.S. Purchasers of ALPs ............................ 25

NONCONFIDENTIAL

## TABLE OF CONTENTS (CONTINUED)

Page

2. Substantial Evidence Demonstrates a High Degree of Substitutability Between Subject Imports and the Domestic Like Product ................................................................... 27

3. Substantial Evidence Supports the Commission's Determination That Fujifilm's Pricing Product Data Were Completely Unreliable ................................................... 28

4. Substantial Evidence Supports the Commission's Determination That A Comparison of Pricing Data for the 10 Largest Customers Was More Probative of Underselling ...... 29

5. Substantial Evidence Demonstrates That Certain Customers Purchased Lower-Priced Subject Imports Instead of the Domestic Like Product ................................................. 32

C. Responses to the Commission's Purchasers' Questionnaire Do Not Undermine the Agency's Finding of Adverse Price Effects ................... 34

V. THE COMMISSION LAWFULLY FOUND ADVERSE IMPACTS OF SUBJECT IMPORTS ............................................................................ 34

A. The Commission Correctly Determined That Subject Imports Had An Adverse Impact on the Domestic Industry As a Whole .................... 35

B. Plaintiffs' Trends-Based Arguments Are Wrong .................................... 37

1. The Statute and This Court's Precedent Establish That Improvements in Domestic Industry Variables Alone Do Not Require a Negative Material Injury Determination .............. 37

2. The Commission's Factual Findings and Explanations Regarding Kodak's Profitability and Other Indicators Are Reasonable ......................................................................... 38

3. The Court Has Sustained Similar "But For" Reasoning and Should Do So Here .................................................................. 41

C. The Commission Lawfully Addressed Fujifilm's Arguments and Alternative Causes for the Domestic Industry's Injury .......................... 44

CONCLUSION ................................................................................................... 47

NONCONFIDENTIAL

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Acciai Speciali Terni, S.p.A. v. United States,
   19 CIT 1051 (1995) ................................................................................26

Allied Min. Prods., Inc. v. United States,
   28 CIT 1861 (2004) ............................................................................ 14-15

Altx, Inc. v. United States,
   167 F. Supp. 2d 1353 (Ct. Int'l Trade 2001) .........................................23

Burlington Truck Lines, Inc. v. United States,
   371 U.S. 156 (1962)...............................................................................44

BYD (H.K.) Co. v. United States,
   785 F. Supp. 3d 1359 (Ct. Int'l Trade 2025),
   appeal docketed, No. 25-1937 (Fed. Cir. July 16, 2025) ........................15

Ceramica Regiomontana, S.A. v. United States,
   810 F.2d 1137 (Fed. Cir. 1987)..............................................................44

Changzhou Trina Solar Energy Co. v. U.S. Int'l Trade Comm'n,
   100 F. Supp. 3d 1314 (Ct. Int'l Trade 2015) .................................15, 17

Chefline Corp. v. United States,
   219 F. Supp. 2d 1303 (Ct. Int'l Trade 2002) .........................................26

Cleo Inc. v. United States,
   30 CIT 1380 (2006), aff'd, 501 F.3d 1291 (Fed. Cir. 2007)...................23

Consol. Edison Co. v. NLRB,
   305 U.S. 197 (1938)..................................................................................5

Copperweld Corp. v. United States,
   682 F. Supp. 552 (Ct. Int'l Trade 1988) ................................... 12, 19-20

CP Kelco US, Inc. v. United States,
   24 F. Supp. 3d 1337 (Ct. Int'l Trade 2014),
   aff'd per curiam, 623 F. App'x 1012 (Fed. Cir. 2015) ....................36-37

CVB, Inc. v. United States,
   675 F. Supp. 3d 1324 (Ct. Int'l Trade 2023) ............................... *passim*

Downhill Pipe & Equip., L.P. v. United States,
    776 F.3d 1369 (Fed. Cir. 2015) .................................................................6, 16

Empire Plow Co. v. United States,
    675 F. Supp. 1348 (Ct. Int'l Trade 1987) ........................................ 14-16

Gerald Metals, Inc. v. United States,
    27 F. Supp. 2d 1351 (Ct. Int'l Trade 1998) ...............................6, 12, 19

ITG Voma Corp. v. U.S. Int'l Trade Comm'n,
    253 F. Supp. 3d 1339 (Ct. Int'l Trade 2017),
    aff'd per curiam, 753 F. App'x 913 (Fed. Cir. 2019) (mem.)......................... *passim*

Jiangsu Dingsheng New Mats. Jt.-Stock Co. v. United States,
    Slip Op. 25-93, 2025 WL 2092386 (Ct. Int'l Trade July 21, 2025) ........................... 12-13, 20

JMC Steel Grp. v. United States,
    70 F. Supp. 3d 1309 (Ct. Int'l Trade 2015) ...................................................31

LG Elecs., Inc. v. U.S. Int'l Trade Comm'n,
    26 F. Supp. 3d 1338 (Ct. Int'l Trade 2014) ..............................................13, 17

Loper Bright Enters. v. Raimondo,
    603 U.S. 369 (2024)................................................................................. *passim*

Makita Corp. v. United States,
    974 F. Supp. 770 (Ct. Int'l Trade 1997) ..............................................12

Nippon Steel Corp. v. United States,
    182 F. Supp. 2d 1330 (Ct. Int'l Trade 2001),
    vacated on other grounds, 345 F.3d 1379 (Fed. Cir. 2003) ...................................26

Nippon Steel Corp. v. United States,
    458 F.3d 1345 (Fed. Cir. 2006).......................................................5, 16, 25, 27

Nucor Corp. v. United States,
    594 F. Supp. 2d 1320 (Ct. Int'l Trade 2008),
    aff'd, 601 F.3d 1291 (Fed. Cir. 2009)...............................................................14

OCTAL Inc. v. United States,
    539 F. Supp. 3d 1291 (Ct. Int'l Trade 2021) .......................................... *passim*

Sandvik AB v. United States,
    721 F. Supp. 1322 (Ct. Int'l Trade 1989),
    aff'd per curiam, 904 F.2d 46 (Fed. Cir. 1990)................................................17

**NONCONFIDENTIAL**

Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colo.,
    145 S. Ct. 1497 (2025) ................................................................................2, 12

Siemens Energy, Inc. v. United States,
    992 F. Supp. 2d 1315 (Ct. Int'l Trade 2014),
    aff'd, 806 F.3d 1367 (Fed. Cir. 2015)................................................4, 6, 34

Tenaris Bay City, Inc. v. United States,
    Slip Op. 25-78, 2025 WL 1720173 (Ct. Int'l Trade June 20, 2025),
    appeal docketed, No. 25-2034 (Fed. Cir. Aug. 20, 2025)................................ 20-21

Timken U.S. Corp. v. United States,
    421 F.3d 1350, 1354 (Fed. Cir. 2005)................................................ 44-45

Torrington Co. v. United States,
    790 F. Supp. 1161 (Ct. Int'l Trade 1992) .................................................. 3, 14-15

U.S. Steel Grp. v. United States,
    96 F.3d 1352 (Fed. Cir. 1996).........................................................................40

United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv.
    Workers Int'l Union, AFL-CIO, CLC v. United States,
    348 F. Supp. 3d 1328 (Ct. Int'l Trade 2018) ("United Steel, Paper I").....................11-12, 23

United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv.
    Workers Int'l Union, AFL-CIO, CLC v. United States,
    425 F. Supp. 3d 1374 (Ct. Int'l Trade 2020) ("United Steel, Paper II").....................31, 37-38

## Statutes

19 U.S.C. § 1516a(b)(1)(B)(i)............................................................................5

19 U.S.C. § 1677(4)(A)....................................................................... passim

19 U.S.C. § 1677(4)(B)....................................................................... passim

19 U.S.C. § 1677(7)(B)(i)(II)..............................................................................22

19 U.S.C. § 1677(7)(C)(i) ..............................................................................6, 19

19 U.S.C. § 1677(7)(C)(ii) ........................................................................ 6, 21-22, 25

19 U.S.C. § 1677(7)(C)(iii)........................................................................6, 20, 45

19 U.S.C. § 1677(7)(E)(ii)...........................................................................6, 12

NONCONFIDENTIAL

19 U.S.C. § 1677(7)(J)...........................................................................................37-38

28 U.S.C. § 2639(a)(1).................................................................................................6

**Legislative Authorities**

Uruguay Round Agreements Act, Statement of Administrative Action,
    H.R. Rep. No. 103-316, Vol. I (1994), reprinted in
    1994 U.S.C.C.A.N. 4040 ................................................................... 20, 44-45

**Administrative Determinations**

Aluminum Foil from China,
    USITC Pub. 4771 (Final) (Apr. 2018).........................................................24

Aluminum Lithographic Printing Plates from China and Japan,
    USITC Pub. 5559 (Final) (Nov. 2024) (PR 103)
    ("ALPs from China and Japan, USITC Pub. 5559") and Confidential Views of
    the Commission (Nov. 14, 2024) ("Views") (CR 170) and USITC's Final
    Staff Rep. (Oct. 9, 2024) (CR 163, PR 89) ("FSR")....................................... *passim*

Aluminum Lithographic Printing Plates From China and Japan:
    Determinations, 89 Fed. Reg. 90,737 (USITC Nov. 18, 2024) (PR 104)
    ("Final Determination")........................................................................ *passim*

Certain Freight Rail Couplers and Parts Thereof from China,
    USITC Pub. 5438 (Final) (July 2023)..........................................................17

Cold-Rolled Steel Flat Products from Brazil, et al.,
    USITC Pub. 4637 (Final) (Sept. 2016)........................................................24

Common Alloy Aluminum Sheet from Bahrain, et al.,
    USITC Pub. 5182 (Final) (Apr. 2021).........................................................42

Fine Denier Polyester Staple Fiber from China and India,
    USITC Pub. 4765 (Final) (Mar. 2018).........................................................24

Forged Steel Fittings from India and Korea,
    USITC Pub. 5137 (Final) (Nov. 2020) ..................................................... 42-43

Mattresses from Cambodia, et. al.,
    USITC Pub. 5191 (Final) (May 2021).........................................................42

**NONCONFIDENTIAL**

Polyethylene Terephthalate (PET) Resin from Canada, et al.,
    USITC Pub. 4604 (Final) (Apr. 2016) ...................................................................24

Quartz Surface Products from India and Turkey,
    USITC Pub. 5061 (Final) (June 2020) ...................................................................42

Utility Scale Wind Towers from Malaysia,
    USITC Pub. 5215 (Final) (July 2021) ....................................................................42

NONCONFIDENTIAL

This response brief is filed on behalf of Eastman Kodak Company ("Kodak"), Defendant-Intervenor, in opposition to the Motion for Judgment on the Agency Record and accompanying Memorandum In Support of Motion for Judgment on the Agency Record filed on behalf of Fujifilm North America Corporation, Fujifilm Corporation, and Fujifilm Printing Plate (China) Co., Ltd. (collectively, "Fujifilm" or "Plaintiffs") (ECF No. 36) ("Pls.' Br.").  As set forth below, Fujifilm's claims are without merit and should be rejected, and this Court should sustain the underlying agency determination.

## ADMINISTRATIVE DETERMINATION UNDER REVIEW

Fujifilm challenges certain aspects of the U.S. International Trade Commission's ("Commission") affirmative determination in the investigation of aluminum lithographic printing plates ("ALPs") from China and Japan.  See Aluminum Lithographic Printing Plates From China and Japan: Determinations, 89 Fed. Reg. 90,737 (USITC Nov. 18, 2024) (hereinafter, "Final Determination") (PR 104).[1]  The Commission's views on the issues contested by Fujifilm are contained in Aluminum Lithographic Printing Plates from China and Japan, USITC Pub. 5559 (Final) (Nov. 2024) (hereinafter, "ALPs from China and Japan, USITC Pub. 5559") (PR 103) and Confidential Views of the Commission (Nov. 14, 2024) (hereinafter, "Views") (CR 170).

