# UNITED STATES COURT OF INTERNATIONAL TRADE

*Before*: The Honorable Jennifer Choe-Groves, Judge

|  |  |
|---|---|
| FUJIFILM NORTH AMERICA CORPORATION, FUJIFILM CORPORATION, AND FUJIFILM PRINTING PLATE (CHINA) CO. LTD., | ) ) ) ) ) |
| Plaintiffs, | ) ) **Court No. 24-00251** |
| v. | ) ) **NON-CONFIDENTIAL** **VERSION** |
| UNITED STATES, | ) ) *Confidential information removed from page 25.* |
| Defendant, | ) ) |
| EASTMAN KODAK COMPANY, | ) ) |
| Defendant-Intervenor. | ) ) |

## PLAINTIFFS' FUJIFILM COMMENTS ON REMAND REDETERMINATION

Daniel L. Porter
James P. Durling
William C. Sjoberg
Gina M. Colarusso
John Taishu Pitt

**Pillsbury Winthrop Shaw Pittman LLP**
1200 17th St, N.W.
Washington, D.C. 20036
202-663-8140

*Counsel for Fujifilm*

**June 22, 2026**

**TABLE OF CONTENTS**

Page

INTRODUCTION AND SUMMARY OF ARGUMENT .................................................. 1

ARGUMENT ............................................................................................................... 8

I.    THE COMMISSION'S REMAND REDETERMINATION FAILS TO COMPLY
      WITH THE COURT'S ORDER AND, IN ANY EVENT, IS NOT SUPPORTED
      BY SUBSTANTIAL EVIDENCE AND IS OTHERWISE NOT IN
      ACCORDANCE WITH LAW ............................................................................. 8

      A.    The Commission's Remand Redetermination Still Does Not Comply
            With This Court's Specific Instruction To Explain Why Fujifilm's
            Facts Do Not Fit The Legislative History Example ..................................... 8

      B.    The Commission Incorrectly Interprets the Statute By Treating the
            Narrow Situation of "Shielding" as the Controlling Rule Rather
            Than Applying the Correct Statutory Standard of "Appropriate
            Circumstances" ........................................................................................ 13

            1.    The Commission uses legislative history selectively to narrow
                  impermissibly the statutory text ...................................................... 13

            2.    The Commission uses circular reasoning that impermissibly narrows
                  the statutory text ............................................................................. 17

      C.    The Commission's Inference That Affiliated Internal Replacement
            Constituted "Competition" with Greenwood Is Not Supported by
            Substantial Evidence ............................................................................... 19

            1.    The integrated affiliated sales structure and centrally controlled
                  restructuring negates the Commission's "competition" inference ... 20

            2.    The pricing evidence and absence of lost sales or revenues also
                  contradict a finding of "competition" .............................................. 23

3.    Purchaser testimony uniformly attributes the shift to Greenwood's closure, not import competition ........................................................24

4.    The Commission's unexplained reversal on "primary interest" further undermines the "competition" finding ................................27

D.    The Commission's Renewed "Skewing" Analysis Remains Conclusory and Does Not Adequately Address the Actual Distortion Question, And So It Does Not Satisfy The Substantial Evidence Standard ....................................................................................................29

II.    THE COMMISSION'S NEW "IMMATERIAL ANYWAY" RATIONALE IS POST HOC AND DOES NOT CURE THE ERRORS IN THE REMAND DETERMINATION ............................................................................................34

CONCLUSION ....................................................................................................39

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Align Tech., Inc. v. Int'l Trade Comm'n*,
771 F.3d 1317 (Fed. Cir. 2014) ................................................................ 35

*Amanda Foods v. United States*,
807 F. Supp. 2d 1332 (Ct. Int'l Trade 2011) ............................................ 29

*Baude v. United States*,
955 F.3d 1290 (Fed. Cir. 2020) ................................................................ 35

*Duncan v. Walker*,
533 U.S. 167 (2001).................................................................................. 19

*Fujifilm North America Corp. v. United States*,
No. 24-00251, Slip Op. 26-17 (Ct. Int'l Trade Feb. 18, 2026)................... 1

*In re United States*,
166 F.4th 1001 (Fed. Cir. 2026) ............................................................... 17

*Lashify, Inc. v. Int'l Trade Comm'n*,
130 F.4th 948 (Fed. Cir. 2025) ................................................................ 13

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024)......................................................................... 4, 13, 19

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983).................................................................................... 28

*S.E.C. v. Chenery Corp.*,
318 U.S. 80 (1943) .................................................................................... 35

*Suramerica de Aleaciones Laminadas, C.A. v. United States*,
44 F.3d 978 (Fed. Cir. 1994) ............................................................... 20, 22

*Swiff-Train Co. v. United States*,
793 F.3d 1355 (Fed. Cir. 2015) ................................................................ 20

*Timken Co. v. United States*,
894 F.2d 385 (Fed. Cir. 1990) ...............................................................................35

*Universal Camera Corp. v. NLRB*,
340 U.S. 474 (1951)...............................................................................................26

*Wabtec Corp. v. United States*,
805 F. Supp. 3d 1326 (Ct. Int'l Trade 2025) ........................................................*passim*

**Federal Statutes**

19 U.S.C. § 1677(4)(B)(i).............................................................................. 4, 14, 15

19 U.S.C. § 1677(4)(B)(ii) ...................................................................................... 16

**Other Authorities**

S. Rep. No. 96-249 (1979)........................................................................ 1, 8, 10, 15

Statement of Administrative Action for the Uruguay Round Agreements Act,
H.R. Rep. No. 103-316 (1994)................................................................................. 17

**INTRODUCTION AND SUMMARY OF ARGUMENT**

This Court remanded the International Trade Commission's ("Commission") domestic-industry determination for one specific reason: the Commission did not adequately explain why the undisputed facts of this case did not fit squarely within the legislative-history example of an "appropriate" case for excluding a related party— situations "where a U.S. producer is related to a foreign exporter and the foreign exporter directs his exports to the United States so as not to compete with his related U.S. producer." *Fujifilm North America Corp. v. United States*, No. 24-00251, Slip Op. 26-17 (Ct. Int'l Trade Feb. 18, 2026) (hereinafter "*Remand Order*") at 10, 13 (quoting S. Rep. No. 96-249, at 83 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 469). The Court observed that the facts here appeared "very similar" to that example of a situation that met the statutory provision "appropriate" and instructed the Commission to address the similarity or explain the difference. *Remand Order* at 12–13.

The Commission has not done so. Instead of engaging with the actual words of this specific example from the legislative history and comparing them to the evidentiary record, the Remand Redetermination reformulates the example into the Commission's own preferred concept of "shielding," declares that Fujifilm Greenwood was not shielded because its production was "supplanted" by affiliated imports, and pronounces the facts to be "the exact opposite" of what Congress described. Redetermination Pursuant to Court Remand (May 20, 2026), ECF Nos. 70-71 ("Remand Redetermination") at 19, 22. That analytical approach does not satisfy the remand order. It replaces the specific

wording of the example with the Commission's words, and it avoids, rather than performs, the comparison the Court required.  The Commission never explains why the centrally directed cooperation among Fujifilm factories should be deemed as "competition" with Greenwood.