## ISSUES PRESENTED AND SUMMARY OF ARGUMENT

The Final Determination is supported by substantial evidence and in accordance with law because the Commission lawfully:

---

[1]  Documents in the administrative record are cited using the List 1 Public Record ("PR __") or List 2 Confidential Record ("CR __") number corresponding to the record documents identified in the Index to the Administrative Record filed on March 7, 2025 (ECF Nos. 24, 25).

1. Included Fujifilm's U.S. facility in Greenwood, South Carolina in the domestic industry;

2. Determined the volume of subject imports was "significant";

3. Determined the domestic industry experienced adverse price effects by appropriately considering all statutory elements;

4. Found that price is an important factor in purchasing decisions; ALPs have a moderate-to-high degree of substitutability; Fujifilm's quarterly pricing data were unusable, and pricing data for the top 10 customers were an appropriate measure for comparing subject import and domestic prices;

5. Determined lower subject import prices caused importers to purchase subject imports;

6. Determined the domestic industry, inclusive of Fujifilm's U.S. facility, suffered adverse impact by reason of subject imports;

7. Determined Kodak suffered adverse impact by reason of subject imports;

8. Determined improvements in Kodak's profitability and other indicators did not undermine the agency's adverse impact determination; and

9. Addressed each of Fujifilm's arguments regarding the causal link between the impact of subject imports and the domestic industry's condition.

First, Fujifilm urges this Court to engage in statutory interpretation regarding every challenged aspect of the Final Determination, claiming the United States Supreme Court's ("SCOTUS") decision in Loper Bright undermines the Commission's determinations. Contrary to Fujifilm's claims, "the statute's meaning may well be that the agency is authorized to exercise a degree of discretion," which is the case regarding many of Fujifilm's claims. Loper Bright Enters. v. Raimondo, 603 U.S. 369, 394-95 (2024). Further, Fujifilm's disagreements with the Commission's analysis involve questions of fact, which "should not be excessively second-guessed by a court." Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colo., 145 S. Ct. 1497, 1511-15 (2025). Fujifilm also ignores SCOTUS admonition that its decision does "not call into question prior cases that relied on the *Chevron* framework." Loper Bright, 603 U.S. at 412.

Second, the statute's plain language provides that the domestic industry includes "producers as a whole of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the product." 19 U.S.C. § 1677(4)(A). The statute permits the Commission to exclude a party "in appropriate circumstances," providing the Commission with substantial discretion. Id. § 1677(4)(B). The Court (without citing or relying on Chevron) has applied an abuse of discretion standard in evaluating the Commission's determination to include or exclude a U.S. producer from the domestic industry. See, e.g., Torrington Co. v. United States, 790 F. Supp. 1161, 1173 (Ct. Int'l Trade 1992). Regardless, the Commission's decision to include Fujifilm's Greenwood facility within the domestic industry is lawful under the "abuse of discretion" and more searching "substantial evidence" standards.

Third, contrary to Fujifilm's assertions, the Commission evaluated all evidence concerning the significance of the volume of subject imports, including the increase in volume in absolute terms, as well as relative to consumption. Citing substantial evidence, the Commission rejected Fujifilm's claims that its subject import volumes simply reflected Fujifilm's decision to consolidate production by closing its U.S. facility. Thus, as the Commission evaluated the record and addressed each of Fujifilm's salient arguments, the Commission lawfully determined that the volume of subject imports was significant.

Fourth, case law firmly establishes that the Commission need not find price suppression or depression to conclude subject imports had adverse price effects. The Commission evaluated the required statutory factors and found that despite the absence of price depression or suppression, subject imports undersold the domestic like product to a significant degree, thereby

NONCONFIDENTIAL

enabling subject imports to gain market share at the domestic industry's expense.  This analysis of price effects is lawful, as the Court has previously held.

Further, each of the Commission's factual findings contested by Fujifilm is supported by substantial evidence.  Fujifilm's disagreement with the Commission's determinations is nothing more than an invitation for this Court to second guess the Commission's weighing of the evidence – an invitation that is contrary to the standard of review.  See, e.g., Siemens Energy, Inc. v. United States, 992 F. Supp. 2d 1315, 1325 (Ct. Int'l Trade 2014), aff'd, 806 F.3d 1367 (Fed. Cir. 2015).

Fifth, Fujifilm's claims that the Commission unlawfully determined subject imports had an adverse impact on the domestic industry rest almost entirely on its claim that the Commission's inclusion of Fujifilm's Greenwood facility in the domestic industry is unlawful. If this Court rejects Fujifilm's arguments regarding the domestic industry composition, it follows that Fujifilm's arguments regarding adverse impact should also be rejected.

Further, even if this Court finds that the Commission's inclusion of Fujifilm's Greenwood facility in the domestic industry is unlawful, such error was harmless because the Commission analyzed the counterfactual scenario of a domestic industry including only Kodak. In addition, under similar factual circumstances where a [          ] source of supply exits the market, the Commission has reasoned that the domestic industry could have done better, analysis the Court has sustained.  The Commission rejected Fujifilm's claims that it was entitled to maintain its market share citing substantial record evidence, and Fujifilm's disagreement is simply another request for this Court to reweigh evidence.

Fujifilm's arguments also ignore key facts including: (1) Kodak's shift to a "smart revenue" strategy, whereby Kodak sought to improve profitability at the expense of lost sales

NONCONFIDENTIAL

and market share to low-priced subject imports; and (2) the absence of a U.S. producer questionnaire from Southern Lithoplate, which produced and sold ALPs in 2021 only, thereby skewing trends that rely on 2021 as a base year.

*    *    *

In sum, the Commission evaluated the record evidence, lawfully applied the statute, and addressed each of Fujifilm's salient claims.    As a result, this Court should sustain the Commission's <u>Final Determination</u> in its entirety.

## <u>STANDARD OF REVIEW</u>

This Court will uphold the Commission's findings or determinations unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938).   A party "challenging the Commission's determination under the substantial evidence standard 'has chosen a course with a high barrier to reversal.'"  <u>Nippon Steel Corp. v. United States</u>, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (quoting <u>Mitsubishi Heavy Indus., Ltd. v. United States</u>, 275 F.3d 1056, 1060 (Fed. Cir. 2001)).  Indeed, "'even if it is possible to draw two inconsistent conclusions from evidence in the record, such a possibility does not prevent {the Commission's} determination from being supported by substantial evidence.'"  <u>Id.</u> (alteration in original) (quoting <u>Am. Silicon Techs. v. United States</u>, 261 F.3d 1371, 1376 (Fed. Cir. 2001)). Further, the principle of harmless error is applicable to Commission determinations, meaning that "if the Commission's injury determination is still supported by substantial evidence — even with the errors — the errors are harmless; and the Commission's determination may be

NONCONFIDENTIAL

sustained." CVB, Inc. v. United States, 675 F. Supp. 3d 1324, 1342 (Ct. Int'l Trade 2023) ("CVB, Inc.").

In reviewing the Commission's determinations, the court may not reweigh the evidence or substitute its own judgment for that of the agency. Siemens, 992 F. Supp. 2d at 1325; see also Downhill Pipe & Equip., L.P. v. United States, 776 F.3d 1369, 1376-77 (Fed. Cir. 2015); OCTAL Inc. v. United States, 539 F. Supp. 3d 1291, 1296 (Ct. Int'l Trade 2021) ("{I}t is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record."). Moreover, the Commission's determinations are presumed to be correct, and the party challenging the determinations bears the burden of proving otherwise. See 28 U.S.C. § 2639(a)(1). While the Commission is directed to evaluate the volume, price effects, and impact of subject imports pursuant to 19 U.S.C. § 1677(7)(C)(i)-(iii), the presence or absence of any one of these factors "is not dispositive to a finding of material injury" and "the Commission has discretion to weigh the significance of each factor in light of the circumstances." Gerald Metals, Inc. v. United States, 27 F. Supp. 2d 1351, 1355 n.7 (Ct. Int'l Trade 1998); 19 U.S.C. § 1677(7)(E)(ii).

## STATEMENT OF FACTS

On September 28, 2023, the Commission commenced the underlying proceeding. ALPs from China and Japan, USITC Pub. 5559 at 1 (PR 103). During the final phase of its investigations, the Commission collected and analyzed data for calendar years 2021 to 2023 and the first quarters of 2023 and 2024. Id. at 3-4 (PR 103).

The Commission considered U.S. producer questionnaire responses from two firms: Kodak and Fujifilm Manufacturing USA Inc. ("Fujifilm USA"). Id. (PR 103). Notably, a third

NONCONFIDENTIAL

U.S. producer – Southern Lithoplate Inc. ("SLP"), which closed its last U.S. ALPs facility in May 2021 – did not submit a response to the Commission's U.S. producer questionnaire. Views at 26 (CR 170). As such, the Commission's database understates domestic industry shipments and production in 2021, and understates the market share shift from domestic industry shipments to subject imports between 2021 and 2023. See id. at 36 n.140 (CR 170).

The Commission determined that Fujifilm USA qualified as a related party. ALPs from China and Japan, USITC Pub. 5559 at 3, 9-10 (PR 103). Fujifilm's Greenwood facility accounted for [          ] percent of domestic ALP production in 2021 and 2022, respectively, despite the facility closing in March 2022. Id. at 65 (PR 103); USITC's Final Staff Rep. at Table 3.7 (Oct. 9, 2024) (CR 163, PR 89) ("FSR"). The Commission rejected Fujifilm's argument that appropriate circumstances existed to exclude Fujifilm's Greenwood facility from the domestic industry. ALPs from China and Japan, USITC Pub. 5559 at 9-13 (PR 103). As a result, the Commission assessed the U.S. industry based on the questionnaire responses of Kodak and Fujifilm USA, including financial data exclusive of [          ] Id. (PR 103); FSR at 3.1-3.14, 6.1-6.20 (CR 163, PR 89).

The Commission found the volume of, as well as the increase in the volume of, subject imports was significant in absolute terms and relative to U.S. consumption and production. Views at 36 (CR 170). From 2021 to 2023, the volume of subject imports increased from [          ] square meters in 2021, to [          ] square meters in 2022, before declining to [          ] square meters in 2023. Id. at 35 (CR 170). As a share of apparent U.S. consumption, subject imports increased from [     ] percent in 2021 to [     ] percent in 2022 and [     ] percent in 2023, resulting in an overall increase of [     ] percentage points. Id. (CR 170). That share also climbed by [     ] percentage points from interim 2023 to interim

NONCONFIDENTIAL

2024. Id. (CR 170). The Commission also addressed Fujifilm's arguments concerning the alleged absence of "volume effects"; considered the context of Fujifilm's decision to close its Greenwood facility and switch to importing; and observed that "subject imports from importers other than Fujifilm also increased in market share over the POI." Id. at 36 n.141, 56 n.231, 56-71 (CR 170).

The Commission found that subject imports had significant price effects, including "significant underselling" that "caused subject imports to gain sales and market share from the domestic industry." ALPs from China and Japan, USITC Pub. 5559 at 28-37 (PR 103). The Commission considered the pricing data on both an industry-wide and company-specific level. See id. (PR 103).