The undisputed facts remain as they were.  Prior to the period of investigation ("POI"), Fujifilm made a global corporate decision to close its U.S. aluminum lithographic plate ("ALP") production facility in Greenwood, South Carolina, and to serve its U.S. customers from its production operations in Japan and China.  Commission Staff Report – Final and Preliminary (Oct. 2024) ("SR") at 3.4 (C.R. 163); Fujifilm's U.S. Producer Questionnaire Resp. at II-2a (C.R. 72).[1]  That corporate decision was driven by the large and growing imbalance between declining worldwide demand for print media and existing global ALP production capacity—not by Fujifilm's own subject import competition.  SR at Table 3.12 (C.R. 163).  The Commission acknowledged as much in its original determination.  Views of the Commission (Nov. 14, 2024) ("*Views*") at 13–14 (C.R. 170).  All Fujifilm supply to the U.S. market—whether produced at Greenwood, in Japan, or in China—flowed through a single affiliated U.S. sales entity, Fujifilm North America Corporation ("FNAC"), which was inextricably linked to Greenwood. Greenwood did not sell directly to unaffiliated U.S. customers; nor did

---

[1] Citations to the public record are indicated by "P.R.", referring to List 1 on the index of the administrative record (ECF No. 25) and List 1 on the index of the remand administrative record (ECF No. 73).  Citations to the confidential record are indicated by "C.R.", referring to List 2 on the index of the administrative record (ECF No. 24) and List 2 on the index of the remand administrative record (ECF No. 72).

Fujifilm Japan nor Fujifilm China. FNAC was the exclusive sales channel for all Fujifilm ALPs in the United States regardless of where it was produced. SR at 5.5 (C.R. 163). In other words, 100 percent of subject imports from Japan were shipped to FNAC, and 100 percent of subject imports from China were shipped to FNAC. Fujifilm Japan Foreign Producer Questionnaire Resp. ("FPQR") at I-7 (C.R. 71); Fujifilm China Foreign Producer Questionnaire Resp. ("FPQR") at I-7 (C.R. 73). Thus, the record shows a centrally directed affiliated export arrangement through a single corporate sales channel – the very kind of coordinated direction the legislative history example describes.

The Remand Redetermination's response to these facts is to assert that because the affiliated imports "supplanted" Greenwood's production, they were somehow "competing" with Greenwood and therefore this case is the "opposite" of the legislative example. Remand Redetermination at 19–20. That reasoning is flawed in multiple respects, and it is those flaws—legal, analytical, and evidentiary—that these comments address.

At the outset, we note that the Remand Redetermination does not comply with the Court's remand instruction. The Court directed the Commission to explain how the facts are "similar or different" from the example in the legislative history. *Remand Order* at 12–13. The Commission did not perform that comparison. Instead, it reformulated the legislative history example into its own "shielding" concept, constructed a hypothetical of its own invention—in which a foreign affiliate exports only products the domestic producer does not make—and then declared the Fujifilm facts to be different from that hypothetical. Remand Redetermination at 19. But the Court's instruction was to

compare the facts to the legislative-history example as written, not to a narrower hypothetical the Commission prefers.  This non-compliance alone warrants a further remand.

Moreover, separate and apart from non-compliance with the remand order, the Remand Redetermination rests on an incorrect interpretation of the statute.  Under *Loper Bright*, the question is whether the Commission's interpretation reflects the "best reading" of the statutory text.  *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 400 (2024).  The statutory text here provides for exclusion "in appropriate circumstances"— not just when the related U.S. producer is allegedly "shielded."  19 U.S.C. § 1677(4)(B)(i).  The Commission's approach effectively replaces the broader statutory phrase with a rigid agency-created test under which the answer to a single question—was the domestic producer "shielded"—is treated as dispositive.  Remand Redetermination at 13–14, 17–22.  But that is not the statute that Congress wrote, and the Commission's interpretation renders the legislative example a nullity.  The Commission's approach is not the best reading of the controlling statutory term "appropriate."

Under the Commission's reasoning, any time a foreign parent replaces affiliated domestic production with subject imports, the framework will always conclude that the domestic producer was not "shielded" (because its performance declined), that the imports were "competing" (because they displaced domestic output), and that exclusion would "mask injury" (because aggregate data would look less negative without the declining party).  That circular logic means the specific scenario specifically identified as appropriate for exclusion can never in practice result in exclusion.  Such circular logic

would create a rigid *per se* rule that is contrary to the flexibility required by the statutory term "appropriate."

Even accepting the Commission's legal framework, its central factual finding— that the affiliated imports were "competing" with Greenwood—is not supported by substantial evidence.  The record shows coordinated replacement among affiliated producers through a single corporate sales channel, not ordinary market competition between independent actors.  SR at 5.5 (C.R. 163).  Greenwood reported no lost sales and no lost revenues to subject imports from its sister factories in Japan and China.  *Id*. at 5.15 (P.R. 89).  Pricing data show that in comparisons involving 278 distinct product codes, the average unit values of subject imports were equal to or higher than those of the corresponding domestic products in 96.7 percent of comparisons—the opposite of what one would expect in price-based competition.  FNAC's U.S. Importers' Questionnaire Resp. ("QR") (July 23, 2024) at Attachment C (C.R. 74).  Indeed, the testimony of purchasers confirms the point: of 19 purchasers who reported purchasing subject imports instead of domestic product, only 2 said the decision was based on price; the remaining 17 consistently cited Greenwood's closure – not competition – as the reason for their shift to imports.  SR at Table 5.14 (C.R. 163).  The Commission ignores this purchaser testimony entirely.

The Remand Redetermination also fails to address the Commission's own unexplained reversal of position on whether Fujifilm's "primary interest" lay in importation or domestic production—a finding the Commission reversed between the preliminary and final stages despite no change in the underlying facts.  *Compare*

- 5 -

*Aluminum Lithographic Printing Plates from China and Japan*, USITC Pub. 5475 (Prelim.) (Nov. 2023) ("*Preliminary Determination*") at 15 (P.R. 41) ("we agree that Fujifilm's primary interest appears to lie in importation") *with Views* at 14 (C.R. 170) ("its primary interest was in domestic production, until it ceased such production in March 2022").  If there is a reason for this change, the Commission has not provided it.

The Commission's other central factual finding about "skewing" is also not supported by substantial evidence.  In the Remand Redetermination, the Commission's renewed "skewing" analysis and conclusion remain conclusory.  The Commission asserts that excluding Greenwood would "mask" injury, Remand Redetermination at 18, 23–24, but it never explains why excluding Greenwood's data would distort the domestic-industry picture rather than clarify it.  As this Court's recent decision in *Wabtec* makes clear, "exclusion of data is not synonymous with skewing data." *Wabtec Corp. v. United States*, 805 F. Supp. 3d 1326, 1345 (Ct. Int'l Trade 2025).  The Commission's reasoning assumes what it must prove: that Greenwood's decline belongs in the industry dataset in the first place.  If Greenwood should properly be excluded as a related party, then it is inclusion—not exclusion—that distorts the data by injecting the effects of an intra-corporate sourcing decision into the injury analysis for the domestic industry that remained exposed to subject imports.