Kodak challenged the reliability and accuracy of Fujifilm's pricing data and urged the Commission to consider the totality of the record evidence in analyzing subject imports' price effects. See Petitioner's Prehearing Br. at 34-56 (Sept. 10, 2024) (CR 128, PR 72) ("Pet. Prehrg. Br."). The Commission closed a portion of its hearing to consider confidential data and explanations from counsel regarding Fujifilm's pricing data. See Hearing Tr. at 248-327 (Sept. 17, 2024) (CR 134). The Commission found pervasive errors in Fujifilm's pricing data, including data reported by FNAC, "whose sales accounted for the vast majority of reported subject import sales volume," and that inflated "FNAC's reported prices relative to Kodak's reported prices." ALPs from China and Japan, USITC Pub. 5559 at 29 (PR 103). The Commission also found that neither FNAC nor Fujifilm properly removed all transportation and linked goods and services costs in reporting their pricing data – in contrast to Kodak, which did "properly net out" such costs. Id. at 30 (PR 103). The Commission also observed that the

prevalence of volume discounts and differences in customer sizes "impair{ed}" pricing comparisons.  Id. at 29-32 (PR 103).

Following the hearing, the Commission collected additional pricing information from Kodak and Fujifilm based on each company's 10 largest customers by volume.  In conducting its analysis, the Commission considered pricing data for "Kodak's and Fujifilm's ten largest customers, the pricing data of ECO3 {(an importer of subject imports)}, lost sales information, and other record evidence."  Views at 27, 38 (CR 170).  The Commission found that this data showed substantial underselling by subject imports.  Id. at 42 (CR 170).  After addressing and rejecting Fujifilm's arguments concerning alleged non-price reasons for the domestic industry's lost sales, the Commission determined that the record showed that subject imports had significant adverse price effects.  See id. at 36-49 (CR 170).

The Commission also found that subject imports had an adverse impact on the domestic industry.  ALPs from China and Japan, USITC Pub. 5559 at 37-53 (PR 103).  The Commission analyzed subject imports' impact on the domestic industry inclusive of Fujifilm's Greenwood facility and with respect to Kodak specifically as the sole remaining domestic producer following the closure of Fujifilm's Greenwood facility in March 2022.  See id. at 38 (PR 103).

The Commission found that the "domestic industry's performance declined by most measures during the POI."  Views at 50 (CR 170).  "In response to the significant underselling by subject imports," the Commission observed that Kodak pursued "a 'smart revenue' strategy" in 2022, to improve its financial viability that entailed "shifting from 'chasing low-price sales . . . to pursuing sales where it could earn a reasonable return.'"  Id. at 60 (CR 170) (quoting Pub. Hearing Tr. at 40 (Sept. 17, 2024) (PR 80)).  The Commission found this explained Kodak's modest financial improvements and its declines in production and shipments (that far outpaced

NONCONFIDENTIAL

declines in demand) from 2022 to 2023 and over the interim periods, and the company's lost market share. See id. (CR 170).

Further, the Commission reasoned that Kodak's "performance would have been stronger had subject import pricing" and subject imports not prevented Kodak from gaining and retaining market share and even higher prices, as would be expected when a [          ] source of ALP supply – Fujifilm's Greenwood facility – was closed. See id. at 50 (CR 170). The Commission also noted that Kodak "reported [          ] throughout the POI, with the exception of a positive net income margin of [      ] percent in 2023," and suffered a worsening net income as a ratio to net sales from 2021 to 2022 and during interim 2024 compared to interim 2023. Id. at 55-56, 58 n.235 (CR 170). Moreover, the domestic industry's net sales, gross profits, and operating profits declined by more than apparent U.S. consumption during the POI. Id. at 50 (CR 170).

The domestic industry also lost market share to subject imports and its "output indicators – including production, capacity, and U.S. shipments – all declined by a substantially greater percentage than the [      ] percent decline in apparent U.S. consumption between 2021 and 2023." Id. (CR 170). Whether [

], the domestic industry lost market share to subject imports between 2021 and interim 2024. See id. at 51, 53-54 (CR 170); FSR at F.3 (CR 163, PR 89).

The "domestic industry's production, capacity, capacity utilization, and U.S. shipments, all declined sharply from 2021 to 2023 and were generally lower in interim 2024 than in interim 2023." Views at 51 (CR 170) (footnotes omitted) (citing FSR at Tables 3.7 & 3.9, C.1 (CR 163, PR 89)). Similarly, "Kodak's production, capacity utilization, and U.S. shipments, all declined overall from 2021 to 2023 and were generally lower in interim 2024 than in interim 2023." Id. at

NONCONFIDENTIAL

53 (CR 170) (footnotes omitted) (citing FSR at Table C.2 (CR 163, PR 89)).  Whether in terms of the domestic industry as a whole or Kodak specifically, employment indicia also declined from 2021 to 2023 and were lower in interim 2024 compared to interim 2023, including with respect to production-related workers, total hours worked, wages paid, and productivity.  See id. at 52, 54-55 (CR 170).

Based on the record developed, a majority of the Commission found that the domestic industry was materially injured by reason of subject imports.  This appeal followed.

## ARGUMENT

### I.   FUJIFILM IS WRONG THAT ASPECTS OF THE COMMISSION'S FINAL DETERMINATION CANNOT SURVIVE SCRUTINY UNDER *LOPER BRIGHT*

According to Plaintiffs, because the Commission "adopted legal interpretations contrary to applicable statutory provisions" and made improper factual findings, this Court should remand the Final Determination.  Pls.' Br. at 5.  In fact, Plaintiffs urge this Court to engage in statutory interpretation with regard to every challenged aspect of the Final Determination.  See id. at 10-11.  Fujifilm's Loper Bright analysis is unavailing and wrong.

As the Supreme Court explained, "the statute's meaning may well be that the agency is authorized to exercise a degree of discretion."  Loper Bright, 603 U.S. at 394-95.  Indeed, this Court has reasoned that the terms of the statute here and legislative history signify congressional intent that the Commission be given broad discretion in analyzing the volume, price effects, and impact of subject imports.  See United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. United States, 348 F. Supp. 3d 1328, 1333 (Ct. Int'l Trade 2018) (hereinafter, "United Steel, Paper I") ("The statute does not provide further guidance, giving the Commission discretion to assess the conditions of competition in a

NONCONFIDENTIAL

particular industry."); <u>Copperweld Corp. v. United States</u>, 682 F. Supp. 552, 565, 570 (Ct. Int'l Trade 1988) (referring to price effects and volume).  Moreover, "the Commission has discretion to weigh the significance" of the volume, price, effects, and impact of subject imports in reaching its determination.  <u>Gerald Metals</u>, 27 F. Supp. 2d at 1355 n.7.  Furthermore, the

> significance of the various factors affecting an industry will depend upon the facts of each particular case.  Neither the presence nor the absence of any factor . . . can necessarily give decisive guidance with respect to whether an industry is materially injured, and the significance to be assigned to a particular factor is for the {Commission} to decide.

<u>Makita Corp. v. United States</u>, 974 F. Supp. 770, 786 (Ct. Int'l Trade 1997); <u>see</u> 19 U.S.C. § 1677(7)(E)(ii).

In addition, Plaintiffs fail repeatedly to distinguish between judicial review of questions of law and questions of fact.  As the Supreme Court cautioned, such a distinction is critical, because the application of open-ended statutory terms may primarily turn on issues of fact "which should not be excessively second-guessed by a court."  <u>Seven Cnty. Infrastructure Coal.</u>, 145 S. Ct. at 1511-15.

As discussed below, the Commission did not "adopt{} legal interpretations contrary to applicable statutory provisions."  Pls.' Br. at 5.  Plaintiffs' criticisms of the Commission's analysis reflect mere disagreement with how the Commission weighed and considered record evidence.  Such disagreements involve and turn on issues of fact rather than legal interpretations.  As the Court recently recognized, while "the meaning of a statutory term is a legal question . . . the application of that term to the record is a factual determination for the agency."  <u>Jiangsu Dingsheng New Mats. Jt.-Stock Co. v. United States</u>, Ct. No. 23-00264, Slip Op. 25-93 at 10, 2025 WL 2092386, at *4 (Ct. Int'l Trade July 21, 2025) (citation omitted).  Where the agency's

-12-

"task is a mixed question of law and fact requiring it to apply {a} statutory term to the record information," the Court reviews the agency's decision under the "substantial evidence" standard "i.e., reasonable on {the} record." Id.

Plaintiffs also ignore the portion of Loper Bright stating that the decision does "not call into question prior cases that relied on the *Chevron* framework." Loper Bright, 603 U.S. at 412. As the Supreme Court explained, prior judicial decisions that relied on the Chevron framework "are still subject to statutory *stare decisis* despite our change in interpretive methodology," and "{m}ere reliance on *Chevron* cannot constitute a 'special justification'" for overruling such a holding. Id. Thus, while Plaintiffs attempt to diminish existing case law, such as the Court of International Trade's decisions in LG Electronics, Inc. v. United States, 26 F. Supp. 3d 1337, 1344-47 (Ct. Int'l Trade 2014) (sustaining the Commission's related parties analysis framework) and OCTAL (sustaining the Commission's volume, price effects, and impact analysis), Plaintiffs ignore key aspects of Loper Bright and case law that did not rely on Chevron deference. See, e.g., Pls.' Br. at 14-19, 32 n.3; infra Section II.A. Therefore, Loper Bright does not undermine the Final Determination.

## II.     THE COMMISSION LAWFULLY INCLUDED ALL U.S. PRODUCERS OF ALUMINUM LITHOGRAPHIC PRINTING PLATES IN THE DOMESTIC INDUSTRY

During the underlying proceeding, Fujifilm asserted that the statute's related party provision, 19 U.S.C. § 1677(4)(B), "provides the Commission broad discretion to exclude related parties" from the domestic industry, while also "recogniz{ing} the Commission might not agree" to exclude Fujifilm's Greenwood facility. Fujifilm's Pre-Hearing Br. at 25-26 (Sept. 10, 2024) (CR 129, PR 69). Dissatisfied with the Commission's decision to include Fujifilm's Greenwood facility in the domestic industry, Plaintiffs argue that the Commission's determination

NONCONFIDENTIAL

"misinterpreted the relevant statutory provisions" and is "unsupported by substantial evidence." Pls.' Br. at 13-22. Plaintiffs' arguments are wrong.

### A. The Statute's Plain Language Permits, But Does Not Require, the Commission to Exclude a Domestic Producer from the Domestic Industry

The statute defines the domestic industry as

> producers as a whole of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the product.

19 U.S.C. § 1677(4)(A). In addition, the Commission "may, in appropriate circumstances" exclude a party from the domestic industry. Id. § 1677(4)(B). Thus, the statute's default domestic industry includes all U.S. producers of the domestic like product, and permits the Commission, under certain circumstances, to exclude a U.S. producer.

Based on the plain statutory language, the Court has held – without citing or relying on Chevron deference – that "{i}t is clearly within the ITC's discretion to apply the related parties provision in its analysis of the facts of the case." Empire Plow Co. v. United States, 675 F. Supp. 1348, 1352 (Ct. Int'l Trade 1987); see also Allied Min. Prods., Inc. v. United States, 28 CIT 1861, 1863-65 (2004). The Court has also held that "{w}here granted statutory discretion, ITC determinations remain subject to review for abuse of discretion." Nucor Corp. v. United States, 594 F. Supp. 2d 1320, 1332 (Ct. Int'l Trade 2008), aff'd, 601 F.3d 1291 (Fed. Cir. 2009). The Court has reviewed and upheld the Commission's decision to decline to exclude an entity from the domestic industry under an abuse of discretion standard. See, e.g., Torrington Co., 790 F. Supp. at 1173 ("The Commission did not abuse its discretion in . . . declining to exclude related parties from its analysis of the condition of the domestic industry.").