Finally, the Commission's *new* assertion that Greenwood's inclusion was "immaterial" because the affirmative injury determination rested on Kodak is a *post hoc* rationalization that does not cure the analytical errors in the determination as written.  Remand Redetermination at 22–25.  The Commission cannot simultaneously insist that

Greenwood must remain in the domestic industry to avoid "masking" injury, *id.* at 18, 23–24, something that would materially affect the outcome, and then assert that Greenwood's inclusion made no difference to the outcome, *Id.* at 22. Those propositions are simply irreconcilable. Moreover, the Commission never presents a genuine alternative analysis assuming Greenwood's exclusion. It simply asserts that selected portions of its original determination also discussed Kodak. *Id.* at 22–25. That discussion, however, never assesses the core question of material injury by reason of subject imports to a domestic industry including only Kodak. That is not a harmless-error analysis; it is a conclusory fallback that does not answer the question the Court remanded.

For all of these reasons, the Commission's Remand Redetermination cannot be sustained. It does not comply with this Court's remand order, it rests on a legally incorrect interpretation of the related-parties provision, and its central factual conclusions are not supported by substantial evidence on the record as a whole.

**ARGUMENT**

**I.     THE COMMISSION'S REMAND REDETERMINATION FAILS TO COMPLY WITH THE COURT'S ORDER AND, IN ANY EVENT, IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND IS OTHERWISE NOT IN ACCORDANCE WITH LAW**

As we detail below, there are several reasons why this Court should not sustain the Commission's Remand Redetermination.

**A.     The Commission's Remand Redetermination Still Does Not Comply With This Court's Specific Instruction To Explain Why Fujifilm's Facts Do Not Fit The Legislative History Example**

The Court did not remand this matter for the Commission merely to restate its prior conclusion in different terms. The Court directed the Commission to explain "how the facts in this case are similar or different than the example provided in the legislative history," which the Court correctly observed appeared "very similar to the facts in this case." *Remand Order* at 12–13. The Commission's Remand Redetermination still does not provide that explanation.

The example of what would be "appropriate" in the legislative history is rather specific. Congress stated that "where a U.S. producer is related to a foreign exporter and the foreign exporter directs his exports to the United States so as not to compete with his related U.S. producer," such circumstances "should be a case where the ITC would **not** consider the related U.S. producer to be part of the domestic industry." S. Rep. No. 96-249, at 83 (1979), reprinted in 1979 U.S.C.C.A.N. 381, 469 (emphasis added). The words of that example matter. Congress did not say that appropriate circumstances existed only when the related U.S. producer was "shielded." Rather, Congress used the

broad term "appropriate" and the specific example in the legislative history described a particular factual arrangement: the foreign exporter "directs" exports to the United States and does so "so as not to compete with" the related U.S. producer. The Commission's Remand Redetermination never explains how those words themselves support the Commission's interpretation.

Instead, the Commission reformulates the example into a different and narrower proposition of its own making. The Commission states that it "understand{s} this to be an example of how a domestic producer's affiliation could act to shield the domestic industry from the effects of subject import competition," and then concludes that the facts here are "the exact opposite" because Fujifilm's imports supplanted Greenwood's production. Remand Redetermination at 19, 22. But that reasoning skips over the actual language used in the specific example. The Remand Redetermination does not explain why "directs his exports . . . so as not to compete" should be read to mean only the Commission's preferred concept of "shielding," particularly in the context of a factory closure, or why the Commission's narrower formulation captures the full meaning of the example.

That omission matters here because the record facts speak directly to the words of the specific example at issue. The evidentiary record shows a centrally directed affiliated sales structure for the U.S. market. Greenwood sold 100 percent of its U.S.-produced ALPs only to FNAC. Fujifilm Japan sold 100 percent of its U.S.-bound ALPs only to FNAC. Fujifilm China likewise sold 100 percent of its U.S.-bound ALPs only to FNAC. Fujifilm's Remand Comments at 5 (C.R. 173R); SR at 5.5 (C.R. 163); Fujifilm Japan

FPQR at I-7 (C.R. 71); Fujifilm China FPQR at I-7 (C.R. 73).  The Commission does not dispute any of these key facts.  Thus, the evidentiary record shows exports being "direct{ed} . . . to the United States" through a single affiliated U.S. sales channel.  *See* S. Rep. No. 96-249, at 83 (1979).  Yet the Commission's Remand Redetermination does not explain why that evidence of centrally directed affiliated exports does not satisfy the first half of the legislative example.

Nor does the Commission adequately explain why the second half of the example—"so as not to compete with his related U.S. producer"—cannot be satisfied on these facts.  The Commission's answer is simply that because the imports replaced Greenwood's production, they, therefore, must have been "competing" with Greenwood.  But here, the imports complemented Greenwood initially, and then filled a gap at existing customers once Greenwood closed.  Such coordinated cooperation is not "competition."  The Commission does not explain why a centrally managed affiliated sourcing transition—through one affiliated sales arm and pursuant to a preplanned corporate decision to shutdown a U.S. factory—must necessarily constitute "competition" within the meaning of the specific example from the Senate Report.

Indeed, the Commission's analysis appears to read the word "compete" out of the example and replace it with a different test: whether affiliated imports were somehow detrimental to the domestic production overall.  The Commission says Fujifilm's decision to substitute imports for Greenwood's production was "detrimental" to Greenwood and therefore was "the opposite of shielding."  Remand Redetermination at 20.  This assertion of "detrimental" makes no sense – continuing to serve existing customers from sister

- 10 -

factories helped those Greenwood customers that wanted to purchase from Fujifilm, and helping its customers helped Greenwood. During the phase down, Greenwood continued to sell every unit it produced. There was no supply push from imports, but rather a demand pull to complement those products Greenwood was no longer making. But even if the substitution was detrimental to Greenwood production in some narrow sense, that still does not answer the interpretive question posed by the legislative example. The issue on remand was not merely whether Greenwood suffered adverse consequences. The issue was whether the Commission could explain why the foreign-affiliated exports here were not "direct{ed} . . . so as not to compete" with Greenwood. The Remand Redetermination does not answer that specific question about the specific example of "appropriate" that was given in the legislative history.

The deficiency is underscored by the Commission's own hypothetical. The Commission suggests that the legislative example would apply if the foreign affiliate exported only ALP products that Greenwood did not make, but that other domestic producers did make. That may be one possible example of exports directed "so as not to compete" with a related U.S. producer. But the Commission never explains why Congress's word "appropriate" is limited to that narrow example of not competing. The example in the Senate Report itself contains no such limitation and refers to "so as not to compete" broadly. The Commission, thus, substitutes a narrower hypothetical of its own invention for the broader language Congress and the example actually used.

The Commission also fails to engage with the facts that most naturally bear on the phrase "directs his exports." FNAC itself explained that imports from Japan and China

- 11 -

increased to replace supply from Greenwood and Tilburg after Fujifilm made a global decision, before the POI, to rationalize production capacity. Fujifilm's Remand Comments at 7–9 (P.R. 113R) (citing Fujifilm's Prehearing Brief at 14 (C.R. 129)); SR at Table 3.12 (C.R. 163). The Commission acknowledges that explanation but dismisses it on the ground that the replacement of Greenwood's production by imports was somehow harmful to Greenwood. Remand Redetermination at 24. Again, that is not the analysis the Court ordered. The question is whether the Commission can explain why this record of centrally directed affiliated exports does not fit the legislative history example. Merely saying that the result was harmful to Greenwood does not explain why the exports were not "direct{ed} . . . so as not to compete" within the meaning of the Senate Report.