NONCONFIDENTIAL

The Court has also examined and "repeatedly upheld" the Commission's multi-factor approach in determining whether the facts of a case warrant exclusion of an entity from the domestic industry. Changzhou Trina Solar Energy Co. v. U.S. Int'l Trade Comm'n, 100 F. Supp. 3d 1314, 1329 (Ct. Int'l Trade 2015), aff'd on other grounds, 879 F.3d 1377 (Fed. Cir. 2018); see, e.g., Torrington Co., 790 F. Supp. at 1168; Allied Min. Prods., 28 CIT at 1865; Empire Plow, 675 F. Supp. at 1352-54. In sum, the Commission's related party framework is well established and lawful.

**B.    The Commission Lawfully Determined that Appropriate Circumstances Did Not Exist to Exclude Fujifilm's Greenwood Facility from the Domestic Industry**

The Commission did not abuse its discretion in determining that appropriate circumstances did not exist to exclude Fujifilm's Greenwood facility from the domestic industry, a determination that also should be affirmed under the less deferential substantial evidence standard urged by Fujifilm.

First, Plaintiffs are incorrect that Loper Bright spurred a "paradigm shift" that necessitates second-guessing the Commission's analysis under the related parties provision. Pls.' Br. at 19. As the Supreme Court made clear, "the best reading of a statute" may be "that it delegates broad discretionary authority to an agency," such as when statutory terms "such as 'appropriate' or 'reasonable'" empower rather than cabin agencies and "'leave{} agencies with flexibility.'" Loper Bright, 603 U.S. at 394-95 (quoting Michigan v. EPA, 576 U.S. 743, 752 (2015)); see also BYD (H.K.) Co. v. United States, 785 F. Supp. 3d 1359, 1377 (Ct. Int'l Trade 2025), appeal docketed, No. 25-1937 (Fed. Cir. July 16, 2025). As courts have held in numerous instances, without relying on Chevron deference, the statute plainly states that the Commission "may" exclude a party from the domestic industry, if the Commission finds that "appropriate

circumstances" warrant the exclusion.  Empire Plow, 675 F. Supp. at 1352; supra Section II.A.

The Commission's analysis in this respect is fact driven.  Moreover, even if Plaintiffs were

correct that the analysis requires a statutory interpretation of the related parties provision (it does

not), Plaintiffs fail to establish that the plain text, legislative history, purpose, or prior judicial

interpretations of the provision compels either the approach or outcome that Plaintiffs prefer.  In

fact, Plaintiffs' own arguments veer away from the text of 19 U.S.C. § 1677(4)(A)-(B) and rely

on what Plaintiffs claim are "limiting principles" evinced by separate statutory provisions.  Pls.'

Br. at 16-19.  The Commission's related party analysis employed here is fully consistent with the

statute, as well as the Commission's well-established – and court-approved – practice.

Second, Plaintiffs fail to establish that the Commission's decision to include Fujifilm's

Greenwood facility in the domestic industry is unsupported by record evidence or otherwise not

in accordance with law.  Plaintiffs' criticisms of the Commission's analysis improperly seek to

have this Court reweigh the evidence and reconsider questions of fact anew, which is not this

Court's role.  See Downhill Pipe & Equip., 776 F.3d at 1376-77.  While Plaintiffs may disagree

with the Commission's conclusion that appropriate circumstances did not exist to exclude

Fujifilm's Greenwood facility, "'even if it is possible to draw two inconsistent conclusions from

evidence in the record, such a possibility does not prevent {the Commission's} determination

from being supported by substantial evidence.'"  Nippon, 458 F.3d at 1352 (alteration in

original) (quoting Am. Silicon, 261 F.3d at 1376).  It is "not within the Court's domain either to

weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on

grounds of a differing interpretation of the record."  OCTAL, 539 F. Supp. 3d at 1296.  In this

case, the Commission undertook extensive data collection, tabulation, and analysis of the

domestic industry's trade and financial data, including domestic industry data both including and

NONCONFIDENTIAL

excluding [                              ]  See, e.g., FSR at 3.1-3.14, 6.1-6.20 (CR 163, PR

89).  The Commission's analysis was anything but "mechanical" or a blunt application of a "one-

size-fits-all" test, as Plaintiffs claim.  Pls.' Br. at 19.

The Commission's application of each of the five factors it considers in its related parties

analysis exemplifies its robust reasoning and lawful determination on this issue.  Even though

the Commission was not obligated to consider and apply the record evidence to each of the five

factors (see Changzhou Trina Solar, 100 F. Supp. 3d at 1326-31), the agency did just that in

reaching its determination.  See Views at 13-16 (CR 170).

The Commission's and the Court's precedent also support the agency's decision here.

See id. at 14 n.43, 16 (CR 170) (citing LG Elecs., 26 F. Supp. 3d at 1344-47, aff'g Certain Large

Residential Washers from Korea and Mexico, USITC Pub. 4378 (Final) (Feb. 2013), and Certain

Tissue Paper from China, USITC Pub. 3758 (Final) (Mar. 2005) at 11-12); see also Certain

Freight Rail Couplers and Parts Thereof from China, USITC Pub. 5438 (Final) (July 2023) at 19

(declining to exclude a related party from the domestic industry and noting that "rather than

complementing its domestic production with subject imports from Mexico," the entity "was

increasingly substituting . . . from Mexico for its domestic production of the same {freight rail

coupler} products"); Sandvik AB v. United States, 721 F. Supp. 1322, 1329-30 (Ct. Int'l Trade

1989) (rejecting arguments similar to those raised by Plaintiffs that the Commission should have

afforded more weight to the reasons why a domestic producer ceased domestic production), aff'd

per curiam, 904 F.2d 46 (Fed. Cir. 1990).

The Commission also reached a reasonable and logical conclusion, supported by

precedent and grounded in a thorough application of its five-factor related parties framework,

that "where a domestic producer replaces domestic production with imports, excluding that

producer from the domestic industry would skew the data in terms of the domestic industry's performance." Views at 16 (CR 170). Plaintiffs' preference for a different factual assessment does not warrant remanding the Commission's determination.

## III.   THE COMMISSION LAWFULLY FOUND THE VOLUME OF SUBJECT IMPORTS TO BE SIGNIFICANT

Plaintiffs raise three arguments in challenging the Commission finding the volume of subject imports to be significant. First, Plaintiffs claim the Commission unlawfully concluded "the subject import volume was 'significant' simply because it increased over the period." Pls.' Br. at 22. Second, Plaintiffs urge this Court "to review the statute in light of the more demanding standard of *Loper Bright*," as well as to order the Commission to provide a more detailed volume analysis. Id. at 22-24. Third, Plaintiffs argue that the Commission's conclusion that the volume of subject imports was significant is unlawful because the Commission failed to consider the context of Fujifilm's Greenwood facility's cessation of production and its shifting to importing ALPs from China and Japan to supply the U.S. market. See id. at 24-28. Plaintiffs' arguments are incorrect.

First, contrary to Plaintiffs' claim, the Commission did not find the volume of subject imports to be significant "simply because it increased over the period." Id. at 22. The Commission thoroughly considered and cited substantial evidence, discussed the meaning of the increase in volume, and analyzed the record as a whole. The Commission explained its assessment of the volume of subject imports as increasing by [     ] percent from 2021 to 2023, the year-to-year changes of such imports, the [     ] percentage point overall increase of subject imports as a share of (i.e., meaning with regard to) apparent U.S. consumption and the heightened share in interim 2024 compared to interim 2023, the increase of [     ] percentage

points in the ratio of (i.e., meaning and effect with regard to) subject imports to domestic production from 2021 to 2022, and a further **[        ]** percentage point increase from 2022 and 2023, while also considering the decreased but still high ratio in interim 2024 compared to interim 2023. See Views at 35 (CR 170). The Commission also explained that the increases in subject imports from 2021 to 2023, as well as in interim 2024 compared to interim 2023, "came at the direct expense of the domestic industry." Id. at 69-70 (CR 170).

The Commission also observed that "subject imports from importers other than Fujifilm also increased in market share over the POI" and, contrary to Plaintiffs' claim, the Commission did not ignore the context of Fujifilm's Greenwood facility's closure and Fujifilm's shifting to importing to supply its U.S. customers. See id. at 36 n.141, 56 n.231, 56-71 (CR 170). Indeed, the Commission explicitly rejected Fujifilm's arguments that it was entitled to maintain the market share vacated by its U.S. facility with subject imports due to: (1) long-term contracts with its customers; and (2) the ability of purchasers to switch easily between ALP suppliers. Id. at 60-62 (CR 170).

Second, as Plaintiffs acknowledge, the statute does not define what volume of subject imports can be considered "significant" because the Commission's analysis and determinations on this factor may vary "across industries and circumstances." Pls.' Br. at 24; see, e.g., OCTAL, 539 F. Supp. 3d at 1298. Plaintiffs' suggestion that this Court should interpret what may be considered "significant" within the meaning of 19 U.S.C. § 1677(7)(C)(i) overlooks that the Court has already done so. See Gerald Metals, 27 F. Supp. 2d at 1355 (noting "'{s}ignificant' is defined as 'having or likely to have influence or effect{;} deserving to be considered{;} important, weighty, notable") (alterations in original). The Court has also explained that 19 U.S.C. § 1677(7)(C)(i) "when read in conjunction with the legislative history indicates that

NONCONFIDENTIAL

disjunctive language was chosen to signify congressional intent that the agency be given broad discretion to analyze import volume in the context of the industry concerned." Copperweld, 682 F. Supp. at 570. Plaintiffs' criticisms of the Commission's volume analysis, therefore, do not turn on statutory interpretation, but rather on the Commission's assessment of the record – a factual determination reviewed under the substantial evidence standard. See Jiangsu Dingsheng, Slip Op. 25-93 at 10, 2025 WL 2092386, at *4.

Third, the Commission was not obligated to mention in its volume analysis the impact on volume from the closure of Fujifilm's Greenwood facility and replacement of domestic production with importing foreign-produced ALPs. See Pls.' Br. at 26-27. The Commission is not required "to discuss each argument or fact presented by a party." See Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-316, Vol. I, at 892 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4215. "For example, if the Commission rejects a party's proposed definition of the like product, the Commission need not necessarily, later in its opinion, continue to reference arguments on causation made by the party on the assumption that its proposed like product definition would be accepted." Id. Accordingly, upon rejecting Fujifilm's proposed definition of the domestic industry as excluding Fujifilm's Greenwood facility, the Commission reasonably proceeded to assess the volume of subject imports based on the record evidence. Moreover, this Court recently considered and rejected the argument advocated by Plaintiffs that the Commission's volume analysis must simultaneously consider conditions of competition. See Tenaris Bay City, Inc. v. United States, Ct. No. 22-00344, Slip Op. 25-78 at 35-40, 2025 WL 1720173, at *13-15 (Ct. Int'l Trade June 20, 2025), appeal docketed, No. 25-2034 (Fed. Cir. Aug. 20, 2025). In considering the text and legislative history of the statute, this Court explained that "the last section of 19 U.S.C. § 1677(7)(C)(iii) regarding

NONCONFIDENTIAL

'conditions of competition' should be read to apply only to the 'impact on affected domestic industry' section of the statute." Id. at 39, 2025 WL 1720173, *14. Thus, Plaintiffs' arguments that the Commission's volume determination is unlawful and inconsistent with the statute are unavailing and should be rejected.