In short, the Remand Redetermination still does not do what the Court required. It does not meaningfully compare the Fujifilm facts to the legislative history example, and it does not explain how the words of that example support the Commission's interpretation. Instead, it replaces Congress's language with the Commission's own narrower "shielding" formulation, then declares that the Fujifilm facts fail that reformulated test. That is not compliance with the *Remand Order*. If the Commission wished to conclude that this case is different from the example Congress gave, it was required to explain why, using both the actual record facts to explain how imports could be deemed to "compete" with Greenwood when the record shows only cooperative coordination, not competition. It still has not done so.

**B.    The Commission Incorrectly Interprets the Statute By Treating the Narrow Situation of "Shielding" as the Controlling Rule Rather Than Applying the Correct Statutory Standard of "Appropriate Circumstances"**

Separate and apart from the conclusion that the Commission failed to comply with the Court's remand instructions, the Remand Redetermination should be rejected because it rests on an incorrect interpretation of the relevant statutory provision, 19 U.S.C. § 1677(4)(B).  Under *Loper Bright*, the question for the Court is not whether the Commission's interpretation is one permissible reading among several.  Rather, the question is whether the Commission's interpretation here reflects the best reading of the statute.  603 U.S. at 400.  It does not.

The Federal Circuit has recently confirmed, in reviewing an ITC decision after *Loper Bright*, that the reviewing court must exercise its own independent judgment and reject a Commission interpretation that reflects a "legally incorrect understanding of the statutory test." *Lashify, Inc. v. Int'l Trade Comm'n*, 130 F.4th 948, 951 (Fed. Cir. 2025).  The Commission's interpretation of the statute is wrong, both (1) because it uses one part of the legislative history to narrow impermissibly the statutory text itself while ignoring other parts of the legislative history; and (2) because it illogically creates a *per se* rule that again impermissibly narrows the statutory text.

**1.    The Commission uses legislative history selectively to narrow impermissibly the statutory text**

The statutory text provides that when a producer of the domestic like product and an exporter or importer of the subject merchandise are related parties, "the producer may, in appropriate circumstances, be excluded from the industry."  19 U.S.C. § 1677(4)(B)(i).

The key phrase is "appropriate circumstances."  Congress did not say that exclusion is permitted only where the related producer is "shielded" from subject imports.  Congress did not say that exclusion is permitted only where the related producer "benefits" from subject imports.  Likewise, Congress did not say that exclusion is forbidden whenever affiliated subject imports replace affiliated domestic production, particularly in the context of a centrally controlled consolidation among several factories, including one in the United States.  Congress instead chose the broader phrase "appropriate circumstances."

That choice of words matters.  "Appropriate circumstances" is naturally read to require a case-specific judgment that takes account of the statute's purpose and the specific facts presented in that case.  But this broad phrase does not naturally read as a rigid or near-rigid rule under which the Commission asks only whether the related producer was "shielded," as the Commission uses that term, and then treats the answer to that question as effectively dispositive.  The Commission's Remand Redetermination does exactly that.  It repeatedly describes the provision's purpose in terms of excluding a producer that is "benefiting or shielded" from subject imports, and then reasons that exclusion is inappropriate here because Greenwood was not shielded.  That is not the statute Congress wrote.

The legislative history confirms the point.  The legislative history provides a specific example of an "appropriate" case: where "a U.S. producer is related to a foreign exporter and the foreign exporter directs his exports to the United States so as not to compete with his related U.S. producer."  S. Rep. No. 96-249, at 83 (1979).  Again, this

- 14 -

specific example did not use the word "shielding."  It used the phrase "directs his

exports . . . so as not to compete."  The best reading of the statutory phrase "appropriate

circumstances" should account for those words of this specific example.  The

Commission's interpretation does not.  Rather than interpreting "appropriate

circumstances" in light of the actual example included, the Commission substitutes its

own preferred formulation and impermissibly narrows "appropriate circumstances" as

referred only to "shielding."

That is too narrow a reading of the relevant statutory language.  At most,

"shielding" may be one way to describe one category of "appropriate circumstances."

But it is not the phrase Congress enacted, and it is not the only reading supported by the

statutory text and legislative example.  The example provided focuses on direction of

exports and the absence of true competition with the related U.S. producer.  Those words

capture a broader concept of affiliated coordination than the Commission's narrower

formulation.  A foreign exporter may direct exports to the United States "so as not to

compete" with its related U.S. producer in ways other than the Commission's narrow

hypothetical of exporting only product types that the related U.S. producer does not

make.  Yet the Commission's approach effectively reads the example as limited to that

kind of product-line segregation.  Nothing in the words of the statute or the specific

example compels such a limitation.

The structure of the provision points in the same direction.  The first part of

section 1677(4)(B) allows that "related parties" may "in appropriate circumstances" be

excluded from the domestic industry.  19 U.S.C. § 1677(4)(B)(i).  However, to give that

first part meaning, the second part sets forth the circumstances in which "parties shall be considered to be related." 19 U.S.C. § 1677(4)(B)(ii). The first part of the statute is meaningless without the definitional second part. That structure suggests that once related-party status exists, the statute calls for a separate and distinct inquiry into whether exclusion is appropriate under the circumstances. However, the Commission's interpretation compresses that separate step into a much narrower inquiry of its own invention. If the producer was not somehow "shielded," exclusion is treated as disfavored or effectively foreclosed. That reading deprives the phrase "appropriate circumstances" of much of its independent force.

The Commission's narrow interpretation is also difficult to reconcile with the flexibility reflected in Congress's use of "may." Congress did not direct that a related producer must always be excluded; nor did it confine exclusion to a single rigid condition. Instead, Congress gave the Commission authority to exclude the producer "in appropriate circumstances." The best reading of that formulation is that the Commission must exercise judgment, within the bounds of the statute and legislative history, about each specific factual record. It is not that the Commission may replace the statutory standard with a single agency-created test that narrows the range of circumstances in which exclusion can be found appropriate.

To be sure, the Statement of Administrative Action notes that the Commission may use the provision "to reduce any distortion in industry data caused by the inclusion in the domestic industry of a related producer who is being shielded from the effects of the subject imports." Statement of Administrative Action for the Uruguay Round

- 16 -

Agreements Act, H.R. Rep. No. 103-316 (1994) ("SAA") at 858.  But even if the SAA

identifies one important application of the provision, it does not authorize the

Commission to replace the broader statutory phrase "appropriate circumstances" with its

own narrower controlling rule.  The SAA has provided another example of "appropriate

circumstances" that complements the one provided in the Senate Report.  The touchstone

remains the broad statutory concept of "appropriate circumstances," not any specific

examples from different parts of the legislative history.  As the Federal Circuit recently

reiterated, Commission practice cannot override the applicable statute.  *See In re United

States*, No. 2025-127, Slip Op. at 20–21 (Fed. Cir. Feb. 2, 2026).  At most, the SAA

supports the proposition that shielding is one important application of the provision. It

does not support the Commission's further step of treating shielding as the controlling

legal rule.

> **2.     The Commission uses circular reasoning that impermissibly narrows the statutory text**

The Remand Redetermination's reasoning, taken on its own terms, creates what is

effectively an unreviewable *per se* rule: whenever a related domestic producer's output is

replaced by affiliated subject imports for any reason, exclusion can never be appropriate.

*See* Remand Redetermination at 25. That result is illogical and contrary to the statutory

test of "appropriate circumstances."