In sum, the Commission lawfully found that "the volume of cumulated subject imports, and the increase in that volume, are significant in absolute terms and relative to consumption and production in the United States." Views at 36 (CR 170).

## IV.   THE COMMISSION'S ANALYSIS OF ADVERSE PRICE EFFECTS IS LAWFUL

Fujifilm argues the Commission's analysis of subject imports' adverse price effects is contrary to the statute and is unsupported by substantial evidence. Fujifilm's arguments are wrong and should be rejected.

### A.   Fujifilm's Arguments Contending the Commission's Analysis of Price Effects Is Not in Accordance With Law Are Wrong

In evaluating the price effects of subject imports, the Commission considers whether:

(I)    there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and

(II)   the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

19 U.S.C. § 1677(7)(C)(ii). Fujifilm claims the Commission failed to analyze properly record information demonstrating that prices for ALPs were not depressed or suppressed and improperly relied on a determination that subject imports gained sales and captured market share from the domestic industry (circumstances that Fujifilm argues relate to volume effects of subject imports, but not price effects) through underselling. See, e.g., Pls.' Br. at 29. Fujifilm argues that the Commission "disregarded the explicit statutory framework for finding adverse

-21-

NONCONFIDENTIAL

price effects" and faults the agency for "apparently believ{ing} that checking any one of the statutory boxes is enough {to find adverse price effects}." Id. at 30. Contrary to Fujifilm's arguments, extensive judicial precedent – including a decision by this Court – makes clear that a determination by the Commission finding adverse price effects based on underselling satisfies the statutory requirements for finding an adverse price effect.

The statute provides the Commission "shall consider," in addition to the volume and impact of subject imports, "the effect of imports of that merchandise on prices in the United States for domestic like products." 19 U.S.C. § 1677(7)(B)(i)(II). In considering subject imports' effect on domestic prices, the statute directs the Commission to "consider whether" significant price underselling by subject imports occurred and whether subject imports depressed or suppressed prices. See id. § 1677(7)(C)(ii). Thus, the existence of price depression and/or suppression is one of two factors the Commission must consider as part of its *overall* assessment of subject imports' price effects.

Consistent with the statute, the Commission here considered whether subject imports undersold the domestic like product (see Views at 37, 41 n.159, 42-43 (CR 170)), and whether subject imports caused depression and/or suppression of prices for the domestic like product (id. at 47-49). Ultimately, the Commission found that although imports did not depress domestic prices or otherwise prevent domestic producers from raising prices, subject imports caused adverse price effects because their pervasive underselling led to lost sales and loss of market share by the domestic industry. Id. at 42-49.

Fujifilm does not contest that the Commission *considered* underselling, price depression, and price suppression as part of its price effects analysis. Instead, Fujifilm presumes the statute requires the Commission to establish both underselling and price suppression/depression in order

to find adverse price effects.  Fujifilm fails to cite a single case in support of its arguments (see generally Pls.' Br. at 29-31), and to the contrary, this Court has explicitly held "{t}he Commission {is} *not required to find price depression or suppression in order to find that subject imports adversely affected domestic prices.*"  ITG Voma Corp. v. U.S. Int'l Trade Comm'n, 253 F. Supp. 3d 1339, 1360-61 (Ct. Int'l Trade 2017) (emphasis added), aff'd per curiam, 753 F. App'x 913 (Fed. Cir. 2019) (mem.); see also OCTAL, 539 F. Supp. 3d at 1303 ("In sum, the Commission may find adverse price effects without a finding of significant price depression or suppression.  However, the Commission is required by statute to *consider both* underselling, and price suppression and depression.");[2] Cleo Inc. v. United States, 30 CIT 1380, 1396 (2006) ("The significance of underselling need not be based on a finding that underselling actually suppressed or depressed domestic prices."), aff'd, 501 F.3d 1291 (Fed. Cir. 2007); Altx, Inc. v. United States, 167 F. Supp. 2d 1353, 1366 (Ct. Int'l Trade 2001) (finding that "the plain language of the statute" makes clear that the Commission is directed to undertake "two statutorily-mandated discrete inquiries" involving underselling and price suppression/depression).

---

[2]    In a footnote, Fujifilm acknowledges that "the court has once rejected a statutory argument being made here," citing OCTAL, 539 F. Supp. 3d 1291. Pls.' Br. at 32-33 n.3. Plaintiffs seek to distinguish OCTAL, asserting that it "was arguably premised upon a Chevron deferential approach to statutory interpretation," but offer no discussion or analysis about how the relevant statutory language is ambiguous or how the statutory language requires a different reading under Loper Bright. See id. at 32 n.3; id. at 10-11 (Section I.A. of Plaintiffs' brief). Further, Plaintiffs assert without elaboration that this Court's decision in United Steel, Paper I, 348 F. Supp. 3d 1328, 1335-36 (Ct. Int'l Trade 2018) "supports" their statutory argument. Pls.' Br. at 32-33 n.3. In that decision, however, this Court remanded the Commission's final determination regarding price effects based on a finding that it was not supported by substantial evidence. See United Steel, Paper I, 348 F. Supp. 3d at 1335. This Court did not make any findings regarding the lawfulness of the Commission's interpretation of the statute, much less any findings that support the arguments advanced by Fujifilm. See id.

In ITG Voma Corp., this Court rejected an argument similar to Plaintiffs' claim that the Commission's price effects analysis was flawed because "the Commission found that subject imports did not depress or suppress prices of the domestic like product to a significant degree." 253 F. Supp. 3d at 1360-61. This Court held that although the record did not contain sufficient evidence to allow the Commission to make findings regarding price depression or suppression:

> . . . the Commission found that the *low-priced subject imports significantly undersold the domestic like product. This underselling resulted in loss of shipments and market share for domestic producers,* even though domestic demand and consumption increased. The Commission concluded, therefore, *that subject imports had an adverse effect on the price of domestic tires because significant underselling by subject imports put competitive pressure on the domestic industry.*

Id. at 1361 (emphasis added). This ruling was affirmed by the U.S. Court of Appeals for the Federal Circuit.

Here, the Commission found "the significant underselling by cumulated subject imports caused subject imports to gain sales and market share from the domestic industry." Views at 49 (CR 170). The absence of a Commission finding of price depression or suppression does not, as Fujifilm would have this Court believe, make this an "unusual" case. Pls.' Br. at 33. The Commission has found adverse price effects to the domestic industry in numerous cases despite the lack of price suppression or depression, where the record otherwise showed lost sales and lost market share due to subject import underselling. See, e.g., Aluminum Foil from China, USITC Pub. 4771 (Final) (Apr. 2018) at 32; Fine Denier Polyester Staple Fiber from China and India, USITC Pub. 4765 (Final) (Mar. 2018) at 28-29; Cold-Rolled Steel Flat Products from Brazil, et al., USITC Pub. 4637 (Final) (Sept. 2016) at 19; Polyethylene Terephthalate (PET) Resin from Canada, et al., USITC Pub. 4604 (Final) (Apr. 2016) at 23.

NONCONFIDENTIAL

Moreover, the Commission's determination of adverse price effects, in the absence of any price suppression or depression, does not result in a "logical inconsistency," as Fujifilm contends. Pls.' Br. at 35. The Commission and the courts have held that lost sales and market share are indicators of adverse price effects. Indeed, the statute logically directs the Commission to consider underselling and price depression/suppression separately (see ITG Voma Corp., 253 F. Supp. 3d at 1361 (citing 19 U.S.C. § 1677(7)(C)(ii))), because these effects are often two sides of the same coin. That is, in a price-sensitive market for substitutable goods, the domestic industry may respond to low-priced imports by holding prices steady, which typically results in lost sales and market share. Or, the domestic industry may drop prices below that of the imports to compete, which typically results in lost profits. In either case, low-priced imports exert "competitive pressure" on the domestic industry, resulting in adverse price effects. See ITG Voma Corp., 253 F. Supp. 3d at 1361.

**B.    Fujifilm's Arguments Contending the Commission's Analysis of Price Effects Is Not Supported by Substantial Evidence Are Wrong**

Fujifilm also argues the Commission's five "subsidiary" factual conclusions within the agency's price effects analysis are not supported by record evidence. See Pls.' Br. at 36-45. Fujifilm's arguments are wrong. A party "challenging the Commission's determination under the substantial evidence standard 'has chosen a course with a high barrier to reversal,'" Nippon, 458 F.3d at 1352 (quoting Mitsubishi, 275 F.3d at 1060), and Fujifilm has not cleared that barrier here.

**1.    Substantial Evidence Demonstrates That Price Is An Important Factor for U.S. Purchasers of ALPs**

Fujifilm initially quotes the Commission's finding that "price is *an* important factor in purchasing decisions, *among other important factors*" (Pls.' Br. at 36 (emphases added)) (quoting

NONCONFIDENTIAL

Views at 30 (CR 170)), but then sets up a strawman argument asserting that the record demonstrates that price was not "the most important factor" for U.S. purchasers of ALPs. Id. The Commission, however, is not required to make a finding that price was "the most important" factor to conclude subject import underselling caused adverse price effects. See, e.g., Chefline Corp. v. United States, 219 F. Supp. 2d 1303, 1316 n.20 (Ct. Int'l Trade 2002) (noting the Commission "does not need to make a finding that price is the 'most' important factor"); Nippon Steel Corp. v. United States, 182 F. Supp. 2d 1330, 1345 (Ct. Int'l Trade 2001) ("A finding of 'price sensitivity' is not precluded by the fact that price is not the *most* important factor.") (emphasis in original), vacated on other grounds, 345 F.3d 1379 (Fed. Cir. 2003); Acciai Speciali Terni, S.p.A. v. United States, 19 CIT 1051, 1059 (1995) (holding although "purchasers did not list price as the most important factor, price was listed as a very important factor," and therefore the "Commission's findings concerning the importance of price {were} supported by the evidence").

Contrary to Plaintiffs' assertions, the Commission extensively analyzed the importance of price to purchasing decisions, stating that "{r}esponding purchasers most frequently ranked price (20 firms) as among their top three purchasing factors," and "{t}he majority of responding purchasers (18 of 23) reported that price was a very important purchasing factor," while also acknowledging that "a greater number of responding purchasers cited other purchasing factors, such as product consistency and reliability of supply, as very important." Views at 30 (CR 170).

As to Fujifilm's assertion that purchasers most frequently identified quality as the most important factor in purchasing decisions and price was only the third-most frequently identified factor (see Pls.' Br. at 37), the Commission explicitly stated that "a majority of responding purchasers reported that U.S.-produced ALPs were comparable to subject imports for all 16

{purchasing} factors," and that "{n}early all responding purchasers reported that the quality of U.S.-produced ALPs and subject imports always or usually met minimum quality standards." Views at 28 (CR 170) (footnotes omitted) (citing FSR at Tables 2.12, 2.10 (CR 163, PR 89)). These findings constitute important evidence that supports the Commission's determination that "price is an important factor in purchasing decisions, among other important factors." Id. at 30 (CR 170).

Plaintiffs' focus on the record information that a majority of responding purchasers only sometimes or never purchase the lowest-priced product (see Pls.' Br. at 37), but the Commission acknowledged this evidence and addressed a broad array of record information relevant to the importance of price to purchasing decisions. See Views at 30 (CR 170). This circumstance does not undermine the Commission's finding that "price is an important factor" in purchasing decisions, nor does the existence of evidence contrary to the Commission finding make the Commission's determination unsupported by substantial evidence. See Nippon, 458 F.3d at 1352 ("'{E}ven if it is possible to draw two inconsistent conclusions from evidence in the record, such a possibility does not prevent {the Commission's} determination from being supported by substantial evidence.'") (second alteration in original) (quoting Am. Silicon, 261 F.3d at 1376).