The Commission's logic runs as follows.  First, it defines "competition" to include

any situation in which affiliated imports are substitutable for, and displace, the domestic

producer's output—regardless of whether the displacement results from a preplanned

- 17 -

corporate decision rather than arm's-length market forces. The specific reasons in a particular case for the displacement simply do not matter and are not addressed. Second, having thus found "competition," the Commission concludes that the domestic producer was not shielded and, therefore, the legislative example is inapplicable. Third, having found declining performance by the domestic producer as a result of the "competition," the Commission concludes that exclusion would mask injury, because the domestic industry's aggregate data would look less negative without the declining related party's numbers.

Each step of this syllogism follows inexorably from the preceding one but leads to an illogical result contrary to the statute. The result is that any time a foreign parent directs a change in its corporate strategy to replace its own affiliated domestic production with subject imports through a cooperatively organized coordinated phase down— essentially the very scenario of non-competition identified in the specific example provided by the legislative history—the Commission's framework will always yield the same answer: (a) the replacement constitutes "competition," (b) the domestic producer was not shielded, and (c) exclusion would mask injury. Under this reasoning, the specific example can never be satisfied in practice, because the Commission treats the defining feature of that example (coordinated replacement of domestic production with affiliated exports) as the very reason exclusion is inappropriate.

That circularity renders the related-parties provision a nullity for the category of cases Congress specifically identified as appropriate for exclusion. It is a basic canon of statutory construction that a statute should be interpreted so as to give effect to all of its

provisions.  *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) (courts must "give effect, if possible, to every clause and word of a statute") (internal citation omitted).  Similarly, legislative history should be read as a whole to give meaning to all the statutory terms.  The Commission's interpretation reads the specific example at issue here out of the statute entirely.  Under *Loper Bright*, this Court must independently evaluate whether the Commission's interpretation comports with the statute, and an interpretation that renders a specific congressional example inoperative cannot represent the "best reading" of the provision.  *See Loper Bright*, 603 U.S. at 400.  The Remand Redetermination should be rejected for this additional reason.

Accordingly, even apart from the Commission's failure to comply with the *Remand Order*, the Remand Redetermination should be rejected because it rests on an incorrect interpretation of § 1677(4)(B).  Under the best reading of the statute, the Commission may not substitute its own "shielding" rule for the broader "appropriate circumstances" standard enacted by Congress.

### C. The Commission's Inference That Affiliated Internal Replacement Constituted "Competition" with Greenwood Is Not Supported by Substantial Evidence

Even if the Commission's statutory interpretation of the relevant statutory language could be considered the "best" interpretation, its Remand Redetermination still cannot be sustained because its central factual inference is not supported by substantial evidence.  The governing standard requires more than citation to those facts that support the agency's preferred narrative.  Proper substantial evidence review requires consideration of the record as a whole, including evidence that "fairly detracts" from the

agency's conclusion, *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994), and asks whether the record contains evidence that "a reasonable mind might accept as adequate to support a conclusion." *Swiff-Train Co. v. United States*, 793 F.3d 1355, 1359 (Fed. Cir. 2015). Moreover, where the record contains significant contrary evidence bearing directly on the agency's inference of competition, the Commission must explain why, notwithstanding that contrary evidence, its conclusion still follows. *Suramerica*, *supra*; *Swiff-Train*, *supra*.

The Commission's key factual rationale is that because Fujifilm's affiliated imports "supplanted" Greenwood's domestic production, those imports necessarily were "competing" with Greenwood rather than being directed so as not to compete with Greenwood. On this evidentiary record, however, that conclusion does not reasonably follow from the facts the Commission itself acknowledges. Fujifilm pointed to numerous facts in the record and fundamentally contradicted any sense of competition. *See* Fujifilm's Remand Comments at 5-9 (C.R. 173R). Rather than actually address any of this evidence, the Commission's Remand Redetermination simply notes it and then repeats its mantra that imports replaced Greenwood volume. The mere fact that Fujifilm Greenwood closed and its volume was replaced by Fujifilm imports does not establish "competition," and does not address the contrary evidence the Commission tries to ignore.

        1.      **The integrated affiliated sales structure and centrally controlled restructuring negates the Commission's "competition" inference**

The evidentiary record shows a tightly integrated affiliated sales structure, not ordinary market competition between separate actors.  The evidentiary record establishes:

➢ Greenwood did not sell ALPs directly to unaffiliated U.S. customers. Rather, Greenwood sold 100 percent of its production to FNAC.

➢ Fujifilm Japan likewise sold 100 percent of its U.S.-bound exports to FNAC.

➢ Fujifilm China also sold 100 percent of its U.S.-bound exports to FNAC.

*See* Fujifilm's Remand Comments at 5 (P.R. 113R); SR at 5.5 (C.R. 163); Fujifilm Japan FPQR at I-7 (C.R. 71); Fujifilm China FPQR at I-7 (C.R. 73).  Thus, all relevant Fujifilm supply to the U.S. market—whether produced in Greenwood, Japan, or China—moved exclusively through the same affiliated U.S. sales channel.  That fact is central.  It means that the record does not show any independent sales efforts by Greenwood and Fujifilm's foreign affiliates competing head-to-head for U.S. customers.  Instead, it shows a single affiliated sales structure through which Fujifilm centrally managed and directed U.S. supply and sales efforts.

The Commission does not meaningfully engage with that contrary evidence. Rather, its response is simply that the focus of the injury analysis is the domestic industry, not FNAC, and that Greenwood's domestic production was replaced by subject imports.  Remand Redetermination at 20 n.57.  But that response does not satisfy the substantial evidence standard, particularly when FNAC and Greenwood were both under a single, centrally controlled corporate structure.  Under *Suramerica*, the Commission must take account of evidence that detracts from its preferred inference, not merely

acknowledge the existence of affiliated imports and move on.  Here, the affiliated single-channel sales structure directly detracts from the Commission's conclusion that the imports should be treated as ordinary market "competition" with Greenwood.  The Commission never explains why that structure does not materially undermine its inference.

The evidentiary record further shows that the sourcing shift at issue was planned and centrally directed before the POI.  FNAC explained that Fujifilm increased imports from Japan and China to replace supply from Greenwood and Tilburg after Fujifilm made a pre-POI global decision to rationalize production capacity.  Fujifilm's Remand Comments at 7–9 (P.R. 113R, C.R. 173R); SR at Table 3.12 (C.R. 163); Fujifilm's U.S. Producer QR at II-2a (Additional Explanation) (C.R. 72).  The Commission acknowledges Fujifilm's explanation but treats it as immaterial because the shift was detrimental to Greenwood.  Remand Redetermination at 24.  Yet that, again, does not answer the actual evidentiary question.  The issue is not whether the shift harmed Greenwood; it is whether the record supports the Commission's inference that the affiliated imports were "competing" with Greenwood, rather than being centrally directed as part of one coordinated sourcing transition.  The undisputed existence of a pre-POI corporate decision to reallocate supply among affiliated entities strongly undercuts the Commission's attempt to characterize the resulting imports as ordinary competition with Greenwood during the POI.  The Commission cannot simply acknowledge such contrary evidence and then adhere to its preferred conclusion without explaining why, notwithstanding that evidence, its conclusion still holds.