### 2.   Substantial Evidence Demonstrates a High Degree of Substitutability Between Subject Imports and the Domestic Like Product

Plaintiffs next challenge the Commission's determination that "there is at least a moderate-to-high degree of substitutability between cumulated subject imports and the domestic like product." Pls.' Br. at 37 (quoting Views at 28 (CR 170)). In particular, Fujifilm asserts that

NONCONFIDENTIAL

the Commission's failure to explain why the need to modify equipment when substituting one supplier's ALPs for another supplier's ALPs does not limit substitutability. Id. at 37-38.

Contrary to Fujifilm's contentions, the Commission acknowledged that "{o}ne factor limiting substitutability is that end users must recalibrate printing equipment when switching plate suppliers." Views at 29-30 (CR 170) (footnotes omitted). Further, the Commission discussed and evaluated evidence provided by various interested parties on the extent to which recalibrating a machine may result in downtime, the additional costs purchasers incur to recalibrate, the ease with which purchasers can switch once their equipment has been recalibrated, and that "many purchasers sourced {ALPs} from multiple suppliers during the POI." Id. (CR 170). The Commission also stated explicitly that "the record indicates that the cost and time required for purchasers to switch between suppliers, through the recalibration of their equipment, is not significant." Id. at 30 n.111 (CR 170). Thus, contrary to Fujifilm's contentions, the Commission evaluated the record regarding this issue.

3.    **Substantial Evidence Supports the Commission's Determination That Fujifilm's Pricing Product Data Were Completely Unreliable**

Fujifilm claims the Commission "ignore{ed} Fujifilm's submitted pricing product data." Pls.' Br. at 38. Contrary to Plaintiffs' characterization, the Commission did not "ignore" Fujifilm's pricing product data; rather, it "afforded less weight" to the quarterly pricing data – submitted by Fujifilm and Kodak – after concluding the data submitted by Fujifilm were inaccurate and failed to "properly net out all transportation and linked goods (e.g., chemicals) and services costs for associated products (e.g., CTPs and processors)." Views at 39 (CR 170). The Commission reached this conclusion after the highly unusual step of requesting that Fujifilm submit documentation to the agency to verify the accuracy of Plaintiffs' submitted pricing data.

NONCONFIDENTIAL

Id. at 38-39 (CR 170).  The Commission also emphasized that it elected to place less weight on the quarterly pricing data based on findings of: (1) prevalent substantial discounts for large volume customers; and (2) a disproportionate share of sales made to small customers by Fujifilm, relative to Kodak.  Id. at 38 (CR 170).  Based on these findings, the Commission concluded that the quarterly pricing data collected did not facilitate meaningful pricing comparisons.  Id. (CR 170).

Rather than address the Commission's findings regarding the deficiencies in its submitted data, Fujifilm instead seeks to challenge the manner in which Kodak's quarterly pricing data were reported, asserting that "there is no evidence that Fujifilm and Kodak adopted different approaches in compiling reported pricing product data."  Pls.' Br. at 39.  Contrary to Fujifilm's contentions, however, a report prepared by Commission staff detailing its verification of the information submitted by Kodak states:

[


]

Verification Report of Kodak at 11 (Sept. 26, 2024) (CR 150).  Accordingly, Plaintiffs' claim that "there is no evidence that Fujifilm and Kodak adopted different approaches in compiling reported pricing product data" is incorrect.  Pls.' Br. at 39.

**4.    Substantial Evidence Supports the Commission's Determination That A Comparison of Pricing Data for the 10 Largest Customers Was More Probative of Underselling**

Fujifilm challenges the Commission's reliance on pricing information for its and Kodak's ten largest customers, asserting incorrectly that the Commission's analysis "discarded" the quarterly pricing product data submitted to the agency and "relied solely on pricing data for a

NONCONFIDENTIAL

subset – the top 10 customers." Id.  As explained above, the Commission did not "discard" the quarterly pricing data – rather, it gave those data less weight in its pricing analysis and instead relied on data it found to be more reliable and probative.  See Views at 38, 41 (CR 170).  Equally incorrect is Fujifilm's assertion that the Commission "focused myopically on alleged flaws in the Fujifilm overall pricing data but never addressed the advantages of such data over the narrower Top 10 data."  Pls.' Br. at 39.

Contrary to Fujifilm's assertions, the Commission explained its basis for placing significant weight on the pricing data for Fujifilm's and Kodak's ten largest customers.  The Commission explained that due to the prevalence of volume discounts in the U.S. market, meaning that "larger-volume customers pay{} less for ALPs on a unit basis than smaller-volume customers," a comparison of Fujifilm's quarterly pricing data, which reflect a "greater proportion of sales to smaller customers," would not result in an apples-to-apples comparison with pricing data reported by Kodak, which sold a significant portion of its ALPs to larger-volume customers.  Views at 40 (CR 170).  The record established that Kodak supplied approximately [          ] customers with its ten largest customers accounting for [        ] percent of its overall pricing data, while Fujifilm supplied more than [          ] customers with its ten largest customers accounting for [        ] percent of its overall pricing data.  Id. (CR 170).  Indeed, as Fujifilm's counsel acknowledged at the hearing, the differential in pricing for its largest and smallest customers is [                    ] percent.  Id. at 32, 40 n.153 (CR 170).

The Commission also explained its basis for placing significant weight on the comparisons of pricing data between Kodak's and Fujifilm's ten largest customers, stating:

> Narrowing the customer universe to this subset of Kodak's and {Fujifilm's} purchasers mitigates distortions caused by the differing sizes of each supplier's customer base, given that their

-30-

> top ten customers are comparable in terms of reported purchase
> volumes in 2023. Although the pricing data for the top ten
> customers do not contain data from imports of subject merchandise
> other than {Fujifilm}, {Fujifilm's} pricing data account for the
> vast majority, [      ] percent, of the volume of reported subject
> imports in the overall pricing data, and {Fujifilm} also accounted
> for the vast majority of sales of cumulated subject imports in the
> market during the POI.

Id. at 41 (CR 170); cf. United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. &

Serv. Workers Int'l Union, AFL-CIO, CLC v. United States, 425 F. Supp. 3d 1374, 1379 (Ct.

Int'l Trade 2020) (hereinafter, "United Steel, Paper II") ("The Commission has discretion in

evaluating domestic injury because the antidumping statute does not direct the use of a specific

methodology."); see also JMC Steel Grp. v. United States, 70 F. Supp. 3d 1309, 1316 n.4 (Ct.

Int'l Trade 2015) ("When evaluating challenges to the ITC's choice of methodology, the court

will affirm the chosen methodology so long as it is reasonable.").

Finally, Fujifilm's unsubstantiated assertion that the pricing comparisons based on

Fujifilm's and Kodak's ten largest customers "show that subject imports may have undersold for

the limited volume sold to the largest customers but oversold with respect to the much larger

import volume sold to other smaller customers" is speculative and is inconsistent with the

Commission's explicit findings based on substantial evidence. In particular, the pricing data

considered by the Commission relating to Kodak's and Fujifilm's ten largest customers

accounted for [      ] percent of Kodak's total pricing data, [      ] percent of Fujifilm's total

pricing data, and [      ] of subject imports in the total pricing data. Views at 42 n.161 (CR

170).

NONCONFIDENTIAL

5.      **Substantial Evidence Demonstrates That Certain Customers Purchased Lower-Priced Subject Imports Instead of the Domestic Like Product**

Fujifilm next challenges the Commission's analysis of record information regarding lost sales – and, specifically, the agency's analysis of information relating to purchasers [        ] and [        ]  See Pls.' Br. at 40-43.  Plaintiffs' arguments should be rejected.

With respect to [        ]  Fujifilm highlights that the company's U.S. Purchaser questionnaire response indicated that it did not purchase subject imports instead of the domestic like product.  Id. at 41.  The Commission acknowledged this, but nevertheless determined that [        ] emphasized the importance of price in its questionnaire response and also the comparability of subject imports and the domestic like product on factors other than price.  Views at 43-44, n.168 ([        ] response stated that [        

        ] and that [        

        ]) (CR 170).

Plaintiffs next assert that [        ] increase in purchases of subject imports between 2021 and 2022 occurred because Fujifilm shuttered its Greenwood facility and supplied the customer with ALPs from "both subject countries" and its Dutch facility.  Pls.' Br. at 41.  While Plaintiffs emphasize that these lost sales "did not come at the expense of *Kodak*" (id. (emphasis added)), they most certainly came at the expense of the domestic industry based on the closure of the Greenwood facility.  If this Court affirms the Commission's inclusion of Fujifilm's Greenwood facility in the domestic industry (see supra Section II), [        ] increased purchases of subject imports instead of the domestic like product from the Greenwood facility represents sales lost by the domestic industry to subject imports.

With respect to [        ] Fujifilm again frames its challenges to the Commission's findings in relation to purchases that did not come at the expense of Kodak.  Pls.' Br. at 42-43. Indeed, while Fujifilm asserts that the Commission "insisted on attributing Kodak's lower share to competition from subject producers" (Pls.' Br. at 42-43), this mischaracterizes the Commission's analysis.  Instead, the Commission focused on the domestic industry as a whole, noting that

> From 2021 to 2023, domestically produced ALPs' share of [        ]'s purchases declined by [        ] percentage points, as the share of subject imports in its purchases increased by [        ] percentage points and the share of nonsubject imports in its purchases [                    ] percentage points.

Views at 45 n.172 (CR 170).  Based on these circumstances, the Commission concluded that

[

                              ] Id. at 45 (CR 170).  Accordingly, as discussed at the conclusion of the preceding paragraph, if this Court affirms the Commission's definition of the domestic industry, its analysis of [        ] purchases of domestically produced ALPs and subject imports – and its conclusion that subject imports took share away from the domestic industry over the POI – is supported by substantial evidence and should be affirmed.[3]

---

[3]     Plaintiffs also assert that the Commission [                                                                     ] The Commission addressed this argument, however explaining that "[                    ] does not explain the change in [        ]'s purchases of domestically produced ALPs because [        ]'s purchases of subject imports did not decrease along with demand but rather increased and took share away from the domestic industry over the period."  Views at 45 (CR 170) (footnote omitted).

NONCONFIDENTIAL

**C.      Responses to the Commission's Purchasers' Questionnaire Do Not Undermine the Agency's Finding of Adverse Price Effects**

Fujifilm also argues the Commission's statement that "the significant underselling by cumulated subject imports caused subject imports to gain sales and market share from the domestic industry" is undermined by purchasers' statements. Pls.' Br. at 43-44 (quoting Views at 49 (CR 170)). Fujifilm recounts portions of the Commission's questionnaire relating to the purchase of subject imports rather than the domestic like product, and claims the Commission failed to "adequately address this evidence." Id. at 45. Contrary to Fujifilm's contentions, however, the Commission explicitly acknowledged and addressed this evidence – and it concluded that other evidence supported its adverse price effects conclusions. See Views at 43 n.165 ("However, other evidence on the record, discussed below, further indicates that underselling resulted in subject imports gaining sales and market share at the expense of the domestic industry.") (CR 170). Thus, the Commission did not "ignore" this evidence, but rather placed greater weight on other information that supported its finding of adverse price effects. Fujifilm's argument is nothing more than an invitation for this Court to second guess the Commission's weighing of the evidence before it – an invitation on which this Court should decline to engage. See, e.g., Siemens, 992 F. Supp. 2d at 1335 ("{T}he court may not reweigh the record evidence or otherwise second-guess the Commission's reasonable explanation.").