The Commission's conclusions unreasonably treat "supplanting" and "competition" as interchangeable without explaining why.  The Remand Redetermination claims that because the imports were "directly substitutable" for Greenwood's production and were "displacing that production," Greenwood was not shielded.  Remand Redetermination at 19–20.  But substitutability does not itself prove competition in the way the Commission assumes.  Products can be substitutable and still be deployed through a centrally managed affiliated sales structure in a manner that reflects coordinated internal sourcing rather than competition between distinct market actors.  The evidentiary record here—single affiliated sales arm, common ownership, and a preplanned sourcing shift—points strongly toward the former.  The Commission never adequately explains why those facts do not matter.

### 2.     The pricing evidence and absence of lost sales or revenues also contradict a finding of "competition"

Nor does the Commission meaningfully engage with record evidence about pricing that cuts against its theory of competition.  Fujifilm pointed to pricing data indicating that when FNAC shifted supply from Greenwood to Japan or China, the selling price to customers was often higher than the price previously charged for Greenwood-produced ALPs.  *See* FNAC's U.S. Importers' QR at Attachment C (C.R. 74); Fujifilm's Remand Comments at 6–7 (P.R. 113R).  The Commission dismisses that evidence in a brief footnote, stating that regardless of FNAC's sales prices, subject imports increasingly replaced Greenwood's production and Greenwood still declined and closed.  Remand Redetermination at 22–23 n.63.  That response is not a reasoned analysis of the

evidence.  If the Commission's theory is that the affiliated imports were somehow competing with Greenwood in the market, it was required to do more than brush aside record evidence suggesting that the pricing dynamics did not resemble ordinary undercutting or displacement through lower-priced competition.  Again, substantial evidence review requires consideration of what detracts from the agency's inference, not merely recitation of the inference itself.

The Commission likewise gives little weight to the absence of confirmed lost sales or lost revenues by Greenwood.  Fujifilm argued that the lack of such evidence was consistent with a centrally directed affiliated sourcing transition, rather than competition between Greenwood and imports.  SR at 5.15 (P.R. 89); Fujifilm's Remand Comments at 6 (P.R. 113R).  The Commission responds that even without reported lost sales or revenues, Greenwood's sales and revenues declined as its production was increasingly replaced by imports.  Remand Redetermination at 23.  But that only restates the result of the sourcing shift.  It does not explain why the result of that shift should be understood as "competition" rather than internal replacement.  Here again, the Commission never actually explains why these contrary facts do not matter.

### 3.    Purchaser testimony uniformly attributes the shift to Greenwood's closure, not import competition

The Commission's "competition" inference is further undermined by the direct testimony of purchasers—evidence the Remand Redetermination entirely ignores.  The Commission's Staff Report compiled responses from purchasers who reported purchasing subject imports instead of domestic product.  Of the 19 purchasers who confirmed

*NON-CONFIDENTIAL VERSION*

purchasing subject imports instead of domestic ALPs, only 2 stated that their decision

was based on price.  SR at Table 5.14 (C.R. 163).  The remaining 17 purchasers provided

explanations that overwhelmingly pointed to Fujifilm's closure of its Greenwood

facility—not lower-priced import competition—as the reason for their shift to subject

imports.

　　　The purchaser explanations are revealing.  [                              ] stated it

[                                                                                                    ]

[                              ] reported [

           ] [            ] likewise cited [                              ]

[                 ] explained: [


        ] [        ] stated: [

                   ] [              ] reported simply: [

           ]  SR at Table 5.14 (C.R. 163).

　　　This purchaser testimony constitutes significant contrary evidence that directly

detracts from the Commission's conclusion that affiliated imports were "competing" with

Greenwood's domestic production.  These are the actual market participants explaining,

in their own words, that the shift to subject imports occurred because Greenwood

closed—not because lower-priced imports displaced Greenwood in the marketplace.

Their testimony is entirely consistent with Fujifilm's explanation of a centrally directed

affiliated sourcing transition and entirely inconsistent with the Commission's

characterization of the import increase as market "competition."

- 25 -

Under the substantial evidence standard, the Commission cannot simply ignore this body of evidence. *See e.g., Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) (substantial evidence review requires consideration of "whatever in the record fairly detracts from" the agency's conclusion). The Remand Redetermination makes no mention of this purchaser testimony and provides no explanation of why the consistent, independent accounts from 17 of 19 purchasers do not undermine the Commission's preferred characterization of the sourcing shift as "competition." That omission is fatal to the Commission's finding under the substantial evidence standard.

To be sure, the possibility of drawing two inconsistent conclusions from the evidence does not by itself defeat an agency determination. But that principle does not rescue the Commission here. The argument is not that Fujifilm prefers a different inference. The argument is that the Commission has not shown a rational connection between numerous record facts it acknowledges and its ultimate conclusion that affiliated internal replacement somehow amounted to "competition" with Greenwood. The acknowledged facts are that all relevant Fujifilm supply to the U.S. market flowed through FNAC; Greenwood did not sell directly to unaffiliated U.S. customers; Fujifilm's sourcing shift was the product of a pre-POI corporate decision; the record included evidence that imported Fujifilm product often sold at higher prices than Greenwood product; and customer repeatedly pointed to Greenwood's closure as the reason for their switch, not competition. Those facts are inconsistent with the conclusion that the affiliated imports were somehow "competing" with Greenwood. At minimum, they required a fuller explanation than what the Commission has given.

That deficiency is especially important because the Commission's "competition" finding does so much work in the Remand Redetermination. It is the basis for the Commission's conclusion that the legislative example is inapplicable, for its conclusion that Greenwood was not shielded, and for its conclusion that exclusion would improperly mask injury. If the competition finding lacks substantial evidentiary support, the core of the remand analysis fails with it.

In the end, the Remand Redetermination reduces to the proposition that because Greenwood's domestic production was replaced by affiliated imports, those imports must have been competing with Greenwood. On this record, that proposition is not supported by substantial evidence. The record shows coordinated affiliated replacement through a single corporate sales channel, not the kind of ordinary market competition the Commission assumes. Because the Commission has not adequately explained why the facts it acknowledges reasonably support its contrary conclusion, the Remand Redetermination should be rejected.

### 4. The Commission's unexplained reversal on "primary interest" further undermines the "competition" finding

Aside from these specific facts in the record that undermine its conclusion, the Commission's conclusion that Greenwood was "competing" with subject imports is further undermined by the Commission's own unexplained reversal of position on whether Fujifilm's primary interest lay in domestic production or importation. At the preliminary stage of these investigations, the Commission found that "Fujifilm's primary interest appears to lie in importation." *Preliminary Determination* at 15 (P.R. 41). Yet at

- 27 -

the final determination, the Commission reversed course entirely, stating that Greenwood's "primary interest was in domestic production, until it ceased such production in March 2022." *Views* at 14 (C.R. 170). None of the underlying facts changed between the preliminary and final determinations. The same questionnaire responses, the same ownership structure, and the same preplanned global sourcing transition were on the record at both stages of the Commission's investigation.

The Remand Redetermination does not address this reversal. It does not acknowledge that the Commission previously reached the opposite conclusion on the same record. Nor does it explain why the facts that supported a finding of primary interest in importation at the preliminary stage suddenly supported the opposite conclusion at the final stage. That silence is legally significant. "When an agency changes its position suddenly and without explanation or does not take account of legitimate reliance on prior interpretation, the agency's action may be arbitrary, capricious or an abuse of discretion." *Amanda Foods v. United States*, 807 F. Supp. 2d 1332, 1343 (Ct. Int'l Trade 2011); *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency must provide a "reasoned explanation" for changing course).