**V.      THE COMMISSION LAWFULLY FOUND ADVERSE IMPACTS OF SUBJECT IMPORTS**

Fujifilm argues the Commission's determination that the domestic industry suffered an adverse impact by reason of subject imports is unlawful and not supported by substantial evidence. Pls.' Br. at 45-55. As with Fujifilm's other arguments, Fujifilm ignores several aspects of the Commission's findings, re-asserts arguments raised at the administrative level that

the Commission specifically addressed in its Views, and urges this Court to reweigh evidence. Each of Fujifilm's claims is wrong.

### A.    The Commission Correctly Determined That Subject Imports Had An Adverse Impact on the Domestic Industry As a Whole

As an initial matter, Fujifilm's arguments concerning the Commission's adverse impact analysis rely almost entirely on its claim that the Commission's inclusion of Fujifilm's Greenwood facility in the domestic industry is unlawful. For instance, Fujifilm argues the Commission's determination is unlawful because:

- The record "shows improving performance by Kodak for many key metrics." Pls.' Br. at 45 (emphasis added).

- The Commission applied the wrong standard because it found that *Kodak* could have done better absent imports. Id. at 46-47.

- The Commission "confused cause and effect" by failing to isolate *Kodak* from the domestic industry. Id. at 48-49.

- Fujifilm raised Kodak's public disclosure statements, which Fujifilm claims the Commission failed to address adequately. Id. at 49-50.

If this Court rejects Fujifilm's argument concerning the composition of the domestic industry, as it should (see supra Section I), Fujifilm's adverse impact arguments crumble as well.

As the Commission explained, "{t}he domestic industry's performance declined by most measures during the POI." Views at 50 (CR 170). Specifically, "the domestic industry lost market share to cumulated subject imports," including a [    ] percentage point decline from 2021 to 2023 and an additional [    ] percentage points over the interim periods. Id. at 50-51 (CR 170); FSR at C.3 (CR 163, PR 89). Additionally, from 2021 to 2023, the domestic industry's "output indicators – including production, capacity, and U.S. shipments – all declined by" more than [    ] percent far outpacing "the [    ] percent decline in apparent U.S.

consumption" over that period.  Views at 50 (CR 170); FSR at C.3 (CR 163, PR 89).  Moreover, the domestic industry's "net sales, gross profits, and operating profits also declined" substantially.  Views at 50 (CR 170); FSR at C.4 (CR 163, PR 89).  Further, the domestic industry's employment indicators declined, with the number of production-related workers, hours worked, and wages paid declining by [    ] percent or more from 2021 to 2023, productivity declining by [    ] percent, and all four indicators were lower in interim 2024 than in interim 2023.  Views at 52 (CR 170); FSR at C.4 (CR 163, PR 89).

The Commission also described the domestic industry's profitability as "mixed," explaining irregular trends over the three-year and interim periods.  Views at 52-53 (CR 170). But as explained in further detail below in Sections V.B.1-2., the improvements in domestic industry profitability, as well as for Kodak specifically, do not undermine the Commission's determination of an adverse impact by reason of subject imports.  Id. at 60 (discussing Kodak's shift to a "smart revenue" strategy in 2022) (CR 170).  In short, the record firmly supports the Commission's determination that the domestic industry as a whole (i.e., inclusive of Fujifilm's Greenwood facility) was adversely impacted by subject imports.

*        *        *

In sum, if this Court sustains the Commission's definition of the domestic industry to include Fujifilm's Greenwood facility, it should reject the bulk of Fujifilm's arguments regarding the Commission's adverse impact determination.  As addressed below in Sections V.B. and V.C., however, even if this Court finds the Commission's decision to include Fujifilm's Greenwood facility within the domestic industry is unlawful, this Court should sustain the Commission's determination as supported by substantial and otherwise lawful.  See CVB, Inc., 675 F. Supp. 3d at 1342 ("{I}f the Commission's injury determination is still supported by substantial

evidence— even with the errors — the errors are harmless; and the Commission's determination may be sustained"); CP Kelco US, Inc., 24 F. Supp. 3d at 1353, aff'd per curiam, 623 F. App'x 1012 (Fed. Cir. 2015).

## B.    Plaintiffs' Trends-Based Arguments Are Wrong

Several of Plaintiffs' arguments rely on an incorrect assertion that the statute requires the domestic industry to suffer downward trends in profitability.  For instance, Fujifilm claims "the stat{ute} require{s the Commission} to find actual negative effects, and not just the failure to improve by more" and claims the Commission "{n}eed{s} to find negative trends."  Pls.' Br. at 46-47.   Similarly, Fujifilm claims that "improving market share and financial performance confirms that subject imports were not the cause of industry trends."  Id. at 49.   Contrary to Fujifilm's claims, the statute and this Court's precedent firmly establish that increasing profitability is not a basis for the Commission to reach a negative material injury determination. Further, the Commission addressed the issue of Kodak's increasing profitability and explained why, in the context of the record facts, that trend did not demonstrate a lack of adverse impact by reason of subject imports or a lack of material injury.   This Court, therefore, should reject Fujifilm's trends-based arguments.

### 1.    The Statute and This Court's Precedent Establish That Improvements in Domestic Industry Variables Alone Do Not Require a Negative Material Injury Determination

As an initial matter, the statute explicitly provides that

> {t}he Commission may not determine that there is no material injury . . . to an industry in the United States merely because that industry is profitable or because the performance of that industry has recently improved.

NONCONFIDENTIAL

19 U.S.C. § 1677(7)(J); see also CVB, Inc., 675 F. Supp. 3d at 1345 ("{T}he law prohibits the Commission from finding that there is no material injury to an industry 'merely because . . . the performance of that industry has recently improved.'") (quoting 19 U.S.C. § 1677(7)(J)); OCTAL, 539 F. Supp. 3d at 1310-13 (sustaining the Commission's final affirmative material injury determination despite some evidence of improvements in profitability); United Steel, Paper II, 425 F. Supp. 3d at 1380 (sustaining the Commission's affirmative material injury determination on remand, despite an increase in the "the domestic industry's profit" which the Commission explained was "'modest' in light of the significant increase in demand and decline of raw material costs"); ITG Voma Corp., 253 F. Supp. 3d at 1358-59 (sustaining the Commission's affirmative material injury determination, despite the domestic industry's strong financial performance because other factors declined during the period of investigation), aff'd, 753 F. App'x 913 (Fed. Cir. 2019).  Thus, Fujifilm is wrong to assert that in order to reach an affirmative material injury determination, the Commission must find negative trends in profitability or any other enumerated factor.

2.    **The Commission's Factual Findings and Explanations Regarding Kodak's Profitability and Other Indicators Are Reasonable**

The Commission's affirmative determination – despite improvements in certain domestic industry performance indicators – identifies substantial evidence that supports a conclusion that subject imports had an adverse impact on the domestic industry.

First, regarding profitability, Kodak witnesses provided testimony and contemporaneous documentary evidence demonstrating that in 2022, Kodak adopted a "smart revenue" strategy to deal with the surge in low-priced subject imports.  Views at 60 (CR 170).  The strategy sought to improve profitability by focusing "on sales with sustainable margins," and "not pursu{ing} low-

-38-

priced sales contracts that would result in increased sales volumes and revenues at unprofitable margins." Pet. Prehrg. Br. at Exh. 1 at ¶¶ 34-36, Attachs. 13-17 (explaining that **[**

**]**) (CR 128, PR 72). As the Commission explained, "{t}his strategy . . . resulted in improvements in Kodak's financial performance but at the expense of its production, capacity utilization, U.S. shipments, and market share," which all declined substantially from 2022 to 2023. Views at 60 (CR 170); FSR at C.6 (CR 163, PR 89). Fujifilm's opening brief in this action does not mention "smart revenue" or the Commission's related factual findings, which are reasonable and supported by substantial evidence.

Second, regarding market share, Fujifilm completely ignores an important piece of evidence that the Commission considered. One U.S. ALP producer, SLP, ceased production in May 2021 and entered into a brokerage agreement with Kodak, whereby Kodak absorbed SLP's customer base. Views at 26 (CR 170). SLP did not respond to the Commission's U.S. producer questionnaire, but estimated that it produced **[        ]** square meters of ALPs in 2021, a figure that is not included in the Commission's U.S. producer or market share tables. Id. at 26 n.91 (CR 170). Under this agreement, Kodak's shipment volumes increased, as Kodak sold **[            ]** square meters of U.S.-produced ALPs to SLP's former customers in 2021 and **[            ]** square meters in 2022, as SLP's customers were not **[**

**]** Kodak's Post-Hrg. Br. at Exh. 5, ¶ 3 (CR 151, PR 86). While Kodak's shipments increased modestly from 2021 to 2022 due to its absorption of SLP's customers, this was not a gain in sales or market share by the domestic industry. Rather, SLP's sales in 2021 are simply not included in the Commission's database, a fact the Commission recognized. Views at 36 n.140, 54 n.215 (CR 170). Further, as the Commission explained, "{t}he record does not

**NONCONFIDENTIAL**

indicate that" Kodak's sales to "SLP's former customers were insulated from competition with subject imports." Id. at 65-66 (CR 170). Fujifilm does not mention SLP in its opening brief.

Importantly, despite Kodak's absorption of SLP's customers, Kodak's shipments declined massively – falling first by [      ] percent from 2022 to 2023, and then by [      ] percent over the interim 2023 and 2024 periods. FSR at C.6 (CR 163, PR 89). Kodak's market share also declined from [      ] percent in 2022 to [      ] percent in 2023, and from [      ] percent to a period low [      ] percent over the 2023/2024 interim periods, demonstrating that Kodak's decline in sales cannot be explained by a decline in demand. Id. (CR 163, PR 89).[4] Over this same period, subject imports' market share increased from [      ] percent in 2022 to [      ] percent in 2023, and from [      ] percent in interim 2023 to [      ] percent in interim 2024. Id. at C.5 (CR 163, PR 89). As a result, Kodak's loss in market share was due to subject imports, as the Commission correctly found and explained. Views at 54 (CR 170).

Fujifilm's failure to address significant facts that the Commission reasonably relied on in reaching its determination undermines its claims. This Court should reject Fujifilm's request to reweigh the evidence by emphasizing alternative facts and ignoring record evidence the Commission specifically addressed. See, e.g., U.S. Steel Grp. v. United States, 96 F.3d 1352, 1357 (Fed. Cir. 1996) ("It is the Commission's task to evaluate the evidence it collects during its investigation. Certain decisions, such as the weight to be assigned a particular piece of evidence, lie at the core of that evaluative process.'"); OCTAL, F. Supp. 3d at 1306.

---

[4]    Rather than address SLP, Fujifilm claims that the Commission's focus on 2022 to 2023 "ignores 2021 to 2022," but that is not correct. Pls.' Br. at 52. As SLP's customers were fully transitioned to Kodak in 2022, the Commission's emphasis on 2022 to 2023 (and interim 2023 to interim 2024) considers a key issue in the database – the absence of SLP's own sales in 2021. Fujifilm's brief, not the Commission's Views, "ignores" the facts.

NONCONFIDENTIAL

3.     **The Court Has Sustained Similar "But For" Reasoning and Should Do So Here**

Fujifilm's trends-based arguments are intertwined with its arguments that the Commission unlawfully determined the domestic industry was materially injured by reason of subject imports because the Commission reasoned that Kodak would have done better "but for" subject imports.  See, e.g., Pls.' Br. at 46, 52 (framing the Commission's analysis as "could have done better").  Contrary to Fujifilm's assertions, there is nothing unique about the Commission's analysis, which the Court has sustained in similar circumstances.