This unexplained reversal directly detracts from the Commission's finding that Greenwood's primary interest was in domestic production and that the affiliated imports therefore were "competing" with that production. If the Commission itself concluded at the preliminary stage that Fujifilm's primary interest lay in importation, that finding is powerful evidence that the subsequent sourcing shift was not ordinary "competition," but

- 28 -

rather the execution of a corporate strategy in which importation—not domestic production—was the primary interest.  The Commission's failure to reconcile its own prior finding, or even to acknowledge it, renders its Remand Redetermination arbitrary and unsupported by substantial evidence on this point.

> **D.    The Commission's Renewed "Skewing" Analysis Remains Conclusory and Does Not Adequately Address the Actual Distortion Question, And So It Does Not Satisfy The Substantial Evidence Standard**

The Commission's separate rationale—that excluding Greenwood would "skew" the domestic industry data and "mask" injury—also cannot sustain the Remand Redetermination.  The Commission still has not adequately explained why exclusion of Greenwood would distort, rather than clarify, the domestic-industry analysis on the facts of this case.

On this issue the Remand Redetermination repeats the same basic proposition as the original determination: because Greenwood's production, shipments, market share, and financial performance declined while affiliated subject imports increased, excluding Greenwood would "mask declines in the domestic industry's performance caused by subject imports."  Remand Redetermination at 18, 23–24.  But that conclusion remains largely asserted, not explained.  The Commission still does not grapple with the critical distinction between removing Greenwood's data from the aggregate and showing that exclusion would distort the domestic-industry analysis.  As this court recently put the point in closely analogous circumstances, "{e}xclusion of data is not synonymous with skewing data." *Wabtec Corp.*, 805 F. Supp. 3d at 1345 (emphasis added).

That distinction is decisive here. The substantial evidence question is not whether exclusion would alter the domestic industry dataset; of course it would. The question is whether the Commission explained why that change would produce a more distorted picture of the domestic industry, rather than a more accurate one. The Remand Redetermination still does not answer that question. At most, it shows that excluding Greenwood would remove evidence of Greenwood's decline from the industry totals. But the Commission does not explain *why* the loss of that data would create distortion rather than eliminate it, given the very purpose of the related-parties provision – to permit exclusion of a related producer where appropriate.

That analytical gap is especially important on this evidentiary record. Greenwood ceased domestic production early in the period, and Kodak was the only continuing U.S. producer thereafter. The Commission itself now states that its affirmative injury determination was not really dependent on Greenwood's inclusion because the Commission's findings were based on the impact of subject imports on Kodak after Greenwood ceased production, particularly in 2023 and interim 2024. Remand Redetermination at 22–25. If that is so, then the Commission was required to explain more clearly and more completely why excluding Greenwood would nevertheless skew the relevant analysis. The Remand Redetermination does not do so. Instead, it advances two propositions that remain at odds: first, that Greenwood must remain in the domestic industry because excluding it would mask injury; and second, that the affirmative determination rested on Kodak anyway. *Id*. at 18 and 22–25. The Commission has not reconciled these inconsistent positions.

- 30 -

The Commission's treatment of "skewing" is also deficient because it assumes, rather than demonstrates, that Greenwood's decline should be treated as part of the relevant domestic-industry injury picture. But that is precisely the disputed point. Fujifilm's position has long been that Greenwood's domestic production should be excluded because the record reflects a centrally directed affiliated sourcing transition. If that argument has force, then the relevant distortion question is not whether Greenwood's decline disappears from the aggregate if Greenwood is excluded. The relevant question is whether **including** Greenwood in the domestic industry improperly injects into the industry data the effects of Fujifilm's internal affiliated sourcing decision, thereby distorting the analysis of the domestic industry that actually faced competition with subject imports in the market. The Commission never squarely addresses that question.

Instead, the Remand Redetermination continues to treat Greenwood's inclusion in the aggregate as self-evidently proper and Greenwood's exclusion as self-evidently distortive. That is not enough. As *Wabtec* correctly recognized, exclusion and skewing are not the same thing. 805 F. Supp. 3d at 1345. The whole point of the related-parties provision is that, in some cases, inclusion of a related producer may itself distort the industry data. The Commission, therefore, needed to explain why that concern was absent here, not merely why Greenwood's exclusion would change the aggregate numbers. The Remand Redetermination still does not engage with that actual issue.

The weakness of the Commission's analysis is underscored by its own description of the purpose of the related-parties provision. The Commission says the provision is meant to avoid distortion caused by including in the domestic industry a producer that is

- 31 -

benefitting from, or shielded from, subject imports by virtue of its affiliation.  Remand Redetermination at 13–14.  Yet when it turns to the "skewing" issue, the Commission simply assumes that including Greenwood creates no comparable distortion risk, even though Greenwood's situation was unlike Kodak's in a material respect: Greenwood was part of an affiliated structure in which domestic production was being replaced by affiliated subject imports through a single corporate sales channel.  Whether or not the Commission ultimately agreed with Fujifilm, that difference required analysis.  The Commission did not provide it.

Nor does the Commission meaningfully answer the practical distortion problem created by its own impact discussion.  If the Commission is correct that its affirmative determination rested on Kodak's experience after Greenwood's closure, then inclusion of Greenwood's earlier decline in the domestic-industry aggregate risks overstating the connection between overall industry decline and subject imports affecting Kodak.  Put differently, the Commission cannot simply say on the one hand that Kodak's condition was the main issue, while saying on the other hand that Greenwood's decline had to remain embedded in the domestic-industry dataset to avoid "masking" injury.  The Remand Redetermination still does not reconcile those competing propositions.

The Commission's analysis is, therefore, conclusory in a second sense: it identifies a consequence of exclusion—Greenwood's declining data would no longer be in the aggregate—but does not explain *why* that consequence is analytically improper. Exclusion under the related-parties provision necessarily changes the domestic-industry dataset.  That is the point of exclusion.  The Commission cannot justify inclusion merely

- 32 -

by noting that exclusion would alter the aggregated numbers.  It had to explain why the resulting dataset would be <u>skewed</u> in a way inconsistent with the statute.  As *Wabtec* makes clear, the former does not establish the latter.  805 F. Supp. 3d at 1345.  The Remand Redetermination still does not supply that reasoning.

The Commission's reliance on "masking" language, Remand Redetermination at 18, 23–24, does not cure the problem.  Whether exclusion would "mask" injury depends on defining the proper domestic industry in the first place and whether Greenwood's experience should remain part of that industry's data.  The Commission effectively assumes the answer to that antecedent question by treating Greenwood's decline as inherently part of the industry story.  Notwithstanding, where the very dispute is whether Greenwood should be excluded as a related party, that assumption cannot substitute for analysis.

In the end, the Commission's "skewing" rationale still reduces to this: Greenwood declined, therefore Greenwood must remain in the domestic industry so that the aggregate will continue to reflect Greenwood's decline.  *Wabtec* correctly rejects that logic.  Exclusion of data is not synonymous with skewing data.  805 F. Supp. 3d at 1345.  The Commission was required to explain why excluding Greenwood would create a distorted picture of the domestic industry, rather than prevent one.  Because the Remand Redetermination still does not adequately answer that question, its separate "skewing" rationale cannot sustain the result.