In CVB, Inc., the Court found that the Commission's factual findings that the domestic industry was segmented between producers and purchasers of boxed and flat-pack mattresses was not supported by substantial evidence.  675 F. Supp. 3d at 1338-43.  The Court, however, found these errors harmless because the Commission addressed the counterfactual scenario that domestic producers engaged exclusively in the manufacture of boxed mattresses were materially injured by subject imports.  Id. at 1343.  The Court noted that while the Commission "acknowledged that domestic boxed mattress manufacturers 'improved their performance' during the period of investigation," the Commission also "found that these manufacturers *could have performed even better if not for the subject imports.*'"  Id. at 1343-44 (emphasis added).  The Court elaborated that the Commission explained:

> This improvement was expected because boxed mattress imports from China decreased dramatically in the wake of an antidumping order, and the domestic industry invested in increasing boxed mattress production capacity.  However, the Commission found that, **but for** the subject imports 'displac{ing} domestic industry shipments . . . and depress{ing} domestic like product prices to a significant degree,' domestic boxed mattress producers would have improved their performance even more.

NONCONFIDENTIAL

Id. at 1344 (emphasis added). The Court, thus, held that "{s}ubstantial evidence supports this portion of the Commission's Views, and it is enough to sustain the Commission's ultimate injury finding." Id.

Similarly, in OCTAL v. United States, the Court rejected a claimed lack of correlation between the subject imports and the domestic industry's performance because "'{a}s subject imports increased {their} market share, the domestic industry {increased its operating profits}.'" 539 F. Supp. 3d at 1311. The Court noted the Commission's conclusion that "although there are some industrywide data suggesting a positive profitability trend, the 'domestic industry as a whole would have performed materially better in the absence of the dumped imports.'" Id.

The Commission has relied on a similar "but for" analysis in many prior cases. See Mattresses from Cambodia, et. al., USITC Pub. 5191 (Final) (May 2021) at 53-54 (finding that "the performance of domestic {} producers would have been appreciably stronger during the period of investigation **but for** the significant volume and increase in volume of low-priced subject imports that displaced domestic industry shipments from the U.S. market and depressed domestic like product prices to a significant degree," and further finding that domestic producers "could have increased their U.S. shipments and market share more than they did during the period **but for** subject import competition," and that "domestic producers {} could have had greater sales revenues and operating and net income than they did during the period of investigation **but for** subject import competition") (emphases added), aff'd, CVB, Inc., 675 F. Supp. 3d at 1334; Common Alloy Aluminum Sheet from Bahrain, et al., USITC Pub. 5182 (Final) (Apr. 2021) at 45-46; Utility Scale Wind Towers from Malaysia, USITC Pub. 5215 (Final) (July 2021) at 35-39; Quartz Surface Products from India and Turkey, USITC Pub. 5061 (Final) (June 2020) at 33; Forged Steel Fittings From India and Korea, USITC Pub. 5137 (Final)

NONCONFIDENTIAL

(Nov. 2020) at 34-35. Thus, the Commission's explanation here, which is underpinned by factual findings and substantial evidence that is specific to this record and the ALPs industry, is appropriate and lawful.

As such, the Commission's "but for" analysis under the counterfactual scenario where Fujifilm's Greenwood facility is excluded from the domestic industry is not unique and is an analysis the Court has previously sustained. Fujifilm's decision to close the Greenwood facility left a substantial gap in supply in the U.S. market, and the Commission reasonably concluded that Kodak, as the last remaining U.S. producer of ALPs, could have expected to increase its shipments and revenues to fill the void left by Fujifilm's closure. Indeed, in 2021, Fujifilm's Greenwood facility accounted for **[      ]** percent of the U.S. market, a figure that declined to just **[    ]** percent in 2022, and **[    ]** in 2023 and the interim periods. FSR at C.5 (CR 163, PR 89). Fujifilm argued it was entitled to maintain this market share given existing contracts with its customers and that purchasers cannot easily switch between suppliers, but the Commission addressed and rejected these arguments. Views at 60-62 (CR 170). The Commission also found that the low prices of subject imports contributed to Fujifilm's ability to replace its U.S. production with subject imports and prevented Kodak from gaining market share. Id. at 57-58 (CR 170). Indeed, as already discussed, Kodak lost market share to subject imports, particularly between 2022 and 2023 and over the interim periods. The Commission also observed that: (1) eight of 24 purchasers reported they had changed suppliers since January 1, 2021, indicating it is not difficult to switch among suppliers; and (2) **[      ]** percent of subject import sales in 2023 were made on the spot market, directly undercutting Fujifilm's claims regarding contracts preventing its customers from switching to Kodak or another source. Id. at 60-62 (CR 170). Thus, the Commission addressed and rejected each of Fujifilm's arguments.

NONCONFIDENTIAL

In short, the Commission's counterfactual "but for" analysis is supported by the Commission's and the Court's precedent, as well as substantial evidence.

**C.      The Commission Lawfully Addressed Fujifilm's Arguments and Alternative Causes for the Domestic Industry's Injury**

Fujifilm argues that the Commission did not adequately address certain arguments it raised below and urges this Court to remand the agency's decision for further consideration of these issues.  Pls.' Br. at 49-55.  Contrary to Fujifilm's argument, the Commission adequately addressed each of Fujifilm's salient arguments, and the agency's determination is supported by substantial evidence.

Courts look for a reasoned analysis or explanation for an agency's decision to determine whether a particular decision is arbitrary, capricious, or an abuse of discretion.  See, e.g., Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 167-68 (1962).  An explicit explanation is not necessary, however, where the agency's decisional path is reasonably discernible.  See Ceramica Regiomontana, S.A. v. United States, 810 F.2d 1137, 1139 (Fed. Cir. 1987) ("A court may 'uphold {an agency's} decision of less than ideal clarity if the agency's path may reasonably be discerned.'") (quoting Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974)).  Moreover, while the Commission "must consider an important aspect of the problem," the "law does not require that an agency make an explicit response to every argument made by a party, but instead requires that issues material to the agency's determination be discussed so that the path of the agency may reasonably be discerned by a reviewing court."  Timken U.S. Corp. v. United States, 421 F.3d 1350, 1354 (Fed. Cir. 2005) (quoting Uruguay Round Agreements Act: Statement of Administrative Action, H.R. Doc.

No. 103-316, Vol. I at 892 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4215) (internal quotation marks and citations omitted).

Fujifilm claims the Commission failed to address several of its arguments. First, Fujifilm claims the agency failed to discuss its argument that Kodak's SEC filing showed Kodak reported stronger financial results to the Commission for its U.S. sales than its results outside the U.S. market. Pls.' Br. at 49. Nothing in the statute requires the Commission to consider such a comparison. Indeed, quite the opposite. The statute requires the Commission to "evaluate all relevant economic factors which have a bearing on the state of the industry <u>in the United States.</u>" 19 U.S.C. § 1677(7)(C)(iii) (emphasis added). There are a multitude of explanations for Kodak's performance outside the U.S. market or in other aspects of the Print Segment of its business that have nothing to do with the impact of subject imports on Kodak's U.S. sales of and operations involving ALPs, and the statute does not require the Commission to conduct such a broad investigation of a separate industry and markets. The Commission's "failure" to address specifically this argument, which was limited to less than two pages in Fujifilm's 172-page prehearing brief, is harmless, if it is an error at all. <u>See</u> Fujifilm's Prehrg. Br. at 112-13 (CR 129, PR 69).

Fujifilm raises a number of other issues that it claims the Commission did not adequately address, but in each instance, Fujifilm grudgingly admits the Commission did address the argument. For example, Fujifilm states it noted the absence of price depression and suppression, but the Commission addressed these facts and nevertheless found adverse price effects and provided a lengthy explanation of why underselling by subject imports led to the domestic industry's loss of market share. Views at 47-49, 57-58 (CR 170); <u>see also</u> <u>supra</u> Section IV.A.

NONCONFIDENTIAL

Fujifilm also repeatedly highlights that Kodak's trade-related indicators declined between 2021 and 2023 by less than demand.  Pls.' Br. at 50-51.  The Commission, however, addressed these circumstances and, as discussed above, Fujifilm completely ignores that SLP is not included in the database, thereby skewing data for calendar year 2021, a fact recognized repeatedly by the Commission.  Views at 36, n.140, 54 n.215 (CR 170).  Further, as summarized in the table below, between 2022 and 2023 and between the interim periods, Kodak's trade-related indicators fell by a far greater percentage than demand (i.e., apparent consumption), as Kodak lost market share to subject imports.

| Period Changes | | |
|---|---|---|
| Metric | 2022 to 2023 | Interim 2023 to 2024 |
| Apparent Consumption | [     ] percent | [     ] percent |
| Kodak's U.S. ALP Production (quantity) | [     ] percent | [     ] percent |
| Kodak's U.S. Shipments (quantity) | [     ] percent | [     ] percent |

FSR at C.5-C.6 (CR 163, PR 89).

Finally, Fujifilm argues the Commission "did not really engage with" evidence that certain purchasers relied on non-price reasons for purchasing ALPs.  Pls.' Br. at 53-54.  Contrary to Fujifilm's claim, the Commission directly addressed this issue.  Views at 62 (stating "{w}e are also unpersuaded by Fujifilm's argument that non-price factors explain any purchasers lost by Kodak to Fujifilm during the POI" and providing a fulsome explanation) (CR 170).  Indeed, as the Commission explained, "the vast majority of responding purchasers reported that domestically produced ALPs were comparable to subject imports with respect to all non-price factors." Id. (CR 170).

As Fujifilm is forced to acknowledge, the Commission grappled with each of its arguments and dismissed them after evaluating the record evidence.  As such, there is no basis

NONCONFIDENTIAL

for this Court to remand the Commission's well-reasoned determination, which thoroughly evaluated the record and addressed all of Fujifilm's salient arguments.

## CONCLUSION

For the reasons above, Defendant-Intervenor respectfully urges this Court to sustain the Final Determination.

Respectfully submitted,

/s/ John M. Herrmann
JOHN M. HERRMANN
PAUL C. ROSENTHAL
JOSHUA R. MOREY
ELIZABETH C. JOHNSON
JULIA A. FOX
MATTHEW T. MARTIN
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, D.C. 20007
(202) 342-8400
jherrmann@kelleydrye.com
prosenthal@kelleydrye.com
jmorey@kelleydrye.com
ejohnson@kelleydrye.com
jfox@kelleydrye.com
mmartin@kelleydrye.com

Counsel to Defendant-Intervenor

Dated: October 20, 2025

**CERTIFICATE OF COMPLIANCE**
**WITH U.S. COURT OF INTERNATIONAL TRADE**
**STANDARD CHAMBERS PROCEDURES**

Pursuant to the United States Court of International Trade Standard Chambers procedures, counsel for Defendant-Intervenor Eastman Kodak Company certifies that this response brief contains 13,981 words, including footnotes, tables, and charts. The word count certification is made in reliance on the word-count feature contained in Microsoft Enterprise – 365.

Respectfully submitted,

/s/ John M. Herrmann

JOHN M. HERRMANN
PAUL C. ROSENTHAL
JOSHUA R. MOREY
ELIZABETH C. JOHNSON
JULIA A. FOX
MATTHEW T. MARTIN
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, D.C.  20007
(202) 342-8400
jherrmann@kelleydrye.com
prosenthal@kelleydrye.com
jmorey@kelleydrye.com
ejohnson@kelleydrye.com
jfox@kelleydrye.com
mmartin@kelleydrye.com

Counsel to Defendant-Intervenor

Dated:  October 20, 2025