**II.    THE COMMISSION'S NEW "IMMATERIAL ANYWAY" RATIONALE IS POST HOC AND DOES NOT CURE THE ERRORS IN THE REMAND DETERMINATION**

Perhaps recognizing that it did not really comply with the Court's remand instruction, the Commission presents an alternative argument.  The Commission attempts to insulate its Remand Redetermination by asserting that Greenwood's inclusion in the domestic industry was ultimately immaterial because the Commission's affirmative injury determination rested on Kodak after Greenwood ceased production.  According to the Commission, "Fujifilm's inclusion in the domestic industry was immaterial to Commission's affirmative injury determinations," because the Commission's findings were based on the impact of subject imports on Kodak in 2023 and interim 2024.  Remand Redetermination at 24.  That argument, however, does not cure the defects in the Remand Redetermination discussed above.

As an initial matter, the Commission's immateriality discussion does not resolve the issue remanded by the Court.  The Court remanded because the Commission had not adequately supported its refusal to exclude Greenwood from the domestic industry under the related-parties provision.  The Commission, therefore, was required to provide a legally proper and factually supported related-parties analysis.  It could not avoid that obligation by asserting without any serious analysis, at the end of the Remand Redetermination, that the outcome supposedly would have been the same even if Greenwood had been excluded.  Whether the result might have been the same is not a substitute for properly following the Court's instructions on remand.

- 34 -

In addition, and importantly, "{a}n agency action must stand or fall on the grounds the agency itself invoked, and it may not be sustained on post hoc rationalizations supplied during judicial review." *Timken Co. v. United States*, 894 F.2d 385, 389 (Fed. Cir. 1990); *see also Baude v. United States*, 955 F.3d 1290, 1302 (Fed. Cir. 2020) (explaining that agency decisions are required to "stand on their own merit" as "{o}therwise, they cannot stand at all.") (citing *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 88 (1943)); *see also Align Tech., Inc. v. Int'l Trade Comm'n*, 771 F.3d 1317, 1324 (Fed. Cir. 2014) (finding that the reasoning offered by the Commission on appeal was an "improper post hoc rationalization").

The Commission's immateriality discussion cannot be reconciled with the rest of the Remand Redetermination. Throughout the Remand Redetermination, the Commission insists that Greenwood had to remain in the domestic industry because excluding Greenwood would skew the industry data and mask injury. *See* Remand Redetermination at 18, 23. But if Greenwood's inclusion truly was immaterial because the affirmative injury determination rested on Kodak alone after Greenwood closed, then the Commission's repeated insistence that Greenwood had to remain in the domestic industry becomes much harder to understand. The Commission cannot simultaneously argue, on the one hand, that Greenwood's inclusion was necessary to avoid distortion of the injury analysis and, on the other hand, that Greenwood's inclusion somehow made no difference to the outcome. Those propositions are at odds with each other, and the Remand Redetermination does not reconcile them.

The problem is not merely rhetorical. The Commission's own explanation confirms that Greenwood's inclusion and exclusion mattered to the way the Commission framed the case. The Remand Redetermination relies on Greenwood's decline to support the Commission's conclusions that Greenwood was not shielded, that the legislative example does not apply, and that exclusion would mask injury to the domestic industry. Having relied on Greenwood's inclusion in those ways, the Commission cannot simply say at the end of the analysis that Greenwood's inclusion was immaterial. The Commission's reasoning throughout the Remand Redetermination demonstrates the opposite: Greenwood's inclusion was central to the analytical path by which the Commission reaffirmed its original conclusion.

Moreover, the Commission's immateriality discussion appears to function as a form of harmless-error reasoning, but without the discipline that a more traditional harmless-error analysis requires. The Commission argues that its significant underselling and adverse-impact findings were based on Kodak's experience in 2023 and interim 2024, after Greenwood had ceased production. But even if those later Kodak-specific findings were important to the Commission's ultimate determination, that does not establish that the erroneous inclusion of Greenwood in the domestic industry was harmless. The domestic-industry definition is a threshold issue. It frames the domestic industry whose condition the Commission must analyze. If the Commission defined the domestic industry incorrectly, the fact that some later portions of its reasoning focused on Kodak does not automatically render the definitional error immaterial.

- 36 -

That point is especially important here because Fujifilm's position has never been limited to the proposition that Greenwood should be excluded as a matter of form. Fujifilm has argued that Greenwood's exclusion matters because the Commission's original volume, price, and impact analyses were fundamentally shaped by the inclusion of a related producer whose domestic production was being replaced through an affiliated sourcing transition. The Commission now responds that it "recognized" that subject imports' gain in market share reflected, in part, Fujifilm's sourcing shift and that its affirmative determinations instead rested on Kodak's competitive displacement. *See* Remand Redetermination at 25 n.71. But that response, again, assumes the answer to the underlying dispute. If Greenwood should have been excluded, then the Commission was required to assess injury using the correctly defined domestic industry from the outset. The Commission cannot show immateriality merely by pointing to selected portions of its original analysis that also discussed Kodak alone.

The Commission's immateriality discussion also fails because it appears only after the Commission has already reaffirmed the correctness of keeping Greenwood in the domestic industry. In that sense, this immateriality argument reads less like an independent analysis and more like a fallback justification. The Commission does not undertake a genuine alternative analysis assuming Greenwood's exclusion and then demonstrating that the same result would necessarily follow. This alternative analysis was not presented in the original determination, and was not presented in the Remand Redetermination. The Commission asserts without any serious analysis that the affirmative determination was based on Kodak anyway. That is not the same thing.

Without a full and explicitly stated alternative analysis based on a domestic industry consisting only of Kodak, the Commission's immateriality claim remains largely conclusory and without any properly analyzed evidentiary support.

Nor does the Commission's reliance on Kodak's later experience eliminate the prejudice flowing from the Commission's errors in the related-parties analysis. If the Court agrees that the Commission still misinterpreted the statute, still failed to justify its use of the legislative example, or still lacked substantial evidence for its conclusions regarding competition and skewing, then the Remand Redetermination cannot stand simply because the Commission also included a paragraph asserting that the outcome would have been the same. An agency may not avoid remand obligations by offering an unsupported assurance that its erroneous premise made no practical difference.

In the end, the Commission's "immaterial anyway" rationale does not cure the remand errors. It does not answer the question remanded by the Court, it is at odds with the Commission's repeated insistence that Greenwood's inclusion was necessary to avoid skewing and masking injury, and it does not rest on any genuine alternative analysis of a properly defined domestic industry. At most, it is a fallback assertion that selected portions of the original determination focused on Kodak. That is not enough to sustain the Remand Redetermination.

**CONCLUSION**

For all of the above reasons, this Court should find that the Commission's Remand

Redetermination cannot be sustained.

/s/ Daniel L. Porter

Daniel L. Porter
James P. Durling
William C. Sjoberg
Gina M. Colarusso
John Taishu Pitt

**Pillsbury Winthrop Shaw Pittman LLP**
1200 17th St, N.W.
Washington, D.C. 20036
202-663-8140

*Counsel for Fujifilm*

June 22, 2026

- 39 -

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word 365 using a proportionally spaced typeface 13-point Times New Roman font.

In accordance with the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that this brief complies with the word limitations set forth in the Chambers Procedures.  Specifically, excluding those exempted portions of the brief as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains 9,589.  In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Daniel L. Porter

Daniel L. Porter

**Pillsbury Winthrop Shaw Pittman LLP**
1200 17th St, N.W.
Washington, D.C. 20036
202-663-8140

*Counsel for Fujifilm*